**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NEW YORK IMMIGRATION COALITION, CASA DE MARYLAND, AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE, ADC RESEARCH INSTITUTE, and MAKE THE ROAD NEW YORK,<br><br>　　　Plaintiffs,<br><br>　v.<br><br>UNITED STATES DEPARTMENT OF COMMERCE; and WILBUR L. ROSS, JR., in his official capacity as Secretary of Commerce, and<br><br>BUREAU OF THE CENSUS, an agency within the United States Department of Commerce; and RON S. JARMIN, in his capacity as performing the non-exclusive functions and duties of the Director of the U.S. Census Bureau,<br><br>　　　Defendants. | Civil Action No. |

**COMPLAINT**

1.　　On March 26, 2018, Secretary of Commerce Wilbur Ross ordered that the 2020 Decennial Census include a question about the citizenship of all U.S. residents for the first time since 1950. The Secretary provided no legitimate reason for this decision, let alone any justification for taking such action without any of the customary and essential preparatory testing for adding questions to the Decennial Census. There is no legitimate explanation. Rather, the addition of the citizenship question is a naked act of intentional discrimination directed at immigrant communities of color that is intended to punish their presence, avoid their recognition, stunt their growing political power, and deprive them and the communities in which they live of economic benefits.

2.      As Secretary Ross recently testified, adding a citizenship question will lead to a "decline" in participation in the Decennial Census—which Ross estimated at 1 percent of the population (or more than 3 million people)—because there are "folks who may not feel comfortable answering" the citizenship question.

3.      The "folks" Secretary Ross referenced are members of immigrant communities of color who have been the target of a series of tactics by the Trump Administration designed to foment fear. These tactics—fueled by the Trump Administration's undisputed and undisguised animus directed towards these communities—have included draconian sweeps and other immigration enforcement actions at sensitive places such as schools and courthouses, the forced separation of parents from their children, and executive actions ending the legal status of entire categories of immigrants who have resided in the United States for years. All these actions have discouraged members of these communities from interacting with government agents or availing themselves of government services.

4.      Against this backdrop, the addition of a citizenship question to the Decennial Census—in essence, a door-to-door government inquiry as to the citizenship status of every member of every household in the United States—will sow enormous fear in immigrant communities of color that will deter participation in the 2020 Census, as Secretary Ross admitted. This will only exacerbate the Decennial Census' long-standing problem of undercounting immigrants of color, and Latinos in particular. The resulting undercount will impact both non-citizens and U.S. citizens of color, including family members of non-citizens and those who live in mixed status households with non-citizens.

5.      Because the Decennial Census is the basis for allocating a wide range of federal resources and apportioning political power, reduced census participation by members of immigrant communities of color will result in these communities losing government funding as well as political power and representation in the United States

Congress, the Electoral College, and state legislatures. This is not an unintended consequence of Defendants' decision; it is the very purpose. President Trump, Attorney General Sessions, and their senior advisers have made no secret of their fear of the growing political power of immigrant communities of color.

6.    Indeed, Defendants' discriminatory goals do not stop there. Even though the Constitution requires that all residents of each state be counted in apportionment calculations, proponents of adding a citizenship question to the Decennial Census maintain the express goal of using the citizenship information obtained from the Decennial Census to exclude non-citizens from legislative apportionment calculations. Defendants thus seek to facilitate the dilution of the constitutionally prescribed voting power for communities with higher percentages of non-citizens.

7.    The process that led to Defendants' addition of the citizenship question lays bare their illicit motives. Secretary Ross has publicly endorsed the Administration's anti-immigrant initiatives, and Secretary Ross and the Department of Commerce engaged in extraordinary violations of procedural and substantive regulations and guidelines governing the development of questions for the Decennial Census—regulations and guidelines that exist specifically to ensure that questions on the Decennial Census advance, rather than impede, the purpose of providing an actual enumeration of the U.S. population. And Secretary Ross and the Department of Commerce ignored the advice of the Census Bureau's professional staff, its scientific advisory committee, and six previous Census directors from both Republican and Democratic administrations, all of whom warned that adding such a question would exacerbate existing problems with lower response rates among certain communities.

8.    The sole justification that Defendants have mounted for their decision is transparently pretextual. Defendants claim that the addition was necessary because the Department of Justice ("DOJ") purportedly needs better data to enforce the Voting Rights Act ("VRA"). The VRA has been enforced by the government and private parties for

more than 50 years, with *no* citizenship question on the short-form Decennial Census. And for that same 50 plus years, DOJ has *never* had access to individual-level citizenship data. DOJ has provided no explanation, let alone any detailed analysis, as to why gathering citizenship data through the Decennial Census is suddenly necessary to enforcing the Voting Rights Act. It is not.

9.      The addition of the citizenship question will result in an inaccurate Decennial Census that will undermine and fail to achieve its constitutional objective: an actual enumeration of the United States' population. In his unprecedented abandonment of his constitutional mandate to conduct an actual enumeration of all people in the United States, Secretary Ross has violated and otherwise failed to abide by Constitutional, statutory, and regulatory mandates, as well as Census Bureau policy.

10.     The Decennial Census should not be weaponized to target disfavored groups. But that is exactly what the Trump Administration has done by adding a citizenship question. Because this decision was motivated by invidious discrimination, is inconsistent with the Constitution's mandate of an actual enumeration of the population, and is irrational, arbitrary, and capricious, the Court should declare it in violation of the Constitution and the Administrative Procedures Act and enjoin the inclusion of any citizenship question on the 2020 Decennial Census.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

12.     The declaratory and injunctive relief sought is authorized under 28 U.S.C. §§ 2201 and 2202.

13.     Venue in this district is proper under 28 U.S.C. § 1391(e)(1)(C) because Secretary Ross is a Defendant and is an Officer or Employee of the United States. As such, a civil action may be brought in any venue where "the plaintiff resides if no real property is involved in the action." This matter does not involve real property, and the

Plaintiff the New York Immigration Coalition has its principal place of business in the district of the United States District Court for the Southern District of New York.

## PARTIES

### A.   Plaintiffs

14.   The New York Immigration Coalition ("NYIC") is an umbrella policy and advocacy organization for more than 200 groups in New York State, representing the collective interests of New York's diverse immigrant communities and organizations. It has its principal place of business at 131 West 33rd St, New York, NY 10001.

15.   NYIC's mission is to unite immigrants, members, and allies so that all New Yorkers can thrive. It envisions a New York state that is stronger because all people are welcome, treated fairly, and given the chance to pursue their dreams. NYIC pursues solutions to advance the interests of New York's diverse immigrant communities and advocates for laws, policies, and programs that lead to justice and opportunity for all immigrant groups. It seeks to build the power of immigrants and the organizations that serve them to ensure their sustainability, improve people's lives, and strengthen New York State.

16.   NYIC's 200-plus members are dues-paying, 501(c)(3), nonprofit organizations that are committed to advancing work on immigrant justice, empowerment, and integration. NYIC's members are located throughout New York State and beyond. These member groups include grassroots community groups, social services providers, large-scale labor and academic institutions, and organizations working in economic, social, and racial justice. A number of NYIC's member organizations receive funding from a variety of local, state, and federal government sources to carry out social service,

health, and education programs.  Many of these organizations receive governmental

funding that is directly tied to the Decennial Census.[1]

17.     The differential undercount[2] caused by the addition of the citizenship

question in the 2020 Decennial Census will reduce the amount of federal funds that are

distributed to the states and localities within the states and localities where Latinos,

Asian-Americans, Arab-Americans, and other immigrant communities of color constitute

significant portions of the population. This will injure a number of NYIC's member

organizations that receive funding to carry out social service, health, and education

programs in these areas.

18.     As an organization, NYIC also has an ongoing commitment to promoting

engagement in the Decennial Census among individuals served by its member

organizations. For example, NYIC partnered with the New York Community Media

Alliance to launch an outreach campaign to boost immigrant participation in the 2010

Decennial Census. As part of that effort, NYIC coordinated public service

announcements in 24 languages that appeared in 69 newspapers. NYIC also held at least

two press briefings with elected officials. These efforts helped to increase New York

City's mail-in 2010 Decennial Census participation rate by approximately 3%.

19.     For the 2020 Decennial Census, NYIC has already begun its outreach

efforts. Since the beginning of 2018, it has helped form New York Counts 2020, a

growing, non-partisan coalition of more than 50 diverse organizational stakeholders

across New York to advocate for a fair and complete 2020 Decennial Census

enumeration. This broad-based coalition, which was formally launched in March 2018, is

composed of racial, ethnic, immigrant, religious, health, education, labor, housing, social

---

[1] U.S. Census Bureau, *Uses of Census Bureau Data in Federal Funds Distribution* 10 (2017), https://www2.census.gov/programs-surveys/decennial/2020/program-management/working-papers/Uses-of-Census-Bureau-Data-in-Federal-Funds-Distribution.pdf.

[2] The Census Bureau describes the undercounting of particular racial and ethnic groups as a "differential undercount," as distinct from a "net undercount" of the entire population.

services, and business groups working in partnership with state and local government officials.

20. NYIC is investing resources to solidify the work and reach of New York Counts 2020 through robust advocacy, outreach, and mass educational forums. It has already begun disseminating online petitions, petitioning Community Boards to pass resolutions for a fair and accurate count, and co-convening an all-day statewide conference, "Making New York Count in 2020." NYIC will continue coordinating the working committees of New York Counts 2020, including by: coordinating "train the trainer" sessions throughout the state to equip leaders with tools to educate their communities on the importance of the Decennial Census; devising effective messaging to convince hard-to-reach communities to participate; empowering coalition members to assist their communities in completing the Decennial Census online; and advocating to ensure that there are no unnecessary barriers impeding marginalized communities from being counted while also ensuring their privacy is protected.

21. In its extensive Decennial Census outreach, NYIC has already faced, and will continue to face, a much more difficult environment due to New York immigrant communities' heightened fear of interacting with government workers which will be increased by the addition of the citizenship question. This fear extends not only to undocumented immigrants or non-citizens with legal status, but also to family and household members of non-citizens who will be concerned that participating might endanger their loved ones.

22. Because of the heightened fear and suspicion created by the citizenship question, NYIC will be forced to expend more resources on their outreach efforts to try to reduce the effect of this question on the response rate in the immigrant communities they serve. Specifically, due to this strain on resources, NYIC is already fundraising to try to support its 2020 Decennial Census work. NYIC will need to apply for additional grants to sustain the increased need for Decennial Census outreach, further diverting its resources

that would otherwise be spent on trying to obtain grants for other areas. Further, NYIC has already, and will continue to, divert resources from its other organizational priorities, including its work on health care and language access issues.

23.     Plaintiff CASA de Maryland, Inc. ("CASA") is a nonprofit membership organization headquartered in Langley Park, Maryland. It has offices in Maryland, Virginia and Pennsylvania.

24.     CASA's mission is to create a more just society by increasing the power of and improving the quality of life in low-income immigrant communities. To advance this mission, CASA offers social, health, job training, employment, and legal services to immigrant communities. CASA serves nearly 20,000 people a year through its offices and provides support to additional clients over the phone and through email.

25.     CASA has more than 90,000 members in Maryland, Virginia and Pennsylvania, making it the largest membership-based immigrant rights organization in the Mid-Atlantic region. Over 32,000 of CASA's members reside in Prince George's County, Maryland, a jurisdiction where both the Latino and Central American immigrant population exceed both the national and state average. The differential undercount that will result from adding the citizenship question to the 2020 Decennial Census will result in a lower percentage of federal funding allocated to this jurisdiction, injuring CASA members who reside there. For example, CASA's members in Prince George's County include parents with children enrolled in Title I schools, and truck drivers who use the roads on a daily basis and thus depend on federal highway funds to perform their jobs.

26.     The differential undercount that will result from adding the citizenship question to the 2020 Decennial Census will also diminish the political power and influence of CASA's members in jurisdiction such as Prince George's County.  In jurisdictions such as Prince George's County where immigrant populations of color exceed both the national and state average, the differential undercount will cause immigrants of color to be placed in malapportioned congressional and state legislative

districts that have greater population than other districts in the same state. These communities, moreover, will comprise a lesser percentage of the total population of the congressional or state legislative district than they would but-for the differential undercount.

27.    CASA as an organization also receives governmental funding that is directly tied to the Decennial Census. Among other things, CASA receives Community Development Block Grant (CDBG) funds that are allocated based on population and demographics determined by the Decennial Census, including poverty levels. The differential undercount that will result from adding the citizenship question to the 2020 Decennial Census will result in a lower percentage of CDBG funds allocated to the areas that CASA serves, and therefore CASA will receive less of such funds as a result.

28.    CASA has an ongoing commitment to promoting engagement in the Decennial Census among its members and constituents. In the months leading up to and during the 2010 Decennial Census, CASA conducted outreach and engagement work with the immigrant community in its region concerning census participation. That work consisted of educating constituents about the Decennial Census, its importance to the community, and assisting individuals in answering the census questionnaire.

29.    For the 2020 Decennial Census, once again CASA plans on participating in outreach and education work and hopes to receive outside funding to help support this work. This time, however, CASA's efforts will be undermined by the Trump Administration's intentional effort to instill heightened fear of interacting with government workers among immigrant communities of color, including through the addition of the citizenship question. This fear extends not only to undocumented immigrants or non-citizens with legal status but also to family members of non-citizens, who will be concerned that participating in the Decennial Census might endanger their loved ones.

30.     Because of the heightened fear and suspicion created by the citizenship question, CASA will be forced to expend more resources on its Decennial Census outreach efforts to try to reduce the effect of this question on the response rate in the immigrant communities of color it serves. Specifically, CASA intends to invest more resources in communications, including through social media and videos to engage more people. Despite these efforts, CASA still expects it will need to interact with community members multiple times to answer questions and try to convince them to participate in the 2020 Decennial Census.

31.     CASA expects it will need to spend more resources to reach the same number of people as it did in 2010, and that ultimately it will be less successful in convincing its constituents to participate in the 2020 Decennial Census due in large part to the presence of the citizenship question.

32.     Because of the need to increase the time and money spent on Decennial Census outreach due to the addition of the citizenship question, CASA will need to divert resources from other areas critical to its mission, including job training and health outreach. Indeed, CASA has already had to divert resources from these areas in order to address concerns from its constituents stemming from the announcement of the citizenship question.

33.     Plaintiff American-Arab Anti-Discrimination Committee ("ADC") is a civil rights organization committed to defending and promoting the rights and liberties of Arab-Americans and other persons of Arab heritage. ADC is the largest American-Arab grassroots civil rights organization in the United States.

34.     Founded in 1980 by former Senator James Abourezk, ADC's objectives include combating stereotypes and discrimination against and affecting the Arab-American community in the United States, serving as a public voice for the Arab-American community in the United States on domestic and foreign policy issues, and educating the American public in order to promote greater understanding of Arab history

and culture. ADC advocates, educates, and organizes to defend and promote human rights and civil liberties of Arab-Americans and other persons of Arab heritage.

35.     ADC has several thousand dues-paying members nationwide, including members in all 50 states. Its members are also active through ADC's 28 local chapters, located in 20 states and the District of Columbia. ADC has members in states likely to either lose a congressional seat or not receive an additional congressional seat that the state otherwise would have gained during the post-2020 Decennial Census apportionment process as a result of the increased differential undercount that will occur in those states due to the addition of the citizenship question. These states include Texas, Arizona, and Florida, each of which has significant Latino, Arab-American, and immigrant populations.

36.     ADC also has members who live in states that use unadjusted Decennial Census figures to determine congressional and/or state legislative allocations. In jurisdictions such as San Antonio and Houston, Texas and Miami-Dade, Broward, and Orange Counties, Florida, the differential undercount will cause ADC's members to be placed in malapportioned congressional and state legislative districts that have greater population than other districts in the same state. These communities, moreover, will comprise a lesser percentage of the total population of the congressional or state legislative district than they would but-for the differential undercount.

37.     The differential undercount caused by the addition of the citizenship question in the 2020 Decennial Census will reduce the amount of federal funds that are distributed to the states and localities within the states and localities where Latinos, Asian-Americans, Arab-Americans, and other immigrant communities of color constitute significant portions of the population. This will injure ADC members who reside in these areas, such as San Antonio and Houston, Texas and Miami-Dade, Broward, and Orange Counties, Florida, Kings County, New York, and Prince George's County, Maryland. Its members will be harmed by the loss of federal funding tied to the Decennial Census due

to an increased differential undercount in these areas caused by the addition of the citizenship question, as all of these jurisdictions have Latino and immigrant populations greater than their respective state averages. For example, ADC has members in these jurisdictions with children enrolled in Title I schools and members who use the roads on a regular basis and thus depend in part on federal highway funds for their upkeep.

38.     As an organization, ADC is also committed to promoting engagement in the Decennial Census among its members and constituents. In the months leading up to and during the 2010 Decennial Census, ADC conducted outreach and engagement work with the Arab-American community concerning census engagement. That work consisted of creating messaging about participating in the Decennial Census that was focused on the Arab-American community, and efforts to "get out the count" in that community as well. Part of the financial support for conducting this outreach came from the federal government.

39.     For the 2020 Decennial Census, ADC has already begun its engagement work within the Arab-American community. In 2017, it focused on educating community members about the Decennial Census and its importance. This year, ADC will hold focus groups to test messaging about Decennial Census participation and will follow up with polling afterwards. As the Decennial Census draws nearer, ADC will conduct training for census enumerators, run advertisements encouraging participation, and hold a strategy symposium, among other activities.

40.     During the 2020 Decennial Census, ADC will face a much more difficult environment due to increased fear of interacting with government workers among the Arab-American community, a fear which will be heightened by the addition of the citizenship question. This fear extends not only to undocumented immigrants or non-citizens with legal status, but also to family and household members of non-citizens, who fear that participating in the Decennial Census might endanger their loved ones.

41.     Because of the heightened fear and suspicion created by the citizenship question, ADC will be forced to invest more resources in its Decennial Census outreach efforts to try to reduce the effect of the citizenship question on the response rate in the communities it serves. Specifically, ADC intends to invest more resources in messaging and communications to engage more people, but still expects that it will require increased interactions and contacts to try to convince its constituents to participate in the 2020 Decennial Census.

42.     ADC expects that if the citizenship question is introduced, it will need to spend more resources to reach the same number of people as it did in prior Decennial Censuses and that ultimately, it will be less successful in convincing its constituents to participate due to the presence of the citizenship question.

43.     Because of the need to increase the time and money spent on Decennial Census outreach caused by the addition of the citizenship question, ADC will need to divert resources from other areas critical to its mission, including organizing, issue advocacy efforts and educational initiatives. ADC has already had to divert resources from these areas to address an increase in concern from its constituents stemming from the announcement of the citizenship question.

44.     Plaintiff ADC Research Institute ("ADCRI") is a 501(c)(3) corporation founded in 1982 by former Senator James Abourezk. ADCRI sponsors public programs and initiatives in support of the constitutional and First Amendment rights of Arab-Americans, as well as research studies, publications, seminars, and conferences that document discrimination faced by Arab-Americans in the workplace, schools, media and government agencies. These programs also promote a better understanding of Arab cultural heritage by the public and policy makers.

45.     ADCRI is also committed to promoting engagement in the Decennial Census among its constituents. In the months leading up to and during the 2010 Decennial Census, ADCRI conducted outreach and engagement work with the Arab-

American community concerning census engagement. ADCRI has already begun such engagement work for the 2020 Decennial Census.

46.     This time, however, ADCRI will face a much more difficult environment due to increased fear in the Arab-American community of interacting with government workers due in part to the addition of the citizenship question. Because of this heightened fear and suspicion created by the citizenship question, ADCRI will be forced to invest more resources in its outreach efforts to try to reduce the effect of this question on the response rate in the communities it serves. As a result, ADCRI expects it will need more resources to reach the same number of people as it did in 2010 and that ultimately, it will be less successful in convincing its constituents to participate in the 2020 Decennial Census due in large part to the presence of the citizenship question.

47.     Because of the need to increase the time and money spent on Decennial Census outreach due to the addition of the citizenship question, ADCRI will need to divert resources from other areas critical to its mission, including its engagement with public school teachers and other educational issues. ADCRI has already needed to divert resources from these areas to address increased concerns by its constituents stemming from the announcement of the citizenship question.

48.     Plaintiff Make the Road New York ("Make the Road New York") is a nonprofit membership organization with offices and service centers in Brooklyn, Queens, Staten Island, Suffolk County, and White Plains.

49.     Make the Road New York's mission is to build the power of immigrant and working class communities to achieve dignity and justice. To achieve this mission, they engage in four core strategies: Legal and Survival Services, Transformative Education, Community Organizing and Policy Innovation.

50.     Make the Road New York has more than 22,000 members who reside in New York City, Long Island and Westchester County. These members lead multiple organizing committees across numerous issues and program areas of concern to the

organization. Members take on leadership roles in the campaigns, determine priorities, and elect the representatives who comprise most of the Board of Directors.

51.     The jurisdictions where Make the Road New York members reside, including New York City, have Latino immigrant populations that exceed the national and state averages. Make the Road New York also has members who live in jurisdictions with similar demographics in more suburban areas outside of New York City. Its members in these jurisdictions rely on a number of government services whose funding is allocated based on population and demographics determined by the Decennial Census. This includes parents with children enrolled in Title I schools, and drivers who use the roads on a daily basis and thus depend on federal highway funds to perform their jobs.

52.     The differential undercount caused by the addition of the citizenship question in the 2020 Decennial Census will reduce the political power of individual residing in area where Latinos, Asian-Americans, Arab-Americans, and other immigrant communities of color constitute significant portions of the population, and will reduce the amount of federal funds that are distributed to the states and localities within the states where Latinos, Asian-Americans, Arab-Americans, and other immigrant communities of color constitute significant portions of the population. Make the Road New York members reside in these areas, and thus its members will be deprived of political influence and funding to which they would be entitled by a more accurate census.

53.     One of the many Make the Road members who will suffer injury due to the addition of a citizenship question is Perla Lopez. Ms. Lopez is a resident of Queens County, NY, where she works as a Youth Organizer. Because the number of Latino and immigrant residents of Queens County far exceeds the New York state average, the differential undercount will cause Ms. Lopez and other Make the Road New York members in Queens to lose out on political power and funding that will instead go to other areas of New York State.

54.     As an organization, Make the Road New York receives governmental funding that is tied to the Decennial Census. For example, Make the Road New York receives funding through the Community Services Block Grant ("CSBG") program to fund adult literacy programs and legal services and outreach. Make the Road New York also receives funding to promote access to health care and education. The differential undercount that will result from adding the citizenship question to the 2020 Decennial Census will result in a relative reduction in funds allocated to areas that Make the Road New York serves, and therefore Make the Road will receive a comparative reduction of such funds.

55.     Make the Road New York has an ongoing commitment to promoting engagement in the Decennial Census among its members and constituents. In the months leading up to and during the 2010 Decennial Census, Make the Road New York conducted outreach and engagement work with the immigrant community in its region concerning census participation. That work consisted of educating constituents about the Decennial Census and its importance to the community.

56.     For the 2020 Decennial Census, Make the Road New York once again plans on participating in outreach and education work and hopes to receive outside funding to help support this work. This work will include, among other things, general education programs, workshops for members and door-to-door outreach. This time, however, Make the Road New York will face a much more difficult environment due to its constituents' heightened fear of interacting with government workers, which will be increased by the addition of the citizenship question. This fear extends not only to undocumented immigrants or non-citizens with legal status, but also to family and household members of non-citizens, who will be concerned that participating in the Decennial Census might endanger their loved ones. Make the Road New York has confirmed from conversations with several of its members that some of them would be

fearful of responding to the Decennial Census questionnaire if the citizenship question is added.

57.     Because of the heightened fear and suspicion created by the citizenship question, Make the Road New York will be forced to expend more resources on their Decennial Census outreach efforts to try to reduce the effect of this question on the response rate in the immigrant communities of color it serves. Additionally, because of the climate of fear that is being exacerbated by the addition of the citizenship question, Make the Road New York has started its census education work earlier than originally anticipated. Despite these efforts, Make the Road New York still expects it will need to interact with its constituents multiple times to answer questions and try to convince them to participate in the 2020 census.

58.     Make the Road New York expects that it will need to spend more resources to reach the same number of people and that ultimately it will be less successful in convincing its constituents to participate in the 2020 Decennial Census than in 2010 due in large part to the presence of the citizenship question.

59.     Because of the need to increase the time and money spent on Decennial Census outreach due to the addition of the citizenship question, Make the Road New York will need to divert resources from other areas critical to its mission including civic engagement, and providing legal services. Indeed, Make the Road New York has already had to divert resources from other areas in order to address concerns from its constituents stemming from the announcement of the citizenship question.

**B.     Defendants**

60.     Defendant United States Department of Commerce is a cabinet agency within the executive branch of the United States Government, and is an agency within the

meaning of 5 U.S.C. § 552(f). The Commerce Department is responsible for planning, designing, and implementing the 2020 Decennial Census.[3]

61.     Defendant Wilbur L. Ross, Jr. is the Secretary of Commerce. He oversees the Bureau of the Census ("Census Bureau") and is thus responsible for conducting the Decennial Census of the population.[4] He is sued in his official capacity.

62.     Defendant Census Bureau is an agency within, and under the jurisdiction of, the Department of Commerce.[5] The Census Bureau is the agency responsible for planning and administering the Decennial Census.

63.     Defendant Ron S. Jarmin is the Associate Director of the Census Bureau who is currently performing the nonexclusive functions and duties of the Director of the Census Bureau. He is sued in his official capacity.

## FACTS

**A.     Background on the Decennial Census**

### 1.     The Constitutional and Statutory Framework around the Decennial Census

64.     The U.S. Constitution requires the federal government to conduct a Decennial Census counting the total number of "persons"—regardless of citizenship status—residing in each state. The Constitution provides that Representatives "shall be apportioned among the several States . . . according to their respective Numbers," U.S. Const. art. I, cl. 2, § 3; which requires "counting the whole number of persons in each State," *id.* amend. XIV, § 2. To ensure fair representation among the states, the Constitution requires that this count be an "actual Enumeration" conducted every ten years.

---

[3] 13 U.S.C. § 4.
[4] 13 U.S.C. § 141(a).
[5] 13 U.S.C. § 2.

65.     Through the Census Act, Congress has assigned the responsibility of making this enumeration to the Secretary of Commerce, and created the Census Bureau within the Department of Commerce to spearhead this effort.[6] The Secretary has delegated authority for establishing procedures to conduct the census to the Census Bureau. The central constitutional purpose of the Census Bureau in taking the Decennial Census is to conduct an accurate enumeration of the population.

66.     Under these provisions, the Secretary of Commerce is charged with the responsibility to take a Decennial Census to create an actual enumeration of the United States population.[7] The Secretary's discretion in performing the census, however, is not without limits —the Secretary must comply with legal requirements established by the Constitution, statutes, and regulations governing the census. For example, the Secretary's decisions must be consistent with the "constitutional goal of equal representation" and that bear a "reasonable relationship to the accomplishment of any actual enumeration of the population."[8]

67.     To enable a person-by-person count, the Census Bureau sends a questionnaire to virtually every housing unit in the United States. The questionnaire is directed to every resident in the United States and, under 13 U.S.C. § 221, residents are legally required to respond. The Census Bureau then counts responses from every household to determine the population count in each state.

68.     The Census Bureau's constitutional obligation requires that the Census Bureau obtain as accurate an enumeration as possible by ensuring the maximum participation in the Decennial Census.

---

[6] 13 U.S.C. §§ 2, 4, 5, 141(a).

[7] 13 U.S.C. § 141(a).

[8] *Wisconsin v. City of New York*, 517 U.S. 1 (1996).

### 2. The Decennial Census' Role in the Apportionment of Political Representation and the Distribution of Federal Resources

69.     The population data collected through the Decennial Census determines the apportionment of seats in the U.S. House of Representatives among the states. Such apportionment is "based on total population," including both citizens and non-citizens.[9]

70.     The population data collected through the Decennial Census also determines the number of electoral votes each state has in the Electoral College.

71.     States also use Decennial Census data to draw congressional, state, and local legislative districts.

72.     All states use Decennial Census data to draw their congressional districts.[10] When drawing these districts, states must adhere to the U.S. Constitution's one-person, one-vote requirement that congressional districts within a state be equal in population.[11] Consequently, when a local community is disproportionately undercounted in the Decennial Census, the community will be placed in a malapportioned congressional district that has greater population than other congressional districts in the same state. The community, moreover, will comprise a lesser percentage of the total pop the community will be placed in a malapportioned congressional district that has greater population than other congressional districts in the same state. The community, moreover, will comprise a lesser percentage of the total population of the congressional district than it would but-for the differential undercount.

73.     Most states, including Florida, Texas, and New York, also use Decennial Census data to draw state legislative districts. Some states have state constitutional provisions prohibiting their state legislature from adjusting census data in drawing state legislative districts consistent with one-person, one-vote requirements.[12] And some

---

[9] *Evenwel v. Abbott*, 136 S. Ct. 1120, 1128-29 (2016).

[10] *Id.* at 1124.

[11] *Wesberry v. Sanders*, 376 U.S. 1 (1964).

[12] *See* Fla. Const. art. X § 8; Tex. Const. art III; § 26; *see also Reynolds v. Sims*, 377 U.S. 533, 559, 577 (1964); *Brown v. Thomson*, 462 U.S. 835, 842-43 (1983).

municipalities, including New York City, use Decennial Census data to apportion municipal legislative districts. Consequently, when a local community in any of these states is disproportionately undercounted in the Decennial Census, the community will be placed in a malapportioned legislative district that has greater population than other legislative districts in the same state. The community, moreover, will comprise a lesser percentage of the total population of the legislative district than it would but-for the differential undercount.

74.     The federal government also uses Decennial Census data to allocate hundreds of billions of dollars in public funding each year, including to states and local governments. A total of approximately $700 billion is distributed annually to nearly 300 different census-guided federal grant and funding programs. These funds determine the ability of state and local governments to provide for quality education, public housing, transportation, health care and other services, for all their residents, citizens and non-citizens alike.

**B.     The Decennial Census' Undercount of Immigrant Communities of Color and Past Practice of Excluding a Question Concerning Citizenship**

**1.     The Decennial Census' Historical Undercount of Immigrant Communities of Color**

75.     Some demographic groups have proven more difficult to count than others. The Census Bureau refers to these groups as "hard-to-count." Racial and ethnic minorities, immigrant populations, and non-English speakers have historically been some of the hardest groups to count accurately in the Decennial Census due to issues such as language barriers and distrust of government.

76.     The Census Bureau itself has determined that Latinos are at a greater risk of not being counted. Recent data shows that of the estimated 56.5 million Latinos living

in the United States, "roughly one in three live in hard-to-count census tracts [i.e., communities]."[13]

77.    Individuals identifying as Hispanic were undercounted by almost 5% in the 1990 Decennial Census, and though the number has decreased some over the past two censuses, it remains significant. The 2010 Decennial Census failed to count more than 1.5 million Hispanic and African-American individuals. Other immigrant communities, including Asian-Americans and Arab-Americans, have historically been undercounted as well.

78.    The Census Bureau describes the undercounting of particular racial and ethnic groups as a "differential undercount," as distinct from a "net undercount" of the entire population.[14]  Indeed, the population of the United States as a whole is typically over-counted. For example, in 2010, the total U.S. population was over-counted by approximately .01%, due mostly to duplicate counts of whites owning multiple homes.[15]

79.    Over time, the Census Bureau has developed a range of strategies to address the differential undercount of "hard-to-count" populations—including targeted marketing and outreach efforts, partnerships with community organizations, deployment of field staff to follow up with individuals who do not respond, and retention of staff with foreign language skills. In conjunction with prior Decennial Censuses, the Census Bureau designed and implemented public advertising campaigns to reach hard-to-count immigrant communities, including using paid media in over a dozen different languages to improve responsiveness.

80.    For the 2000 and 2010 Decennial Censuses, the Census Bureau partnered with local businesses, faith-based groups, community organizations, elected officials, and

---

[13] The Leadership Conference Education Fund, *Will You Count? Latinos in the 2020 Census* 1 (April 2018).

[14] *See* Coverage Measurement Definitions, Census.gov (last visited Jun. 2, 2018), https://www.census.gov/coverage_measurement/definitions/.

[15] Associated Press, *2010 Census Missed 1.5 Million Minorities,* CBS News, May 22, 2012, https://www.cbsnews.com/news/2010-census-missed-15-million-minorities/.

ethnic organizations to reach these communities and improve the accuracy of the count. These efforts and increased investment of resources in the 2000 and 2010 Decennial Censuses reduced the undercount of all populations, including hard-to-count populations.

### 2. The Census Bureau's Decades-Long Opposition to the Inclusion of a Citizenship Question on the Decennial Census

81. For decades, the Census Bureau opposed the inclusion of a question about citizenship status on the Decennial Census questionnaire based on its longstanding expert conclusion that the inclusion of such a question would impair accuracy, and exacerbate the undercounting of immigrant communities of color.

82. The question concerning citizenship did not appear on the short-form Decennial Census questionnaire sent to every household in the United States, in 1960, 1970, 1980, 1990, 2000, or 2010.

83. Prior to the 1980 Decennial Census, an interagency council tasked with examining the census questionnaire recommended that a citizenship question not be included on the 1980 Decennial Census questionnaire sent to every household in the United States.[16]

84. Similarly, in 1980, the Census Bureau opposed adding a citizenship question, stating that "any effort to ascertain citizenship will inevitably jeopardize the overall accuracy of the population count. . . . Questions as to citizenship are particularly sensitive in minority communities and would inevitably trigger hostility, resentment and refusal to cooperate."[17]

85. Prior to the 1990 Decennial Census, the Census Bureau once again opposed the addition of inquiries into immigration status in the Decennial Census.[18] The

---

[16] Aff. of Daniel B. Levine, Deputy Dir. of the Census Bureau at ¶ 5, Ex. A to Defs.' Mot. To Dismiss the Action or, in the Alt., for Summ. J., *Fed'n for Am. Immigr. Reform v. Klutznick*, No. 79-3269 (D.D.C. Jan. 9, 1983).

[17] *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 568 (D.D.C. 1980).

[18] *See Census Equity Act: Hearings Before the Subcomm. on Census & Population of the H. Comm. on Post Office & Civ. Serv.*, 101st Cong. 43–45, 59  (1989) (statement of C. Louis Kincannon, Deputy

then-Director of the Bureau testified before Congress that asking about citizenship or legal status could cause the Census Bureau to be "perceived as an enforcement agency" and that doing so would have "a major effect on census coverage."[19] He also told Congress that the Census Bureau believed that the addition of a citizenship question would cause immigrants and legal residents to "misunderstand or mistrust the census and fail or refuse to respond."[20]

86.     Similarly, the Census Bureau declined to include a question on citizenship in the 2000 and 2010 Censuses. In 2005, former Census Bureau Director Kenneth Prewitt testified that adding a citizenship question would reduce response rates by non-citizens and the accuracy of counts for both citizens and non-citizens would be worse if the question was included.[21]

87.     In 2009, eight former Census Bureau Directors—from both political parties—issued a statement in response to a congressional attempt to add a question on citizenship and immigration status to the 2010 Decennial Census. The former directors raised concerns that the Census Bureau would not have enough time to determine the effect of suggested questions concerning citizenship and immigration status on data quality and about the potential impact on participation in the 2010 Decennial Census of

---

Director, Census Bureau); Exclude Undocumented Residents from Census Counts Used for Apportionment: Hearing Before the Subcomm. on Census & Population of the H. Comm. on Post Office & Civil Serv., 100th Cong. 50–51 (1988) (testimony of John Keane, Director, Census Bureau) (hereinafter "Keane Testimony 1988").

[19] Enumeration of Undocumented Aliens in the Decennial Census: Hr'g Before the Subcomm, on Energy, Nuclear Proliferation, and Gov't Processes of the S. Comm. on Governmental Affairs, 99th Cong. 16, 23, 32 (1985) (statement of John Keane, Dir., Bureau of the Census).

[20] Keane Testimony 1988, *supra* n.18, at 50.

[21] Counting the Vote: Should Only U.S. Citizens Be Included in Apportioning Our Elected Representatives?: H'rg Before the Subcomm. on Federalism & the Census of the H. Comm. on Gov't Reform, 109th Cong. 72-73, 76-78 (2005) (statement of Kenneth Prewitt).

both legal and undocumented immigrants, particularly in mixed immigration status households.[22]

88.    In 2010, the Director of the Census Bureau explained that "we don't ask citizenship or documentation status" on the Decennial Census and that the form does not include "things that may make some people uncomfortable."[23]

89.    As recently as 2016, four former Census Bureau Directors appointed by presidents of both political parties filed a Supreme Court amicus brief in which they explained that "a [person-by-person] citizenship inquiry would invariably lead to a lower response rate to the Census in general," and would "seriously frustrate the Census Bureau's ability to conduct the only count the Constitution expressly requires: determining the whole number of persons in each state in order to apportion House seats among the states."[24]

90.    The almost 70-year long practice of not inquiring about citizenship on the Decennial Census has ensured that the Census Bureau has the best opportunity to achieve the constitutional mandate of a complete count of every person—both citizens and non-citizens—in the United States.

### 3.    Reliable Citizenship Data Gathered by the Census Bureau through Means Other than the Decennial Census Questionnaire

91.    Of course, the Census Bureau is able to gather citizenship data through surveys, but it does so separate and apart from the Decennial Census' actual enumeration of the population.

---

[22] Vincent P. Barabba, et al., *Statement of Former Census Directors on Adding a New Question to the 2010 Census* (Oct. 16, 2009), https://reformimmigrationforamerica.org/wp-content/uploads/2009/10/thecensusproject.org_letters_cp-formerdirs-16oct2009.pdf.

[23] *Video of Robert Groves*, C-SPAN (Mar. 26, 2010), https://www.c-span.org/video/?292743-6/2010-us-census&start=1902.

[24] Brief of Former Directors of the U.S. Census Bureau as Amici Curiae Supporting Appellees at 25, *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016).

92.     Through the 2000 Decennial Census, the Census Bureau also used a second, "long form" questionnaire, which was sent to approximately one in six households, and which contained additional questions. From 1970 to 2000, one of the questions on the long form questionnaire concerned citizenship status.

93.     Beginning in 2010, the long form Decennial Census questionnaire was discontinued. Its functions were replaced by the American Community Survey ("ACS"), which began operating in 2000 and was at full sample size for housing units in 2005, and for group quarters in 2006. The ACS is a yearly survey of approximately 2% of households across the United States (about 3.5 million). Unlike the Decennial Census, the ACS is not a hard count, but rather a sample that is used to generate statistical estimates, and which can be adjusted to correct for an undercount. Although the ACS survey is conducted annually, ACS data from individual years can also be aggregated in multi-year estimates (referred to as "3-year" or "5-year" estimates," depending on the number of years of data aggregated together) to produce greater levels of statistical precision for estimates concerning smaller geographical units.

94.     As the Census Bureau points out, the Decennial Census and ACS "serve different purposes." While the Decennial Census is intended to "provide an official count of the entire U.S. population to Congress," the ACS is intended to provide information on the social and economic needs of communities.[25]

95.     A question concerning citizenship status currently appears as among one of more than 50 questions on the detailed 28-page ACS questionnaire. The citizenship question that appears on the ACS is not a simple binary yes/no question. Rather, for U.S. citizens, it also asks more detailed information about a person's place of birth; and for some U.S. citizens, it also requests information about the citizenship status of their

---

[25] *ACS and the 2020 Census*, U.S. Census Bureau (last updated Jan. 12, 2018), https://www.census.gov/programs-surveys/acs/about/acs-and-census.html.

parents, and whether they became a U.S. citizen by naturalization. The ACS citizenship question appears as follows:



96.     The citizenship information gathered through the ACS surveys has been, and continues to be, used by a wide array of local, state, and federal agencies, as well as civic organizations and researchers.

97.     The inclusion of a citizenship question on the ACS questionnaire does not implicate the same concerns as including a citizenship question on the Decennial Census. The highly detailed ACS questionnaire, which is sent only to a smaller representative sample of the population, does not carry the same appearance as a federal door-to-door inquiry of the entire population of the United States. Moreover, unlike the Decennial Census, which is a hard count of the population that cannot be adjusted statistically to account for non-respondents, population data from the ACS is based on a sample that may be adjusted statistically to produce reliable estimates for the larger population.

**C.     Advocacy Efforts by Members and Associates of the Trump Administration to Add a Citizenship Question to the Decennial Census in Response to the Growing Political Power of Immigrant Communities of Color**

98.     For years, individuals who are now members and associates of the Trump Administration have expressed concern about the presence and growth of immigrant communities of color in this country and their attendant political power, and have

advocated adding a citizenship question to the Decennial Census for the express purpose of facilitating efforts to reduce the political clout of those communities.

99.    For example, when Christopher Stanley, President Trump's Census Bureau Chief of Congressional Affairs, served as a senior legislative aide to former Senator David Vitter, Vitter sponsored legislation in 2010, 2012, and again in 2014 seeking to add a citizenship question to the Decennial Census. Vitter said he wanted to prevent "large populations of illegals [from being] rewarded" in congressional apportionment.[26]

100.    Trump Administration advisors on the issues of elections and voting— including members of President Trump's appointees to his now-defunct Presidential Commission on Election Integrity ("PCEI"), made repeated statements to the same effect. For example, PCEI Commissioner Hans von Spakovsky said adding the citizenship question was "essential,"[27] and criticized inclusion of non-citizens in the census, complaining that it "dilutes the votes of citizens by including large numbers of ineligible individuals such as noncitizens . . . [in] redistricting, allowing them to manipulate and gerrymander legislative districts."[28]

101.    President Trump's PCEI Vice-Chair, Kansas Secretary of State Kris Kobach, is an anti-immigrant zealot who says that he proposed to President Trump that he add a citizenship question to the Decennial Census "shortly after he was inaugurated"

---

[26] Jonathan Tilove, *Census Bureau knocks Sen. David Vitter's proposal to ask about immigration status*, Times-Picayune, Oct. 13, 2009,
http://www.nola.com/politics/index.ssf/2009/10/census_bureau_knocks_sen_david.html.

[27] Hans A. von Spakovsky, *Commentary: Citizenship Question Essential for Accurate U.S. Census*, Orlando Sentinel, Feb. 19, 2018, http://www.orlandosentinel.com/opinion/os-ed-accurate-census-important-front-burner-20180214-story.html.

[28] Hans A. von Spakovsky, *Evenwel v. Abbott: Destroying Electoral Equality and Eroding "One Person, One Vote,"* CATO SUPREME COURT REVIEW 2016,
https://object.cato.org/sites/cato.org/files/serials/files/supreme-court-review/2016/9/2016-supreme-court-review-chapter-4.pdf.

in January 2017. Kobach reports that President Trump "absolutely was interested in this."[29]

102.    In January 2018, Kobach blogged that adding a citizenship question to the Decennial Census was for the express purpose of draining political representation from immigrant communities. He complained that currently when "congressional districts are drawn up . . . not only are legal aliens counted, but illegal aliens are counted too," and that having this information was necessary "so Congress [can] consider excluding illegal aliens from the apportionment process" and reduce the political power of those communities, as well as to provide the government "information about the movement of people in and out of the country."[30] Kobach's blog post did not mention VRA enforcement as any reason for adding a citizenship question to the Decennial Census.

103.    And at about the same time as Kobach was pitching the citizenship question to President Trump, Chair of the White House Domestic Policy Council, Andrew Bremberg, released a draft Executive Order proposing census questions to determine immigration and citizenship status.[31]

104.    The Administration's hostility towards immigrants is motivated by animus toward people of color and is in response to the growing political power of immigrant communities of color. The vast majority of immigrants in the United States— approximately 86.7%—are people of color and 44.9% are of Latino origin.[32]

---

[29] Bryan Lowry, *That citizenship question on the 2020 Census? Kobach says he pitched it to Trump*, Kansas City Star, Mar. 27, 2018, http://www.kansascity.com/news/politics-government/article207007581.html.

[30] Kris Kobach, Exclusive—Kobach: Bring the Citizenship Question Back to the Census, Breitbart, Jan. 30, 2018, http://www.breitbart.com/big-government/2018/01/30/exclusive-kobach-bring-citizenship-question-back-census/.

[31] Bremberg, Memorandum for the President, Subject: Executive Order on Protecting Taxpayer Resources by Ensuring Our Immigration Laws Promote Accountability and Responsibility (Jan. 23, 2017), http://apps.washingtonpost.com/g/documents/national/draft-executive-orders-on-immigration/2315/.

[32] 2016 State Immigration Data Profiles, Migration Policy Institute (June 1, 2018), https://www.migrationpolicy.org /data/state-profiles/state/demographics/US.

105.    The goal of reducing the political representation of immigrant communities of color is consistent with xenophobic rhetoric that immigration should be restricted because of the political consequences.[33] For example, Mark Krikorian, the Executive Director of the Center for Immigration Studies—a leading source for Trump Administration immigration policy and personnel—warned in 2015 that:

> immigrants and their adult children are disproportionately big-government liberal who vote heavily Democrat because that party's policies accord with their own views and interests…. Note that better control over illegal immigration—walls, mass deportations, whatever— isn't going to fix this. Most immigration is legal immigration and that's where change is most needed.[34]

106.    President Trump has similarly complained about the growth of immigrant communities of color. For example, on August 21, 2015, then-candidate Trump tweeted, "How crazy - 7.5% of all births in U.S. are to illegal immigrants, over 300,000 babies per year. This must stop. Unaffordable and not right!"[35] Just weeks before the election, candidate Trump similarly lamented that immigrants "as a share of national population is set to break all records."[36]

107.    More recently, on April 5, 2018, President Trump criticized current U.S. immigration policy because in his view, it enhanced the political power of immigrant communities of color, saying:

> we cannot let people enter our country… through chain migration….This is what the Democrats are doing to you. And they like it because they think they're going to vote Democratic….

---

[33] *See* Jason Richwine, *More Immigration Would Mean More Democrats*, National Review (Oct. 3, 2017) https://www.nationalreview.com/2017/10/immigration-democratic-party-republican-party-dream-act-party-affiliation-conservatives-limited-government-traditional-values/; *and* Gillian Edevane, *Trump Laments People In Migrant Caravan: Immigrants All 'Vote For Democrats,'* Newsweek, Apr. 30, 2018, http://www.newsweek.com/trump-laments-caravan-immigrants-vote-democrats-906220.

[34] Mark Krikorian, *Mass Legal Immigration Will Finish Conservatism,* National Review, Aug. 31, 2015, https://www.nationalreview.com/2015/08/real-threat-conservatism-isnt-trump-mark-krikorian/.

[35] Donald Trump (@realDonaldTrump), Twitter (Aug. 21, 2015 6:56 AM), https://twitter.com/realdonaldtrump/status/634725641972248576.

[36] Los Angeles Times Staff, *Transcript: Donald Trump's full immigration speech, annotated*, L.A. Times, Aug. 31, 2016, http://www.latimes.com/politics/la-na-pol-donald-trump-immigration-speech-transcript-20160831-snap-htmlstory.html.

A lot of them aren't going to be voting. A lot of times it doesn't matter, because in places, like California, the same person votes many times. You probably heard about that. They always like to say. 'Oh, that's a conspiracy theory.' Not a conspiracy theory, folks. Millions and millions of people.[37]

108.    Again, on April 28, 2018, President Trump said:

If a person puts their foot over the line, we have to take them into our country. We have to register them…. And you know, one of the reasons they do it is because the Democrats actually feel and they are probably right, that all of these people that are pouring across are going to vote for Democrats, they're not going to vote for Republicans, they're going to vote no matter what we do, they're going to vote.[38]

109.    President Trump's repeated statements lamenting the growth of immigrant communities of color and their attendant political power dovetail with his repeated denigration of non-white immigrants; characterizing them as violent criminals and terrorists, animals, and deadbeats; and calling for steps that would prevent immigrants of color from entering and/or to reduce their numbers within the United States. To take just a few examples:

- In launching his presidential campaign, Trump said: "When Mexico sends its people. . . . They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists. . . . It's coming from more than Mexico. It's coming from all over South and Latin America."[39]

- Repeatedly over the course of his campaign, Trump characterized the U.S. citizen children of immigrants as "anchor babies" [40] and vowed to seek an end to "birthright citizenship."[41]

---

[37] Donald Trump, Remarks by President Trump at a Roundtable Discussion on Tax Reform (Apr. 5, 2018), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-roundtable-discussion-tax-reform/.

[38] Draft Transcript, Donald Trump, Make America Great Again Rally in Washington, Michigan (Apr. 28, 2018), https://factba.se/transcript/donald-trump-speech-maga-rally-washington-michigan-april-28-2018

[39] Full text: Donald Trump announces a presidential bid, Wash. Post, June 16, 2015, https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/?noredirect=on&utm_term=.0a30b7ba1f8a.

[40] Reena Flores, *Donald Trump: "Anchor babies" aren't American citizens*, CBS News, Aug. 19, 2015, https://www.cbsnews.com/news/donald-trump-anchor-babies-arent-american-citizens/.

- Trump called for "a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what the hell is going on . . . [O]ur country cannot be the victims of horrendous attacks by people that believe only in Jihad. . ."[42]

- On February 27, 2017, during a meeting with his advisors on the night before he would deliver his first address to Congress, President Trump "recited a few **made-up Hispanic names** and described potential crimes they could have committed, such as rape or murder." His advisors "[Stephen] Miller and [Jared] Kushner laughed."[43]

- On January 11, 2018, in a meeting with members of Congress, President Trump questioned why immigrants were being admitted from El Salvador, Haiti, and Africa, asking "why are we having all these people **from shithole countries** come here." In contrast, Trump said he preferred **immigrants "from places like Norway**."[44]

- As to the immigration diversity lottery, which provides visas to immigrants from countries with low rates of immigration to the U.S., President Trump stated in February 2018 that those selected "turn out to be horrendous. . . . They're **not giving us their best people**, folks."[45]

- On May 16, 2018, President Trump said "We have people coming into the country, or trying to come in. . . You wouldn't believe how bad these people are. These aren't people, these are **animals** …."[46]

---

[41] C. Brodesser-Akner & B. Johnson, *Trump: I'll sue to revoke birthright citizenship*, NJ.com, Aug. 22, 2015,
http://www.nj.com/politics/index.ssf/2015/08/trump_revoke_us_citizenship_from_those_with_undocu.html

[42] Jenna Johnson, *Trump calls for 'total and complete shutdown of Muslims entering the United States,'* Wash. Post., Dec. 7, 2015, https://www.washingtonpost.com/news/post-politics/wp/2015/12/07/donald-trump-calls-for-total-and-complete-shutdown-of-muslims-entering-the-united-states/?utm_term=.49b5e0e287f7.

[43] Josh Dawsey and Nick Miroff, *The Hostile Border between Trump and the Head of DHS*, Wash. Post, May 25, 2015, https://www.washingtonpost.com/politics/were-closed-trump-directs-his-anger-over-immigration-at-homeland-security-secretary/2018/05/24/4bd686ec-5abc-11e8-8b92-45fdd7aaef3c_story.html?utm_term=.fa5ec642b4a3.

[44] Ryan Teague Beckwith, *President Trump Called El Salvador, Haiti 'Shithole Countries'; Report*, TIME Magazine, Jan. 11, 2018, http://time.com/5100058/donald-trump-shithole-countries/.

[45] Dara Lind, *"The Snake": Donald Trump brings back his favorite anti-immigrant fable at CPAC*, Vox, Feb. 23, 2018, https://www.vox.com/policy-and-politics/2018/2/23/17044744/trump-snake-speech-cpac.

[46] Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. Times, May 16, 2018, https://www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html.

110. Consistent with his rhetoric, the Trump Administration has undertaken to reduce the number of immigrants of color in this country. Its actions include:

- Banning individuals from six majority Arab and/or Muslim countries from entering the United States;

- Rescinding the Deferred Action for Childhood Arrivals ("DACA") program, which allowed 800,000 individuals brought to this country as children to legally reside and work in the United States. Over 90% of the participants in the program were Latino;

- Rescinding Temporary Protected Status programs for individuals from El Salvador, Honduras, Nicaragua, Haiti, and Nepal. These programs had allowed over 310,000 individuals from these countries to reside legally in the United States.

- Calling to end the diversity visa lottery. Over 40 % of individuals admitted to the United States through the diversity visa program are from Africa, while another 30% are from Asia.

- Proposing to end family-based immigration. The countries that send the highest number of immigrants to the United States through family-based migration are in Latin America and Asia.

**D.    The Trump Administration's Addition of a Citizenship Question to the 2020 Decennial Census Questionnaire Was Motivated by Discriminatory Animus against Immigrant Communities of Color**

111. The primary purpose of the Administration's unnecessary last-minute addition of a citizenship question was to harm Latinos and immigrants of color by reducing their political representation and access to federal resources. The evidence, just from public sources, is overwhelming. It includes: (1) the impact of adding the citizenship question on immigrant communities of color, both in terms of stoking fears of government among immigrants of color and reducing the political representation and access to resources in their communities; (2) the historical background of the decision to add the citizenship question, including other decisions by Secretary Ross to undermine measures that the Census Bureau has typically taken to mitigate the differential undercount; (3) the rushed and highly unusual sequence of events that led to the decision, including departures from procedural and substantive guidelines to test census questions

before implementation, ensure the overall accuracy of the Decennial Census enumeration, and protect the census from undue political influence; and (4) contemporaneous public statements by Trump Administration officials, allies, and the Trump campaign indicating that the purpose of adding a citizenship question to the Decennial Census was to reduce the political clout of immigrant communities of color.[47]

### 1. The Impact of Adding a Citizenship Question to the Decennial Census on Immigrant Communities of Color

112. As described, *supra*, for decades under both Republican and Democratic administrations, the Census Bureau has consistently opposed the addition of a citizenship question to the Decennial Census questionnaire due to concerns that such a question would deter participation among Latinos and immigrants, and thereby undermine the accuracy of the Decennial Census enumeration. The overwhelming consensus of professional demographers, political scientists, and statisticians is that the inclusion of a question on citizenship in the Decennial Census will cause many Latinos and immigrants of color not to respond to the questionnaire, exacerbating the differential undercount, and thus reducing the political representation and access to resources for members of these groups and others who live in the same communities.

### a. The Climate of Fear of Government among Latino and Immigrant Communities Created by the Trump Administration

113. Particularly when coupled with the toxic anti-immigrant environment the Trump Administration has fomented, adding a citizenship question to the Decennial Census will sow significantly more fear among Latinos and other immigrant communities of color.

114. For example, the Trump Administration has engaged in a series of high profile immigration enforcement actions— sweeps, raids, and high profile arrests—

---

[47] *See Village of Arlington Heights v. Metropolitan Housing Development Corp*, 429 U.S. 252 (1977) (setting forth the factors for assessing claims alleging invidious purpose).

deliberately intended to promote fear in and among immigrant communities of color. These include:

- Starting on February 6, 2017, less than three weeks after President Trump's inauguration, ICE conducted a nationwide sweep by its Los Angeles, Atlanta, Chicago, New York and San Antonio field offices, resulting in 680 detentions.

- In September 2017, the Administration launched "Operation Safe City" which involved mass arrests of 450 individuals in Baltimore, Chicago, Denver, Los Angeles, New York, Philadelphia, Seattle, Washington, D.C., and Massachusetts.

- In April 2018, ICE raided a meatpacking plant in Morristown, Tennessee and detained 97 individuals, the largest workplace raid in a decade. According to press reports, during the raids ICE indiscriminately detained numerous Latino individuals who had authorization to work.

115.    The Trump Administration's enforcement actions specifically target Latinos and immigrants of color. Of the 226,119 ICE removals during FY 2017, 93.48% of individuals deported were from Latin American countries.[48]

116.    The Trump Administration's enforcement actions also target immigrants during interactions with government agencies. For example, Immigration and Customs Enforcement ("ICE") has begun summarily deporting individuals who reported for routine check-ins—even where they had received stays of deportation—and making "collateral arrests" of individuals ICE encountered during operations targeting other individuals.

117.    As one of his first actions following his confirmation as Secretary of the Department of Homeland Security ("DHS"), on February 20, 2017, John Kelly issued a memorandum providing that DHS will "no longer afford Privacy Act rights and

---

[48] _Fiscal Year 2017 ICE Enforcement and Removal Operations Report, U.S. Immigration and Customs Enforcement (June 1, 2018), https://www.ice.gov sites/default/files/documents/Report/2017/ iceEndOfYearFY2017.pdf.

protections to persons who are neither U.S. citizens nor lawful permanent residents."[49] Previous DHS policy and numerous DHS programs expressly provided assurances to immigrants and applicants that their personal data would be protected and could not be used for immigration enforcement purposes.

118.    ICE has also engaged in high profile arrests of immigrants in "sensitive locations," including government venues previously considered safe spaces, including detaining:

- Parents after they drop off their children at schools;

- A ten-year-old child who was seeking medical care in a hospital;

- A woman in a hospital who was awaiting emergency surgery for brain cancer;

- Patients as they leave hospitals after seeking medical care;

- People in courthouses, including victims of domestic violence seeking protective orders or appearing at a custody hearing;

119.    The Immigrant Defense Project documented a 1,200% increase in ICE arrests at courthouses in New York State between 2016 and 2017.[50]

120.    These enforcement activities in sensitive spaces have been accompanied by the Trump Administration's public statements reinforcing the message that immigrant communities of color should fear the government. For example:

- On June 13, 2017, Acting ICE Director Thomas Homan testified in front of the House Appropriations Committee's Subcommittee on Homeland Security that "every immigrant in the country without papers . . . should be uncomfortable. You should look over your

---

[49] JOHN KELLY, ENFORCEMENT OF THE IMMIGRATION LAWS TO SERVE THE NATIONAL INTEREST at 5 (Feb. 20, 2017), *available at* https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf (hereinafter "Kelly, Enforcement of Immigration Laws").

[50] Immigrant Defense Project, *IDP Unveils New Statistics & Trends Detailing Statewide ICE Courthouse Arrests in 2017,* (Dec. 31, 2017), https://www.immigrantdefenseproject.org/wp-content/uploads/ICE-Courthouse-Arrests-Stats-Trends-2017-Press-Release-FINAL.pdf.

shoulder. And you need to be worried. . . . No population is off the table. . . ."[51]

- On August 22, 2017, Homan again stated: "The message is clear: If you're in the United States illegally, if you happen to get by the Border Patrol, someone is looking for you. And that message is clear."[52]

- On May 7, 2018, Attorney General Sessions announced a "zero tolerance" policy, including separating children from parents who cross the border unlawfully.[53]

- On May 22, 2018, Secretary of Education Betsy DeVos testified in Congress that public schools can choose to call ICE to report potentially undocumented students, describing it as a "local community decision."[54]

121.    These actions and statements by the Trump Administration have been successful in instilling fear among Latinos and other immigrant communities of color. Immigrants of color more broadly are now avoiding interactions with public institutions, even when it concerns their own personal health or safety or the well-being of their children.

122.    For example, a 2017 survey of judges, law enforcement personnel, prosecutors, and victims' advocates conducted by the American University National Immigrant Women's Advocacy Project found marked increases in fear among

---

[51] Hearing on the ICE and CBP F.Y. 2018 Budget Before the Subcomm. on Homeland Security of the H. Comm. on Appropriations, 115th Cong. (2017) 2017 WLNR 18737622.

[52] Press Release, The White House Office of the Press Secretary, Press Gaggle by Director of Immigration and Customs Enforcement Tom Homan et al. (June 28, 2017).

[53] *See* Jeff Sessions, Attorney General Sessions Delivers Remarks to the Association of State Criminal Investigative Agencies 2018 Spring Conference (May 7, 2018), available at https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-association-state-criminal-investigative; *see also* Jeff Sessions, Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration (May 7, 2018), available at https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions; *see generally* Sari Horwitz and Maria Sacchetti, *Sessions Vows to Prosecute All Illegal Border Crossers and Separate Children From Their Parents,* Wash. Post, May 7, 2018, https://www.washingtonpost.com/world /national-security/sessions-says-justice-dept-will-prosecute-every-person-who-crosses-border-unlawfully/2018/05/07/e1312b7e-5216-11e8-9c91-7dab596e8252_story.html?utm_term=.9d4809c83868.

[54] Rebecca Klein, *Betsy DeVos Stirs Uproar By Saying Schools Can Call ICE On Undocumented Kids*, Huffington Post, May 23, 2018, https://m.huffpost.com/us/entry/us_5b05a297e4b05f0fc8441ce3/amp.

immigrants resulting in a decline in immigrant willingness to cooperate in criminal prosecutions and immigrant victims seeking protection from the legal system.[55] The report's findings included that:

- The "vast majority (88% to 94%)" of judges "reported being concerned about the impact increased immigration enforcement could have on access to justice for immigrant." Judges similarly reported "that fear of coming to court, worry, and distrust of the police, courts, justice system, and getting involved with any government agencies impedes access to justice for immigrants."

- Law enforcement officials reported "seeing the decline in cooperation and a rise in fear of law enforcement" among immigrant communities "because they believe local law enforcement have the authority (and in some cases, the desire) to deport these individuals." 51% of law enforcement officials reported "fear of deportation" and 42% reported "[p]erpetrator threatened to turn victim in to immigration officials if [they] cooperated" as reasons for non-cooperation.

- Prosecutors reported that immigrants were less likely to cooperate in sexual assault and domestic violence cases than in prior years. Approximately 70% reported that the fear "that the perpetrator will have the victim deported" and "the perpetrator's direct threats to deport the victim" played a role in victims' unwillingness to cooperate.

- Victims' advocates report that "[p]rimary among the reasons for [immigrants] not seeking help from police or courts and not following through with these agencies" are "fear of deportation", "fear that the perpetrator will retaliate by calling immigration enforcement officials."

123.    Numerous police chiefs and prosecutors from across the country have confirmed that the Trump Administration's actions have created deep insecurity and fear

---

[55] National Immigrant Women's Advocacy Project, Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey, May 3, 2018, http://library.niwap.org/wp-content/uploads/Immigrant-Access-to-Justice-National-Report.pdf.

among immigrant communities, stopping many from coming to court or calling the police in the first place. For example:

- Los Angeles Police Chief Charlie Beck stated that reports of sexual assault and domestic violence made by Latino residents fell 25% and 10% respectively between 2016 and 2017 amidst deportation concerns.[56]

- Houston Police Chief Art Acevedo stated that the number of Hispanics reporting rape decreased 42.8% between 2016 and 2017.[57] In comparison, the same study showed an 8.2% increase in non-Hispanic victims reporting rapes and 11.7% increase in non-Hispanics reporting violent crimes generally.[58]

- In Denver, crime reports among non-Latinos increased 3.6% in the first three months of 2017 compared with the same period in 2016, and crime reports generally fell 12% among Latinos.[59] This drop occurred disproportionately in immigrant-heavy neighborhoods.[60]

- Denver City Attorney Kristen Bronson reported that, in the months following the release of a videotape of ICE waiting in a courthouse to make an arrest, thirteen victims of physical and violent assault were "not willing to proceed with the case for fear that they would be spotted in the courthouse and deported."[61]

- In Philadelphia, crime reports by non-Latinos declined by 1.0%, while they fell 4.3% among Latinos.[62] As in Denver, this drop occurred disproportionately in immigrant-heavy neighborhoods.[63]

---

[56] Los Angeles Police Dep't, DECLINE IN REPORTING OF CRIME AMONG HISPANIC POPULATION (March 21, 2017), *available at* http://www.lapdonline.org/newsroom/news_view/61998.

[57] Brooke A. Lewis, *HPD Chief Announces Decrease in Hispanics Reporting Rape and Violent Crimes Compared to Last Year*, Houston Chronicle, Apr. 6, 2017, http://www.chron.com/news/houston-texas/houston/article/HPD-chief-announces-decrease-in-Hispanics-11053829.php.

[58] *Id.*

[59] Rob Arthur, *Latinos In Three Cities Are Reporting Fewer Crimes Since Trump Took Office*, FiveThirtyEight, May 18, 2017, https://fivethirtyeight.com/features/latinos-report-fewer-crimes-in-three-cities-amid-fears-of-deportation/.

[60] *Id.*

[61] Heidi Glenn, *Fear of Deportation Spurs 4 Women to Drop Domestic Abuse Cases in Denver*, N.P.R., Mar. 21, 2017, http://www.npr.org/2017/03/21/520841332/fear-of-deportation-spurs-4-women-to-drop-domestic-abuse-cases-in-denver.

[62] Rob Arthur, *Latinos In Three Cities Are Reporting Fewer Crimes Since Trump Took Office*, FiveThirtyEight, May 18, 2017, https://fivethirtyeight.com/features/latinos-report-fewer-crimes-in-three-cities-amid-fears-of-deportation/.

setter

124.     Similarly, a survey of advocates and attorneys in New York found that many had clients who were declining to pursue legal remedies due to fears of immigration enforcement: 67% reported clients who declined to seek help from the courts; 3% reported clients who declined to pursue an order of protection; 48% reported victims who declined to seek custody of their children or visitation rights; and 46% reported working with immigrant survivors of domestic violence who feared serving as a complaining witness.[64]

125.     Service providers also report a significant drop in immigrant victims contacting law enforcement or pursuing legal protection or redress. In a nationwide survey, 78% of organizations said that immigrant survivors of domestic violence or sexual assault had concerns contacting the police; 75% reported that immigrant survivors are concerned about going to court in a matter related to the abuser; and 43% reported immigrant victims who had dropped civil or criminal cases due to immigration-related fears.[65] Additionally, immigrants self-report that they are too afraid to enter domestic violence shelters or courts.

126.     Immigrants are even avoiding contact with welfare programs for which they are legally eligible for fear of retribution or even deportation.[66] This includes programs such as Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC") and Supplemental Nutrition Assistance Program ("SNAP"). For example, counties in New Jersey with large immigrant communities collectively saw

---

[63] *Id.*

[64] *ICE in New York State Courts Survey*, Immigrant Defense Project (last accessed July 26, 2017), https://www.immigrant defenseproject.org/ice-courts-survey/.

[65] TAHIRIH JUSTICE CENTER, 2017 ADVOCATE AND LEGAL SERVICE SURVEY REGARDING IMMIGRANT SURVIVORS, http://www.tahirih.org/wp-content/uploads/2017/05/2017-Advocate-and-Legal-Service-Survey-Key-Findings.pdf.

[66] Emily Baumgaertner, *Spooked by Trump Proposals, Immigrants Abandon Public Nutrition Services*, N.Y. Times, Mar. 6, 2018, https://www.nytimes.com/2018/03/06/us/politics/trump-immigrants-public-nutrition-services.html.

their food bank participation cut in half. SNAP enrollment in New Jersey fell by 8.1%, Florida WIC participation fell by 9.6%, and Texas WIC enrollment fell by 7.4%.

        **b.**    ***The Census Bureau's Findings that the Climate of Fear Created by the Trump Administration Will Negatively Impact Census Participation by Latinos and Immigrants of Color***

127.     The climate of fear in immigrant communities caused by the Trump Administration has exacerbated concerns about participating in the Decennial Census. Since the start of the Trump Administration, numerous researchers within the Census Bureau itself have found that survey respondents from "hard to count" groups have expressed concern about the potential misuse of census data by the government.

128.     For example, in September 2017, the Census Bureau's own Center for Survey Measurement ("CSM") published a memorandum in which it noted a "recent increase in respondents spontaneously expressing concerns about confidentiality in some of our pretesting studies conducted in 2017."[67] The memorandum explained that "CSM researchers heard respondents express new concerns about topics like the 'Muslim ban,' discomfort 'registering' other household members by reporting their demographic characteristics, the dissolution of the 'DACA' . . . repeated references to Immigration and Customs Enforcement (ICE)," and reported that "respondents' fears, particularly among immigrant respondents, have increased markedly this year."

129.     Specifically, "Spanish-speakers brought up immigration raids, fear of government, and fear of deportation."[68] The memorandum also recounts a report by an interviewer: "A Spanish-speaking respondent answered that he was not a citizen, and then appeared to lie about his country of origin. When the [Field Respondents] started

---

[67] Memorandum, U.S. Census Bureau, Respondent Confidentiality Concerns, Sept. 20, 2017, https://www2.census.gov/cac/nac/meetings/2017-11/Memo-Regarding-Respondent-Confidentiality-Concerns.pdf.

[68] *Id.* at 3.

asking about his year of entry into the U.S., he 'shut down' and stopped responding to her questions. He then walked out and left her alone in the apartment, which had never happened to her during an interview before." Some pre-testing interviewees appeared to move out of their homes after being approached by census interviewers.

130.    Respondents reported being told by community leaders not to open the door without a warrant signed by a judge, and CSM researchers observed respondents falsifying names, dates of birth, and other information on household rosters. They noted specific immigration-related fears among Spanish-speakers, Chinese-speakers, and Arabic-speakers. These fears included repeated requests for reassurances about data privacy and security, especially in the context of immigration enforcement.

131.    CSM described these findings as "particularly troubling given that they impact hard-to-count populations disproportionately, and have implications for data quality and nonresponse," and cited the importance of pretesting questions in addressing these concerns. The memo also highlighted that this degree of non-participation, falsification, and unprompted exclamation of concern is both "unprecedented in the usability interviews that CSM has been conducting since 2014" and likely to be higher during the actual census-taking process because interviewees during pre-testing are financially incentivized and work with an interviewer with whom they have familiarity.[69]

132.    CSM thus recommended "systematically collecting data on this phenomenon, and development and pretesting of new messages to avoid increases in nonresponse among hard-to-count populations for the 2020 Census."[70]

133.    On November 2, 2017, the National Advisory Committee on Racial, Ethnic, and Other Populations ("NAC"), a census advisory board, published a slide deck titled "Respondent Confidential Concerns and Possible Effects on Response Rates and

---

[69] *Id.*

[70] *Id.*

Data Quality for the 2020 Census," which includes evidence of pre-existing anxieties in immigrant communities and communities of color. Focus groups at NAC reported fear that census data would be used by other agencies such as ICE and of resulting deportation.[71] According to the NAC report, pre-testing respondents, focus group participants, and interviewers said:

- "The possibility that the Census could give my information to internal security and immigration could come and arrest me for not having documents terrifies me" (Spanish interview);

- "Particularly with our current political climate, the Latino community will not sign up because they will think that Census will pass their information on and people can come looking for them" (Spanish interview);

- "They say, 'Never open the door!'" and "This alert has been spread everywhere now" (Korean Focus Group);

- "In light of the current political situation, the immigrants, especially the Arabs and Mexicans, would be so scared when they see a government interviewer at their doorsteps" (Arabic Focus Group);

- "The immigrant is not going to trust the Census employee when they are continuously hearing a contradicting message from the media every day threatening to deport immigrants" (Arabic Focus Group);

- "This may just be a sign of the times, but in the recent several months before anything begins, I'm being asked times over, does it make a difference if I'm not a citizen?" (Interviewer).

134. At a May 2018 conference, Census Bureau officials presented on the topic of "Respondent Confidentiality Concerns in Multilingual Pretesting Studies and Possible Effects on Response Rates and Data Quality for the 2020 Census."[72] In that presentation,

---

[71] National Advisory Committee on Racial, Ethnic, and Other Populations, Respondent Confidential Concerns and Possible Effects on Response Rates and Data Quality for the 2020 Census at 9, 12 (Nov. 2, 2017), *available at* https://www.documentcloud.org/documents/4424705-Census-Confidentiality-Presentation.html.

[72] Mikelyn Meyers and Patricia Goerman, Respondent Confidentiality Concerns in Multilingual Pretesting Studies and Possible Effects on Response Rates and Data Quality for the 2020 Census (May 2018), *available at* https://www.census.gov/content/dam/Census/newsroom/press-kits/2018/aapor/aapor-presentation-confidentiality.pdf.

Census Bureau officials discussed findings that showed fear across various language focus groups, finding that these "concerns may have a disproportionate impact on an already 'hard to count' population: immigrants."

135.    The May 2018 presentation also noted specific statements from Spanish-speaking groups about "many people who are afraid of giving their information because they are illegally in this country...so they are afraid of being deported," with one respondent stating that they "didn't include like 4 or 5 people on the household roster."[73] The CSM found an "unprecedented ground swell in confidentiality and data sharing concerns, particularly among immigrants or those who live with immigrants."[74]

136.    The CSM reported that these concerns may "present a barrier to participation in the 2020 Census," could "impact data quality and coverage for the 2020 Census," and are "[p]articularly troubling due to the disproportionate impact on hard-to-count populations."[75]

137.    Upon information and belief, the Census Bureau recently conducted at least forty focus groups about the questions on the 2020 Decennial Census. Many of these focus groups were conducted after the citizenship question was announced, and the groups discussed the new question. Respondents in these focus groups showed serious concern about the citizenship question, including non-citizen legal residents who told the Census Bureau personnel conducting the focus groups that they would not fill out the Decennial Census in response to the question. The Department of Commerce was briefed on the results of these focus groups, but has not publicly acknowledged their existence or content.

---

[73] *Id.*

[74] Mikelyn Meyers, Center for Survey Management, U.S. Census Bureau, Presentation on Respondent Confidentiality Concerns and Possible Effects on Response Rates and Data Quality for the 2020 Census, presented at National Advisory Committee on Racial, Ethnic, and Other Populations Fall Meeting 15 (Nov. 2, 2017), https://www.documentcloud.org/documents/4424705-Census-Confidentiality-Presentation.html.

[75] *Id.*

138.    Upon information and belief, in the weeks following the announcement of the addition of the citizenship question to the 2020 Decennial Census response rates to other surveys conducted by the Census Bureau noticeably decreased according to some field survey takers.

139.    Furthermore, press reports indicate that an ongoing "End-to-End" test of the 2020 Decennial Census being conducted in Providence County, Rhode Island is struggling to get Latinos and immigrants to participate. As the press has reported, "fear of the census among undocumented immigrants is rippling out to their relatives who have green cards or U.S. Citizenship . . . many are afraid of giving their information to the federal government." And a test participant, explaining why he declined to complete the survey asked "what if our information is misused and lands in the hands of immigration? . . . you never know if it's ICE or police knocking. No one wants to open the door."[76]

### c.    *The Heightened Impact of Adding a Citizenship Question to the Decennial Census in the Anti-Immigrant Environment Created by the Trump Administration*

140.    Despite the longstanding consensus of Census Bureau professionals that the addition of a citizenship question would have deleterious effects on participation among Latinos and other immigrants, as well as the Census Bureau's more recent determination that the Trump Administration has created a toxic anti-immigrant environment that already threatens participation by the same groups, Secretary Ross nevertheless ordered the addition of a citizenship question to the Decennial Census. That decision will sow significantly more fear among Latinos and immigrants of color and further decrease their willingness to interact with government agencies or make use of government services to which they are legally entitled.

---

[76] Hansi Lo Wang and Marisa Penaloza, *Many Noncitizens Plan To Avoid The 2020 Census, Test Run Indicates*, NPR, May 11, 2018, https://www.npr.org/2018/05/11/610492880/many-noncitizens-plan-to-avoid-the-2020-census-test-run-indicates?utm_campaign=storyshare&utm_source=twitter.com&utm_medium=social.

141.    The impact in this environment of adding the citizenship question to the Decennial Census on reducing participation by Latinos and Immigrants of color is known.

142.    Former Deputy Assistant Attorney General for Civil Rights Justin Levitt recently testified in Congress that the "way that the federal government is currently perceived with respect to asking questions about citizenship is <u>particularly</u> fraught," and not only for undocumented immigrants. Many legal permanent residents and citizens have "connections to those perceived to be at risk," and "many others will not find reason to distinguish between personal experiences of discrimination . . . and the federal government's Census enumerator at the door."[77]

143.    Arturo Vargas, the executive director of NALEO Educational Fund, who also serves as a member of the Census Bureau's National Advisory Committee on Racial, Ethnic, and other Populations, warned that: "If a citizenship question is added to the decennial census, then this fear people have is going to result in less people wanting to respond to the census, which will produce a very inaccurate census and will actually increase the Census Bureau's cost and budget to conduct the census."[78]

144.    In recent testimony before Congress, Secretary Ross acknowledged that "there will be some decline" due to the new citizenship question because "certain parts of the population might find it challenging" and that there may be some "folks who may not feel comfortable answering [the question]."[79]

---

[77] Testimony of Professor Justin Levitt Before the United States House of Representatives Committee on Oversight and Government Reform, Progress Report on the 2020 Census 6 (May 8, 2018) (emphasis in original), https://oversight.house.gov/wp-content/uploads/2018/05/Levitt-Testimony-2020-Census-Hearing-05082018.pdf.

[78] Priscilla Alvarez, *The Controversial Question DOJ Wants to Add to the U.S. Census*, The Atlantic (Jan. 10, 2018), https://www.theatlantic.com/politics/archive/2018/01/the-controversial-question-doj-wants-to-add-to-the-us-census/550088/.

[79] Hearing to Review the FY2019 Budget Request for the U.S. Department of Commerce, Hr'g Before U.S. S. Subcomm. on Commerce, Justice, Science and Related Agencies, 115 Cong. (May 10, 2018) (testimony by Wilbur Ross, Sec. of Commerce), *video available at*

145.    Acting Census Bureau Director Ron Jarmin also acknowledged in recent congressional testimony that there would be an impact on the "response rates of subgroups."[80]

146.    Thus, the addition of a citizenship question—which would be controversial under almost any circumstances—is particularly charged in this context, and will reduce responses to the Decennial Census among immigrants, and thus reduce the political representation of and resources available to immigrant communities of color. These injuries include:

a. The loss of congressional seats and Electoral College votes in states where Latinos, Asian-Americans, Arab-Americans, and other immigrant communities of color constitute significant portions of the population;

b. The malapportionment of congressional and state legislative districts within states, to the detriment of immigrant communities of color; and

c. The reduction in the amount of federal funds that are distributed to the states and localities where Latinos, Asian-Americans, Arab-Americans, and other immigrant communities of color constitute significant portions of the population.

### d.    *Background Decisions by Secretary Ross that Set the Stage for an Increased Differential Undercount of Immigrant Communities of Color*

147.    The decision to add a citizenship question was made against the backdrop of a concerted effort by Secretary Ross to undermine longstanding efforts by Census Bureau professionals to address the differential undercount of immigrant communities of color, and thus exacerbate the underrepresentation of those communities in the political process.

---

https://www.appropriations.senate.gov/hearings/review-of-the-fy2019-budget-request-for-the-us-dept-of-commerce.

[80] FY 2019 Budget Hearing - Bureau of the Census, U.S. House of Representative Committee on Appropriations (April 18, 2018), https://appropriations.house.gov/calendar/eventsingle.aspx?EventID=395239 (timestamp 1:42:30).

148.     Secretary Ross has publicly supported the Trump Administration's anti-immigrant agenda. In October 2017, Secretary Ross applauded Trump Administration programs to "swiftly return illegal entrants" and to "stop sanctuary cities, asylum abuse, and chain migration."[81]

149.     In furtherance of the administration's anti-immigrant agenda, Secretary Ross has taken tangible steps that will exacerbate the undercount in immigrant communities of color. In January 2018, the Census Bureau departed from precedent by announcing that it would not hire census enumerators who are not U.S. citizens for the 2020 Decennial Census, despite shortfalls in workers. In 2010, 3,487 census takers were non-citizens, the majority of whom possessed hard-to-find language skills and familiarity with hard-to-count immigrant communities.[82]

150.     Secretary Ross's funding decisions will further imperil the Census Bureau's efforts to conduct education and outreach to hard-to-count populations. The cost for the Decennial Census has roughly doubled each decade from 1970 to the present. Notwithstanding that, Congress has directed that the budget for the 2020 Decennial Census not exceed the cost of the 2010 Decennial Census, and Ross's budgetary submissions do not call for the funding necessary to conduct the Decennial Census. As a result, the Census Bureau has had to scale back critical planning, delayed opening six Regional Census Centers and has canceled a number of 2020 field tests and "End-to-End" dress rehearsal tests. Indeed, the budget for the 2020 Decennial Census has been so

---

[81] Press Release, Commerce Dep't, Statement From U.S. Secretary of Commerce Wilbur Ross on the Release of President Trump's Immigration Priorities (Oct. 9, 2017), https://www.commerce.gov/news/press-releases/2017/10/statement-us-secretary-commerce-wilbur-ross-release-president-trumps.

[82] Tara Bahrampour, *Non-citizens won't be hired as census-takers in 2020, staff is told*, Wash. Post, Jan. 23, 2018, https://www.washingtonpost.com/local/social-issues/non-citizens-wont-be-hired-as-census-takers-in-2020-staff-is-told/2018/01/30/b327c8d8-05ee-11e8-94e8-e8b8600ade23_story.html.

uncertain that in 2017 the Government Accountability Office cited that fact, among other reasons, in rating the 2020 Decennial Census as "high-risk."[83]

### 2. The Highly Irregular Sequence of Events Leading to the Eleventh-Hour Decision to Add a Citizenship Question to the Decennial Census

151. The decision to break with 60 years of Census Bureau practice and add an untested question to the Decennial Census just two years before the census will be administered is a serious deviation from the Census Bureau's carefully calibrated procedures and timeline for the development of questions for the Decennial Census questionnaire. Due to this last minute nature of this decision, the citizenship question has never been tested, and no large-scale testing of the full Decennial Census questionnaire with the citizenship question will be conducted.

### a. *The rigorous statutory and regulatory framework governing the development of questions for the Decennial Census questionnaire*

152. The development and content of the Decennial Census questionnaire is subject to an extensive statutory and regulatory framework and is to be conducted pursuant to an extensive, multi-year testing regimen. These statutory and regulatory provisions provide discernible standards that allow assessment of whether the Census Bureau and Commerce Department are abiding by their legal obligations. And the extensive testing regimen allows the Census Bureau to determine the impact of modifications to the Decennial Census questionnaire. In other words, among other things, the testing regimen makes the effect of a change to the questionnaire knowable.

153. Federal law requires "the integrity, objectivity, impartiality, [and] utility" of all information collected for statistical purposes, including the Decennial Census.[84] Relevant policy guidance from the Office of Management and Budget ("OMB") and the

---

[83] U.S. Government Accountability Office, High-Risk Series 225 (Feb. 2017), https://www.gao.gov/assets/690/682765.pdf.

[84] 44 U.S.C. § 3504(e)(1)(B).

Census Bureau similarly prohibit undue political influence. *See* OMB Statistical Policy Directive No. 1 (requiring that federal statistical agencies' independence be protected "from political and other undue external influence in developing. Producing, and disseminating statistics"); Census Bureau Statement of Commitment to Scientific Integrity (stressing that the Bureau must ensure "the separation of the statistical agency from the parts of its department that are responsible for policy-making").[85]

154.    OMB also requires federal statistical agencies, including the Census Bureau, to design statistical surveys in a manner that will ensure the "highest practical rate of response," and to "minimize respondent burden while maximizing data quality."[86] OMB therefore directs federal statistical agencies to "build and sustain trust" with survey respondents.[87] The Census Bureau also prioritizes high response rates as of paramount importance for accurate data collection and its guidelines mandate pre-testing of the Decennial Census questionnaire.

155.    In order to ensure high response rates to surveys, Census Bureau guidelines require "extensive testing, review, and evaluation" whenever a question is revised or a new question is proposed. This process ensures that "[f]inal proposed questions result from extensive cognitive and field testing."[88] As a result, the Census Bureau's Operational Plans for the 2020 Decennial Census included "pretesting questionnaire content . . . prior to making final decisions on questionnaire topics and wording[.]"[89]

---

[85] Statement of Commitment to Scientific Integrity by Principal Statistical Agencies, https://www.census.gov/content/dam/Census/about/about-the-bureau/policies_and_notices/scientificintegrity/Scientific_Integrity_Statement_of_the_Principal_Statistical_Agencies.pdf.

[86] OMB, Standards and Guidelines for Statistical Surveys (Sept. 2016).

[87] OMB Statistical Policy Directive No. 1, 79 Fed. Reg. 71,610.

[88] U.S. Census Bureau, Jan. 26, 2018 Program Mgmt. Review Tr. at 20, https://www2.census.gov/programs-surveys/decennial/2020/program-management/pmr-materials/01-26-2018/transcript-2018-01-26-pmr.pdf.

[89] U.S. Census Bureau, 2020 Census Operational Plan 70 (Nov. 2015), https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/2020-oper-plan.pdf.

156.    In accordance with this need for extensive testing under real-world conditions, the Census Bureau began testing for the 2020 Decennial Census questionnaire in 2007.  This process continued in 2008, when the Census Bureau began its research on ways to rephrase questions on race and ethnicity as a way to reduce the undercounts of minority groups, and began testing this in 2010.  The Census Bureau conducted annual tests to prepare for the 2020 Decennial Census in 2013 and 2014 and in 2015 conducted the National Content Test which reached approximately 1.2 million people.  The Census Bureau also traditionally conducts three end-to-end tests of the Decennial Census. For the 2020 Decennial Census, the address canvassing portion of the 2018 Census Test took place at three sites: Bluefield-Beckley-Oak Hill, WV; Providence County, RI; and Pierce County, WA. Due to underfunding, however, the full end-to-end test is only being conducted in Providence County.

157.    None of this decade-long testing for the 2020 Decennial Census questionnaire included a question relating to citizenship.

158.    The Census Bureau has also constituted various advisory panels of academics and other professional social scientists, specifically to advise it on the content of the questionnaire. These advisory panels include the National Advisory Committee on Racial, Ethnic, and Other Populations, which focuses on increasing census participation and reducing the differential undercount and the Census Scientific Advisory Committee, which advises on a wide range of Census Bureau activities, including survey methodology and census tests.

159.    At no point did the Census Bureau ask either of these advisory panels to review any proposal to include a citizenship question. In fact, the Scientific Advisory Committee voiced its strong opposition to adding such a question. It cited the "flawed

logic" behind the decision, stating that it could "threaten the accuracy and confidentiality" of the count and make it more expensive to conduct.[90]

160.     As a result of the need for extensive pre-testing of the Decennial Census, the last minute addition of the citizenship question ignored all timelines for finalizing the content of the questionnaire, including those enshrined in federal law.

161.     In accordance with 13 U.S.C. § 141(f)(1-2), the Secretary of Commerce must submit to Congress the subjects that will be included on the Decennial Census at least three years in advance and the questions at least two years in advance. After this information is sent to Congress, the Secretary may not modify the subjects or questions on the Decennial Census questionnaire unless the Secretary submits a report to Congress after finding that "new circumstances exist" which necessitate this change.[91]

162.     In order to meet this statutory requirement, the Census Bureau set deadlines for completion of the content creation portion of the 2020 Decennial Census, which called for Federal agencies to provide the Census Bureau with their expected data needs by July 1, 2016, content topics to be finalized by December 2016, and for the final questionnaire wording to be completed by December 2017.

163.     In accordance with this timeline, Secretary Ross submitted the topics for the 2020 Decennial Census to Congress in March 2017. His submission did not include citizenship as a topic. Similarly, the Census Bureau's 2020 Census Operational Plan that was released in September 2017 stated that it had already "finalized the subjects planned for the 2020 Census."[92]

---

[90] Michael Wines, *Census Bureau's Own Expert Panel Rebukes Decision to Add Citizenship Question*, N.Y. Times, March 30, 2018, https://www.nytimes.com/2018/03/30/us/census-bureau-citizenship.html.

[91] 13 U.S.C. § 141(f)(3).

[92] U.S. Census Bureau, *2020 Census Operational Plan (version 2.0)* 70 (Sept. 2016) , https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/2020-oper-plan2.pdf.

**b.** ***The rushed and politicized process leading to the addition of a citizenship question on the Decennial Census questionnaire***

164.     On December 12, 2017, DOJ requested that a citizenship question be added to the Decennial Census questionnaire. On that day, Arthur E. Gary, General Counsel of the Justice Management Division at DOJ, sent a letter to Acting Census Bureau Director Defendant Jarmin requesting that "the Census Bureau reinstate on the 2020 Census questionnaire a question regarding citizenship."[93]

165.     In addition to violating the Census Bureau's deadline for federal agencies to submit data needs, the December 2017 DOJ request was clearly a last minute political decision. Up until this point, the Census Bureau had followed its well-honed internal processes to prepare for a successful Decennial Census, and now is allowing the Trump Administration to inject the citizenship issue into the mix.

166.     Moreover, upon information and belief, although OMB Statistical Policy Directives seek to protect the Census Bureau from "political and other under external influence,"[94] and Census Bureau guidelines further stress that the Bureau must ensure "the separation of the statistical agency from the parts of its department that are responsible for policy-making,"[95] this letter was ghost-written by Acting Assistant Attorney General and political appointee John Gore. In private practice, Gore represented defendants in voting rights litigation adverse to racial minorities.

---

[93] Letter from Arthur E. Gary, General Counsel, Justice Management Division, U.S. Department of Justice to Dr. Ron Jarmin, Performing the Non-Exclusive Functions and Duties of the Director, U.S. Census Bureau, Re: Request to Reinstate Citizenship Question on 2020 Census Questionnaire (Dec. 12, 2017), https://www.documentcloud.org/documents/4340651-Text-of-Dec-2017-DOJ-letter-to-Census.html.

[94] OMB Statistical Policy Directive No. 1, 79 Fed. Reg. 71,610.

[95] Statement of Commitment to Scientific Integrity by Principal Statistical Agencies, https://www.census.gov/content/dam/Census/about/about-the-bureau/policies_and_notices/scientificintegrity/Scientific_Integrity_Statement_of_the_Principal_Statistical_Agencies.pdf.

167.    In his recent congressional testimony, Gore declined to answer questions about who initiated the DOJ request and whether he consulted with career Civil Rights Division employees before making it.

168.    In the letter, Gore claimed that adding a question concerning citizenship on the Decennial Census questionnaire was "critical to the Department's enforcement of Section 2 of the Voting Rights Act," because "the Department needs a reliable calculation of the citizen voting-age population." He also asserted that the "Department believes that Decennial Census questionnaire data regarding citizenship, if available, would be more appropriate for use in redistricting and in Section 2 litigation than ACS citizenship estimates."[96]

169.    The letter does not explain why citizenship data from the Decennial Census is "critical," or how DOJ had been able to enforce the VRA, which was enacted in 1965—for more than 50 years without such information.

170.    The letter did not explain why this request was being made so long after both the deadline for agency requests and the submission to Congress of the topics for the 2020 Decennial Census.

171.    On March 26, 2018, Secretary Ross issued a memo indicating that he had "determined that reinstatement of a citizenship question on the 2020 Decennial Census is necessary to provide complete and accurate data in response to the DOJ request."[97]

172.    In violation of his obligation under 13 U.S.C. § 141(f)(3), Secretary Ross's submission to Congress did not include any explanation for why citizenship was

---

[96] Letter from Arthur E. Gary, General Counsel, Justice Management Division, U.S. Department of Justice to Dr. Ron Jarmin, Performing the Non-Exclusive Functions and Duties of the Director, U.S. Census Bureau, Re: Request to Reinstate Citizenship Question on 2020 Census Questionnaire (Dec. 12, 2017), https://www.documentcloud.org/documents/4340651-Text-of-Dec-2017-DOJ-letter-to-Census.html.

[97] Wilbur Ross, Sec. of Commerce, *Reinstatement of a Citizenship Question on the 202 Decennial Census Questionnaire* (Mar. 26, 2018), https://www.commerce.gov/sites/commerce.gov/files/2018-03-26_2.pdf (hereinafter "Ross Memo").

being added as a topic or a finding that "new circumstances exist" that would warrant such a change.[98]

173.     Secretary Ross downplayed any adverse effects of the citizenship question by stating there was no empirical evidence that there would be an adverse effect. Yet the reason the Census Bureau has no empirical information is that—contrary to years of established administrative practice—it never tested the possible inclusion of a citizenship question on the Decennial Census.

174.     Secretary Ross did not address how a citizenship question will affect response rates of U.S. citizens, especially those who have non-citizen family members and live in mixed status households and, in light of the Trump Administration's stated views towards non-citizens, are likely to be fearful of the potential consequences of their participation in the census for their family members or immediate community.

175.     Although Secretary Ross acknowledged that "the Decennial Census has differed significantly in nature from the sample surveys" like the ACS, he denied that adding a citizenship question to the Decennial Census is novel or needs testing, because it was used in the ACS (and on the long-form Decennial Census before that).[99]

176.     One of the only pieces of evidence Ross's memo does cite is the supposed opinion of rating company Nielsen, which purportedly told Ross that it had not experienced disparate response rates when asking about citizenship in its surveys. Nielsen, however, has stated that it "does not support the inclusion of a question on citizenship for the 2020 U.S. census because [it] believe[s] its inclusion could lead to inaccuracies in the underlying data."[100] And, in any event, relying upon the reaction of a

---

[98] U.S. Census Bureau, *Questions Planned for the 2020 Census and American Community Survey* 7 (Mar. 29, 2018), https://www2.census.gov/library/publications/decennial/2020/operations/planned-questions-2020-acs.pdf.

[99] *Id.* at 3, 7 (emphasis added).

[100] Jeffrey Mervis, *Trump Officials Claim They Can Avoid 2020 Census Problems Caused By Controversial Citizenship Question. Experts Are Very Skeptical*, Science, Apr. 13, 2018,

private company concerned with television ratings, using unknown methodology, and at different points in time, only underscores what little analysis of the likely impact of his decision Ross actually performed.

177.   Thomas Brunell, whom President Trump had at one point planned to appoint as Census Director, but who withdrew his name after bipartisan opposition, recently stated that the decision to add a citizenship question to the Decennial Census questionnaire was not based on social science needs, but rather was "a political decision. And they have every right to do that, because they won the election."[101]

### 3. Contemporaneous Statements by Members and Associates of the Trump Administration Regarding the Addition of a Citizenship Question to the Decennial Census Indicative of Discriminatory Intent

178.   Shortly after the decision was announced, President Trump's reelection campaign stated that President Trump expressly ordered the Commerce Department to add a citizenship question to the Decennial Census, and when Secretary Ross announced it would be added, celebrated its addition. Indeed, less than two days after Secretary Ross announced his decision to add the citizenship question, the Trump campaign sent an email to supporters with the subject: "GOOD NEWS: We are asking about citizenship." In the message, the campaign stated that "President Trump has officially mandated that the 2020 United States Census ask people living in America whether or not they are citizens." Similarly, an email the Trump campaign sent just before the announcement told supporters that the "President wants the 2020 United States Census to ask people whether or not they are citizens." It continued: "In another era, this would be COMMON SENSE… but *19 attorneys general* said they will fight the President if he dares to ask

---

http://www.sciencemag.org/news/2018/04/trump-officials-claim-they-can-avoid-2020-census-problems-caused-controversial.

[101] Jeffrey Mervis, *Exclusive: The would-be U.S. census director assails critics of citizenship question*, Science (May 16, 2018), http://www.sciencemag.org/news/2018/05/exclusive-would-be-us-census-director-assails-critics-citizenship-question.

people if they are citizens. The President wants to know if you're on his side." Neither Trump campaign email made any mention of the purported need for improved VRA enforcement.

179.    J. Christian Adams, another former PCEI Commissioner, praised the decision, noting that it will reduce representation of Hispanic populations and lead to lower numbers of Hispanic-majority districts under the Voting Rights Act.[102] Adams also stated that "[o]nly citizens should be given political power," and added that it is "critical that the next redistricting cycle account for the citizen residents of districts so urban centers do not unfairly profit from the political subsidy that higher noncitizen populations provide."[103]

180.    Former Ohio Secretary of State Ken Blackwell, a senior member of President Trump's transition team in charge of domestic policy and another PCEI Commissioner, also praised the decision to add a citizenship question to the Decennial Census, noting that it would enable states to reapportion their legislative districts using only the number of citizens. Blackwell did not mention VRA enforcement as a purpose of adding the citizenship question.

181.    Similarly, President Trump's ally Congressman Steve King of Iowa said he supported the decision because "[o]nly U.S. citizens should be represented in Congress," and if "we counted only citizens for redistributing seats, California would give up several congressional seats to states that actually honor our Constitution and federal law."[104]

---

[102] *See* J. Christian Adams, *Adams: Trump Census Citizenship Question Helps Black Americans*, TheACRU.org (March 30, 2018), http://www.theacru.org/adams-trump-census-citizenship-question-helps-black-americans/.

[103] Press Release, Publ. Int. Legal Foundation (March 27, 2018), https://publicinterestlegal.org/blog/j-christian-adams-praises-inclusion-of-citizenship-question-in-2020-census/.

[104] Emily Baumgaertner, *A Citizenship Question on the Census May Be Bad for Your Health,* N.Y. Times, Feb. 14, 2018, https://www.nytimes.com/2018/02/14/us/politics/citizenship-question-census-public-health.html.

182.    At least one state has already considered taking advantage of citizenship information from the Decennial Census to do precisely that. In May 2018, a bill was introduced in Missouri to conduct the state's intra-state apportionment solely using citizen population.

### E.    The Trump Administration's Stated Rationale for Adding a Citizenship Question Is Blatantly Pretextual

183.    The rationale that adding a citizenship question to the Decennial Census questionnaire is necessary for enforcement of the VRA is a pretext for Defendants' discriminatory intent. For more than 50 years, DOJ has successfully enforced the VRA without citizenship information from the Decennial Census, suggesting that the facilitation of VRA enforcement was not the purpose of this disastrous last-minute change to the Decennial Census questionnaire.

184.    VRA enforcement is not a priority of the Trump Administration. Upon information and belief, the Trump Administration has initiated only a single lawsuit under Section 2 of the Voting Rights Act, which was investigated and developed during the previous administration.

185.    Upon information and belief, the DOJ's VRA enforcement efforts have never been impaired due to a lack of Citizen Voting Age Population ("CVAP") data from the Decennial Census. To the extent that courts have needed CVAP data in order to enforce the VRA, they have recognized that citizenship data from the ACS "is routinely relied upon in § 2 cases."[105]

186.    Voting rights experts, including former DOJ officials tasked with enforcing the VRA, have repeatedly stated that citizenship data from the Decennial Census is not necessary to successfully enforce the VRA. For example, Vanita Gupta, former head of the DOJ Civil Rights Division, has stated that "[r]igorous enforcement of

---

[105] *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1393 (E.D. Wash. 2014).

the Voting Rights Act has never required the addition of a citizenship question on the census form sent to all households" and that "data from the ongoing American Community Survey was sufficient for us to do our work."[106]

187.    When asked during recent congressional testimony, the ghost writer of the DOJ letter, Acting Assistant Attorney General John Gore, could not identify a single case litigated by DOJ in which a court declined to accept ACS citizenship data. He did identify a single district court case addressing the adequacy of ACS citizenship data, but it concerned an effort to use one-year ACS estimates in a small municipality, rather than more reliable five-year ACS data aggregated from a larger sample.[107]

188.    DOJ has not considered whether—given the reduction in response rates likely to result from the inclusion of a citizenship question on the Decennial Census— citizenship data obtained through the Decennial Census will be sufficiently reliable for purposes of VRA enforcement. Indeed, John Gore recently admitted in testimony to Congress that DOJ had no data as to how adding this question would affect response rates when DOJ proposed adding it.[108]

189.    Moreover, in the past, the Census Bureau has not cited VRA enforcement as a reason for including a citizenship question on the ACS. When the Census Bureau submitted its list of planned topics for the Decennial Census and ACS in March 2017, it only cited a need for the data for "agencies and policymakers setting and evaluating immigration policies and laws, seeking to understand the experience of different

---

[106] Vanita Gupta, *The Bitter Lie Behind the Census Bureau's Citizenship Question*, Wash. Post, Mar. 29, 2018, https://www.washingtonpost.com/opinions/the-bitter-lie-behind-the-censuss-citizenship-question/2018/03/29/f2991020-32cc-11e8-8bdd-cdb33a5eef83_story.html?utm_term=.3dedbb3898f2

[107] *See* Progress Report on the 2020 Census, Hearing Before the U.S. House of Representatives Comm. on Oversight & Gov't Reform (May 18, 2018), https://oversight.house.gov/hearing/progress-on-the-2020-census-continued/ (timestamp 1:19:50)

[108] *See* Progress Report on the 2020 Census, Hearing Before the U.S. House of Representatives Comm. on Oversight & Gov't Reform (May 18, 2018), https://oversight.house.gov/hearing/progress-on-the-2020-census-continued/ (timestamp 1:40:50–1:42:42).

immigrant groups, and enforcing laws, policies, and regulations against discrimination based on national origin."[109]

190.    Indeed, the Decennial Census will use the ACS citizenship question and thus ask about citizenship in a far broader way than is needed for VRA enforcement purposes. Rather than merely asking respondents whether or not they are a U.S. citizen, it also requests, for some individuals, information about place of birth; the citizenship status of one's parents; and naturalization. This information has no use for purposes of VRA enforcement.

191.    As a matter of both process and substance, the rushed addition of an untested and unnecessary citizenship question to the Decennial Census stands in stark contrast to the Census Bureau's extensive testing regarding potential changes to the race and ethnicity questions—which would have enhanced VRA enforcement. Based on years of testing and research, the Census Bureau had concluded that it would obtain better response rates by updating the Decennial Census form to combine race and ethnicity into a single category with multiple checkbox options, as well as adding a new "Middle Eastern or North African" option. These changes would have improved VRA enforcement by allowing the Census Bureau to provide more accurate group-based counts of various groups protected under the VRA. Nonetheless, Secretary Ross overruled the Census Bureau and decided not to make the change to the race and ethnicity questions, citing the purported need for more even more extensive testing before making such a substantial change to the Decennial Census questionnaire.

192.    Finally, Attorney General Sessions undermined his own agency's request when he recently publicly stated that people concerned about the citizenship question

---

[109] U.S. Census Bureau, *Subjects Planned For The 2020 Census and American Community Survey* 51 (Mar. 28, 2017), https://www2.census.gov/library/publications/decennial/2020/operations/planned-subjects-2020-acs.pdf.

should simply decline to answer it.[110] Refusing to answer a question on the Decennial Census questionnaire, however, would violate 13 U.S.C. § 221 and subject non-respondents to a fine. Moreover, if DOJ truly needed CVAP data from the Decennial Census for VRA enforcement, the Attorney General presumably would not publicly encourage behavior that will lead to an inaccurate citizenship count.

## CAUSES OF ACTION

### I.    Intentional Discrimination/Equal Protection (Fifth Amendment)

193.    Plaintiffs repeat and re-allege the previous factual and jurisdictional allegations in this complaint.

194.    The Fifth Amendment of the U.S. Constitution requires that the federal government not deny people the equal protection of its laws and prohibits the federal government from discriminating against individuals living in the United States on the basis of race, ethnicity, national origin, and citizenship.

195.    Defendants acted with discriminatory intent toward Latinos, Asian-Americans, Arab-Americans, and immigrant communities of color generally in adding the citizenship question to the Decennial Census. Defendants maintain animus toward these groups and intend, *inter alia*, to diminish the political power and influence of these groups and to reduce the levels of federal and state funding, benefits, and other resources that these groups receive.

196.    Latinos, Asian-Americans, Arab-Americans, and other immigrant communities of color will suffer discriminatory effects due to the differential undercount that will result from including the citizenship question.

197.    The discriminatory effects will include, *inter alia*:

---

[110] Stephen Dinan, *People Worried About Census Citizenship Question 'Don't Have To Answer,'* Wash. Times (Apr. 25, 2018), https://www.washingtontimes.com/news/2018/apr/25/sessions-americans-dont-have-answer-citizenship/.

a.      The loss of congressional seats and Electoral College votes in states where these groups constitute significant portions of the population. Based on recent population growth trends, absent the differential  undercount , there is a substantial likelihood that Florida and Texas would each gain at least an additional congressional seat following the 2020 Decennial Census, among other possible changes in the appointment of congressional seats. Upon information and belief, the differential undercount caused by the addition of the citizenship question in the 2020 Census will result in at least these two states losing at least one of these additional seats.

b.      The malapportionment of immigrant communities of color in congressional and state legislative districts because all states use Decennial Census data in drawing congressional districts and most states also use Decennial Census data in drawing state legislative districts, including states such as Florida and Texas whose state constitutions prohibit adjusting Decennial Census data in drawing districts. The differential undercount will cause immigrant communities of color in jurisdictions such as San Antonio and Houston, Texas and Miami-Dade, Broward, and Orange Counties, Florida, to live in congressional and state legislative districts that have greater populations than other congressional and state legislative districts in the same state.

c.      The diminishment of political and voting power and influence of immigrant communities of color within congressional and state legislative districts, because members of these groups will constitute a lower percentage of a district's total population than they would absent the differential undercount. These effects will occur in immigrant communities of color such as those in Prince Georges' County, Maryland, New York City, New York, San Antonio and Houston, Texas and Miami-Dade, Broward, and Orange Counties, Florida.

d.      The reduction in the amount of federal funds that are distributed to the states and localities within the states where Latinos, Asian-Americans, Arab-Americans, and other immigrant communities of color constitute significant portions of the

population because the Federal Government uses population data from the Decennial

Census to allocate billions of dollars of federal funding involving numerous federal

programs. This includes funding for federal transportation and highway funding,

Medicaid, and a wide range of other programs, such as Head Start, home energy

assistance and supplemental nutrition programs for women, infants and children. For

example:

     i. The Federal Medical Assistance Percentage ("FMAP") is calculated
annually for each state and based in part on its Decennial Census count.
The FMAP guides the allocation of the hundreds of billions of dollars of
annual federal funding among the states for health programs, including
Medicaid. Furthermore, Medicaid relies on "per capita income"
information calculated with decennial data to determine the amount of the
reimbursement for each state for medical assistance payments. 43 U.S.C.
§§1301, 1396(d). A differential undercount will impact the calculation of
the FMAP, and thus will reduce the federal funding for health programs
such as Medicaid in those states using the FMAP where Latinos, Asian-
Americans, Arab-Americans, and other immigrant communities of color
constitute significant portions of the population, such as Florida and
Texas.

    ii. Federal programs provide financial support for planning, construction,
maintenance and operation of essential infrastructure projects, including
the Highway Trust Fund program, the Urbanized Area Formula Funding
program, the Metropolitan Planning Program and the Community
Highway Safety Grant program. The funds for these programs are
allocated, at least in part, on population figures collected through the
Decennial Census. 23 U.S.C. §104(d)(3); 49 U.S.C. §§5305,5307,5340;
23 U.S.C. § 402. A differential undercount, therefore, will reduce the
federal transportation funding distributed to the states and localities where
Latinos, Asian-Americans, Arab-Americans, and other immigrant
communities of color constitute significant portions of the population.

    198. In addition to the other damages described herein, this intentional

discrimination will cause ongoing harm to Plaintiffs and their members because, as

explained, their members are immigrants of color and live in communities where

immigrants of color constitute significant portions of the populations; and provide

services to immigrant communities of color, and as such, these violations will deprive

them of the political influence and funding to which they would be entitled by a more accurate census.

199.    The decision to add a citizenship question was without any rational basis, let alone any important or compelling governmental interest.

200.    The justification that citizenship data from all U.S. residents is needed to better enforce Section 2 of the VRA is a pretext—and a poor one at that—for Defendants' discriminatory intent.

## II.    Census Clause (Article I, Section II, Clause 3 of the Constitution, as amended by the Fourteenth Amendment)

201.    Plaintiffs repeat and re-allege the previous factual and jurisdictional allegations in this complaint.

202.    Article I of the U.S. Constitution, in conjunction with the Fourteenth Amendment, requires that the federal government conduct an "actual Enumeration" of the national population every ten years by determining the "whole number of persons" in the United States and within each state for the purpose of apportioning members of the House of Representatives to the respective states according to their population. U.S. Const. art. I, § 2, cl. 3; id. amend. XIV, § 2.

203.    Congress has delegated this duty to the Secretary of Commerce, who must conduct the census in a manner consistent with the constitutional goal of equal representation and bearing a "reasonable relationship to the accomplishment of an actual enumeration of the population."

204.    "The population" that the census must enumerate includes all persons living in the United States, and not only U.S. citizens.

205.    Adding a citizenship question to the 2020 Decennial Census does not bear a "reasonable relationship to the accomplishment of an actual enumeration of the population."

206.    The citizenship question will in fact harm the accomplishment of an actual enumeration of the population. It will produce a significant and systemic undercount of certain groups within "the population" of the United States, including Latinos, Asian-Americans, Arab-Americans, and other immigrant communities of color.

207.    Defendants' Constitutional violations will cause ongoing harm to Plaintiffs and their members because, as explained, their members are immigrants of color and live in communities where immigrants of color constitute significant portions of the populations; and provide services to immigrant communities of color, and as such, these violations will deprive them of the political influence and funding to which they would be entitled by a more accurate census.

III.    **Administrative Procedure Act (APA)**

208.    Plaintiffs repeat and re-allege the previous factual and jurisdictional allegations in this complaint.

209.    The Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), prohibits federal agencies from taking any action that is arbitrary, unconstitutional, and contrary to statute.

210.    Defendants' decision to add a citizenship question is contrary to the Census Clause as well as the Fifth Amendment, and therefore violates the APA as an unconstitutional agency action.

211.    Defendants' decision is also arbitrary and capricious for multiple independent reasons. These reasons include:

a.    Defendants violated 13 U.S.C. § 141(f);

b.    Defendants violated 44 U.S.C. § 3504(e);

c.    Defendants violated OMB Statistical Policy Directive No.1;

d.    Defendants violated OMB Statistical Policy Directive No. 2;

e.    Defendants violated the Census Bureau Statistical Quality Guidelines and the Census Bureau Statement of Commitment to Scientific Integrity;

f.   Defendants failed to follow key provisions of the 2020 Census Operational Plan;

g.   Defendants failed to consult with their advisory panels, including the National Advisory Committee on Racial, Ethnic, and Other Populations and the Census Scientific Advisory Committee;

h.   Defendants failed to adequately explain why adding a citizenship question is necessary for enforcement of the VRA, which is the purported purpose of adding the question;

i.   Defendants' stated purpose of adding the citizenship question to help enforce the VRA is pre-textual;

j.   Defendants' inclusion of the citizenship question will actually undermine enforcement of the VRA because it will produce skewed and inaccurate race and ethnicity data;

k.   Defendants failed to adequately study and assess the impact of adding a citizenship question, in contravention of Defendants' policies, historical practices, and legal obligations.

l.   Defendants failed to adequately explain why the citizenship question is being added to the 2020 Decennial Census when it has not been included on a Decennial Census since 1950; and

m.   Defendants' decision was contrary to the evidence before them, which is that adding the citizenship question will produce a significant increase in the undercount of persons living in the United States, and particularly among Latinos, Asian-Americans, Arab-Americans, and other immigrant communities of color that have historically been undercounted;

212.   Defendants' APA violations cause ongoing harm to Plaintiffs and their members because as explained their members are immigrants of color and live in communities where immigrants of color constitute significant portions of the populations; and provide services to immigrant communities of color, and as such, these violations will deprive them of the political influence and funding to which they would be entitled by a more accurate census.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

i.  Declare that Defendants' addition of a citizenship demand to the questionnaire for the 2020 Decennial Census is unauthorized by and contrary to the Constitution and laws of the United States;

ii.  Declare that the Defendants' decision to add a citizenship question to the 2020 Decennial Census is not in accordance with law, is beyond statutory authority, and is arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706;

iii.  Preliminarily and permanently enjoin Defendants and all those acting on their behalf from adding a citizenship question to the 2020 Decennial Census.

iv.  Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

v.  Award such additional relief as the court deems proper.

Dated: June 6, 2018                              Respectfully Submitted,

/s/  Dale Ho                                     /s/  Andrew Bauer
Dale Ho                                          Andrew Bauer
David Hausman*                                   Arnold & Porter Kaye Scholer LLP
American Civil Liberties Union Foundation        250 West 55th Street
125 Broad St.                                    New York, NY 10019-9710
New York, NY 10004                               (212) 836-7669
(212) 549-2693                                   Andrew.Bauer@arnoldporter.com
dho@aclu.org
dhausman@aclu.org
                                                 /s/  John A. Freedman
Sarah Brannon* **                                John A. Freedman
Davin Rosborough**                               David P. Gersch*
Ceridwen Cherry*                                 Peter T. Grossi, Jr*
American Civil Liberties Union Foundation        R. Stanton Jones*
915 15th Street, NW                              Eric A. Rubel*
Washington, DC 20005-2313                        David J. Weiner*
202-675-2337                                     Robert N. Weiner*
sbrannon@aclu.org                                Barbara H. Wootton*
drosborough@aclu.org                             Elisabeth S. Theodore*
ccherry@aclu.org                                 Daniel F. Jacobson*

Arthur N. Eisenberg
Christopher T. Dunn
Perry M. Grossman
New York Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
(212) 607-3300
aeisenberg@nyclu.org
cdunn@nyclu.org
pgrossman@nyclu.org

Caroline D. Kelly*
Christine G. Lao-Scott*
Jay Z. Leff*
Chase R. Raines*
Dylan S. Young*
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, DC 20001-3743
(202) 942-5000
John.Freedman@arnoldporter.com

Samer E. Khalaf*
American-Arab Anti-Discrimination Committee
1705 DeSales Street, N.W., Suite 500
Washington, DC 20036
202-244-2990
skhalaf@adc.org

Nicholas Katz*
CASA de Maryland
8151 15th Avenue
Hyattsville, MD 20783
(240) 491-5743
nkatz@wearecasa.org

* designates *pro hac vice* application forthcoming.
** Not admitted in the District of Columbia; practice limited pursuant to D.C. App. R. 49(c)(3).