# EXHIBIT 6

| | |
|---|---|
| **To:** | Wilbur Ross |
| **Cc:** | Branstad, Eric (Federal)[EBranstad@doc.gov] |
| **From:** | Comstock, Earl (Federal) |
| **Sent:** | Fri 3/10/2017 8:31:29 PM |
| **Importance:** | Normal |
| **Subject:** | Your Question on the Census |
| **Received:** | Fri 3/10/2017 8:31:30 PM |

I was not able to catch anyone at their desk when I called the numbers I have for the Census Bureau from their briefing. However, the

Census Bureau web page on apportionment is explicit and can be found at
https://www.census.gov/population/apportionment/about/faq.html#Q16  It says:

> **Are undocumented residents (aliens) in the 50 states included in the apportionment population counts?**
>
> Yes, all people (citizens and noncitizens) with a usual residence in the 50 states are to be included in the census and thus in the apportionment counts.

 Further, this WSJ blog post from 2010 confirms that neither the 2000 nor the 2010 Census asked about citizenship.
http://blogs.wsj.com/numbers/the-pitfalls-of-counting-illegal-immigrants-937/

THE NUMBERS

The Pitfalls of Counting Illegal Immigrants



By CARL BIALIK

May 7, 2010 7:05 pm ET

 The debate over Arizona's immigration law has included several estimates of the state's illegal-immigrant population, at "almost half a million," "half a million" or "more than half a million." Arguing against the law, Homeland Security chief Janet Napolitano — who is the former governor of Arizona — pointed to decreasing illegal immigration in the state.

 These estimates and claims rest on several annual efforts to count illegal immigrants in the U.S. The nonpartisan Pew Hispanic Center estimated that in 2008 the nationwide population was 11.9 million, and half a million in Arizona. The federal Department of Homeland Security and the Center for Immigration Studies, a Washington, D.C., research group that opposes increased immigration, agree on a figure of 10.8 million for 2009, with DHS putting the Arizona population at 460,000, down from 560,000 a year earlier.

 But as my print column notes this week, these estimates are limited by several factors that make it difficult for researchers to count this population. No major government survey, including the decennial census now under way, asks Americans about their citizenship status. Thus estimates of the number of illegal immigrants in the country are indirect and possibly far off from the correct count.

 These studies rely on census surveys, and assume that about 10% of illegal immigrants aren't counted in these surveys. But that figure largely is based on a 2001 survey of Mexican-born people living in Los Angeles. "I do not advise use of my estimated undercounts for the 2000 census outside of L.A. county, nor for migrants from other nations," said study co-author Enrico Marcelli, assistant professor of sociology at San Diego State University. "However, demographers do not have any other empirical evidence at the moment with which to proceed."

One concern is that the nearly two in five households who didn't respond to the 2001 survey may have included a

0002521

disproportionately large number who also didn't respond to census interviewers. Marcelli said further study would be needed to test that possibility, but he noted the extent of the efforts to select a representative sample and to put respondents at ease in order to elicit honest answers.

"As far as I know, there has not been a new, serious attempt to estimate the undercount of illegal immigrants in the census," said Steven Camarota, director of research for the Center for Immigration Studies.

In 2005, Robert Justich, then a portfolio manager for Bear Stearns, co-authored a report suggesting the population of illegal immigrants "may be as high as 20 million people." Jeffrey Passel, senior demographer for the Pew Hispanic Center, disputed that finding. For one thing, other data sources, such as U.S. birth rates and Mexico's own census, don't corroborate such a large number. If there were really so many more immigrants, than there would be more women of child-bearing age, and more births. And if instead the missing millions are mostly Mexican men working in the U.S. and sending money home, the flip side of that influx would be reflected as a gap in the Mexican census numbers.

"Definitely the number is not as high as 20 million," said Manuel Orozco, senior associate of the Inter-American Dialogue, a Washington, D.C., policy-analysis group.

Justich, who now owns a music and film production firm, countered that immigrants from countries other than Mexico may make up the rest. However, he added that the number is no longer as high as 20 million.

Larger estimates also sometimes are based on border-patrol counts of apprehensions, which are far from reliable proxies. No one is sure of how many people are missed for each one who is caught trying to cross into the U.S. illegally. Many of those who do get through may return quickly, or cross back and forth. Also, some people are caught more than once, inflating the count. "It seems like we're not missing that many bodies in the United States," said Camarota, referring to the gap between the 20 million figure and his own.

The immigrant counters generally have seen a decline in the illegal-immigration population. "Economic drivers are very, very powerful" in lowering the illegal-immigrant population, said Hans Johnson, associate director of the Public Policy Institute of California. Others point to stepped-up enforcement efforts.

However, because of all the assumptions baked into these numbers, such drops come with so much statistical uncertainty that they may not be statistically significant. "The methodology for doing these estimates is not really designed to measure year-to-year change," Passel said.

One key difference between his count and the federal agency's: Homeland Security uses the Census Bureau's American Community Survey, which has a much larger sample size than the Current Population Survey, which Passel used. "I developed all of my methodology and all of the things that go with it when there wasn't an ACS," Passel said, "and I haven't gotten around to shifting to the new survey."

The ACS was introduced after the 2000 census, and may help overcome a problem with census numbers exposed in the last decennial census. Many more foreign-born residents were counted in 2000 than was expected based on annual estimates produced by the bureau. Census officials think these estimates have improved since 2000 thanks to the annual ACS surveys of three million households. "That's the source we're using to estimate the movement" of the foreign-born population, said Howard Hogan, the Census Bureau's associate director for demographic programs. "It's a huge improvement over anything we had available in the '90s."

Still, the Census Bureau doesn't ask people about their immigration status, in part because such questions may drive down overall response rates. Robert M. Groves, director of the Census Bureau, said he'd like to test that hypothesis. "We're sort of data geeks here," Groves said. "What we'd like to do to answer that question is an experiment."

That doesn't mean that census interviewers don't try to find and enumerate illegal immigrants. Groves compares counting that group to efforts to track another population that is hard to count, though not necessarily because of willful avoidance: people who are homeless. Census interviewers spend three days visiting soup kitchens, shelters and outdoor gathering spots such as under certain highway overpasses in Los Angeles. "You don't have to look at that operation very long to realize that though it's a heroic effort, there are all sorts of holes in it," Groves said. As a result, the Census Bureau includes anyone counted in that effort in the overall population, but doesn't break out a separate estimate of homeless people.

"We would like to do estimates that have the smallest number of assumptions we can't test," Groves said. When it comes to counting illegal immigrants, "there are a set of assumptions that we know we can't test. When we find ourselves in that situation, then we're uncomfortable giving a Census Bureau estimate that is subject to all of those debates."

Further reading: Passel outlined methods for counting the illegal-immigrant population, while this paper analyzed some difficulties with the estimates. Earlier the Christian Science Monitor and I have examined these numbers. Immigration statistics have become a subject of debate in the U.K., as well.

**From:** Kris Kobach [mailto:
**Sent:** Monday, July 24, 2017 2:43 PM
**To:** Teramoto, Wendy (Federal) <
**Cc:** Alexander, Brooke (Federal) <                    ; Hernandez, Israel (Federal) <
**Subject:** Re: Follow up on our phone call

Yes.

Sent from my iPhone

On Jul 24, 2017, at 1:39 PM, Teramoto, Wendy (Federal) <                    > wrote:

> Kris- can you do a call with the Secretary and Izzy tomorrow at 11 am? Thanks. Wendy
>
> **From:** Kris Kobach [mailto:
> **Sent:** Monday, July 24, 2017 12:02 PM
> **To:** Teramoto, Wendy (Federal) <
> **Subject:** Re: Follow up on our phone call
>
> That works for me. What number should I call? Or would you like to call me?
>
> On Mon, Jul 24, 2017 at 9:12 AM, Teramoto, Wendy (Federal) <                    > wrote:
>> We can speak today at 230. Please let me know if that works. W
>>
>> Sent from my iPhone
>>
>> On Jul 21, 2017, at 4:34 PM, Kris Kobach <                    > wrote:
>>> Wendy,
>>>
>>> Nice meeting you on the phone this afternoon. Below is the email that I sent to Secretary Ross. He and I had spoken briefly on the phone about this issue, at the direction of Steve Bannon, a few months earlier.
>>>
>>> Let me know what time would work for you on Monday, if you would like to schedule a short call. The issue is pretty straightforward, and the text of the question to be added is in the email below.

000763

Thanks.

Kris Kobach

[redacted]

---------- Forwarded message ----------
From: **Kris Kobach** <[redacted]>
Date: Fri, Jul 14, 2017 at 9:12 AM
Subject: Follow up on our phone call
To: [redacted]


Secretary Ross,

Kansas Secretary of State Kris Kobach here. I'm following up on our telephone discussion from a few months ago. As you may recall, we talked about the fact that the US census does not currently ask respondents their citizenship. This lack of information impairs the federal government's ability to do a number of things accurately. It also leads to the problem that aliens who do not actually "reside" in the United States are still counted for congressional apportionment purposes.

It is essential that one simple question be added to the upcoming 2020 census. That question already appears on the American Community Survey that is conducted by the Census Burear (question #8). A slight variation of that question needs to be added to the census. It should read as follows:

**Is this person a citizen of the United States?**

☐ **Yes, born in the United States**

☐ **Yes, born in Puerto Rico, Guam, the U.S. Virgin Islands, or Northern Marianas**

☐ **Yes, born abroad of U.S. citizen parent or parents**

☐ **Yes, U.S. citizen by naturalization – Print year of naturalization _____**

☐ **No, not a U.S. citizen – this person is a lawful permanent resident (green card holder)**

☐ **No, not a U.S. citizen – this person citizen of another country who is not a green card holder (for example holds a temporary visa or falls into another category of non-citizens)**

Please let me know if there is any assistance that I can provide to accomplish the addition of this question. You may reach me at this email address or on my cell phone at [redacted].

Yours,

Kris Kobach

000764

# EXHIBIT 7

| To: | Teramoto, Wendy (Federal)[         @doc.gov] |
|---|---|
| From: | Comstock, Earl (Federal) |
| Sent: | Sat 9/16/2017 11:33:38 AM |
| Importance: | Normal |
| Subject: | Calls with DoJ |
| Received: | Sat 9/16/2017 11:33:38 AM |

Morning Wendy –

Here is the memo I gave SWLR regarding my discussions with DoJ.

Earl

\*\*\*

September 8, 2017

To:   Secretary Wilbur Ross

Fr:   Earl Comstock

Re:   <u>Census Discussions with DoJ</u>

In early May Eric Branstad put me in touch with Mary Blanche Hankey as the White House liaison in the Department of Justice. Mary Blanche worked for AG Sessions in his Senate office, and came with him to the Department of Justice. We met in person to discuss the citizenship question. She said ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ A few days later she directed me to James McHenry in the Department of Justice.

I spoke several times with James McHenry by phone, and after considering the matter further James said ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ James directed me to Gene Hamilton at the Department of Homeland Security.

Gene and I had several phone calls to discuss the matter, and then Gene relayed that after discussion DHS really felt that it was best handled by the Department of Justice.

At that point the conversation ceased and I asked James Uthmeier, who had by then joined the Department of Commerce Office of General Counsel, to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮

0002458

September 8, 2017

To:     Secretary Wilbur Ross

Fr:     Earl Comstock

Re:     <u>Census Discussions with DoJ</u>

In early May Eric Branstad put me in touch with Mary Blanche Hankey as the White House liaison in the Department of Justice.  Mary Blanche worked for AG Sessions in his Senate office, and came with him to the Department of Justice.  We met in person to discuss the citizenship question.  She said she ███████████████████████████████████████
A few days later she directed me to James McHenry in the Department of Justice.

I spoke several times with James McHenry by phone, and after considering the matter further James said that ███████████████████████████████████████████████
███████████████████████████████████████ James directed me to Gene Hamilton at the Department of Homeland Security.

Gene and I had several phone calls to discuss the matter, and then Gene relayed that after discussion DHS really felt that it was best handled by the Department of Justice.

At that point the conversation ceased and I asked James Uthmeier, who had by then joined the Department of Commerce Office of General Counsel, to ███████████████████████
█████████████████████████████

0009834

| | |
|---|---|
| **To:** | hilary geary███████████ |
| **From:** | Alexander, Brooke (Federal) |
| **Sent:** | Wed 4/5/2017 4:24:19 PM |
| **Importance:** | Normal |
| **Subject:** | tonight |
| **Received:** | Wed 4/5/2017 4:24:00 PM |

Mrs. Ross,

Do you have plans following the Newseum? I'm asking because Steve Bannon has asked that the Secretary talk to someone about the Census and around 7-7:30 pm is the available time. He could do it from the car on the way to a dinner ...

Brooke V Alexander

Executive Assistant to the Secretary

The U.S. Department of Commerce

Washington, D.C. 20230

balexander@doc.gov

202-482-███ office

███████ cell

**From:** Wilbur Ross ███████
**Sent:** 5/2/2017 2:23:38 PM
**To:** Teramoto, Wendy (Federal) ███████
**Subject:** Re: Census

Let's try to stick him in there for a few days to fact find. W

Sent from my iPhone

On May 2, 2017, at 7:17 AM, Teramoto, Wendy (Federal) <███████> wrote:
I continue to talk frequently with Marc Neumann and we often have dinner together. He will not leave les but is in love with the census and talks about it non stop. ███████ Do you want me to set up another meeting? ███████
t███████ Let me know if you want to have a drink or get together with him over the weekend.
Wendy

Sent from my iPhone

Begin forwarded message:
**From:** "Alexander, Brooke (Federal)" ███████
**Date:** May 2, 2017 at 7:10:21 AM PDT
**To:** "Teramoto, Wendy (Federal)" <███████>
**Subject:** FW: Census


-----Original Message-----
From: Wilbur Ross ███████
Sent: Tuesday, May 02, 2017 10:04 AM
To: Comstock, Earl (Federal) <███████>; Herbst, Ellen (Federal) <███████
Subject: Census

███████ Worst of all they emphasize that they have settled with congress on the questions to be asked. I am mystified why nothing have been done in response to my months old request that we include the citizenship question. Why not? ███████

0003700

# EXHIBIT 8

**To:** Wilbur Ross
**Cc:** Branstad, Eric (Federal)[EBranstad@doc.gov]
**From:** Comstock, Earl (Federal)
**Sent:** Fri 3/10/2017 8:31:29 PM
**Importance:** Normal
**Subject:** Your Question on the Census
**Received:** Fri 3/10/2017 8:31:30 PM

I was not able to catch anyone at their desk when I called the numbers I have for the Census Bureau from their briefing.  However, the

Census Bureau web page on apportionment is explicit and can be found at
https://www.census.gov/population/apportionment/about/faq.html#Q16   It says:

> **Are undocumented residents (aliens) in the 50 states included in the apportionment population counts?**
>
> Yes, all people (citizens and noncitizens) with a usual residence in the 50 states are to be included in the census and thus in the apportionment counts.

  Further, this WSJ blog post from 2010 confirms that neither the 2000 nor the 2010 Census asked about citizenship.
http://blogs.wsj.com/numbers/the-pitfalls-of-counting-illegal-immigrants-937/

            THE NUMBERS

The Pitfalls of Counting Illegal Immigrants



By CARL BIALIK

May 7, 2010 7:05 pm ET

  The debate over Arizona's immigration law has included several estimates of the state's illegal-immigrant population, at "almost half a million," "half a million" or "more than half a million." Arguing against the law, Homeland Security chief Janet Napolitano — who is the former governor of Arizona — pointed to decreasing illegal immigration in the state.

  These estimates and claims rest on several annual efforts to count illegal immigrants in the U.S. The nonpartisan Pew Hispanic Center estimated that in 2008 the nationwide population was 11.9 million, and half a million in Arizona. The federal Department of Homeland Security and the Center for Immigration Studies, a Washington, D.C., research group that opposes increased immigration, agree on a figure of 10.8 million for 2009, with DHS putting the Arizona population at 460,000, down from 560,000 a year earlier.

  But as my print column notes this week, these estimates are limited by several factors that make it difficult for researchers to count this population. No major government survey, including the decennial census now under way, asks Americans about their citizenship status. Thus estimates of the number of illegal immigrants in the country are indirect and possibly far off from the correct count.

  These studies rely on census surveys, and assume that about 10% of illegal immigrants aren't counted in these surveys. But that figure largely is based on a 2001 survey of Mexican-born people living in Los Angeles. "I do not advise use of my estimated undercounts for the 2000 census outside of L.A. county, nor for migrants from other nations," said study co-author Enrico Marcelli, assistant professor of sociology at San Diego State University. "However, demographers do not have any other empirical evidence at the moment with which to proceed."

One concern is that the nearly two in five households who didn't respond to the 2001 survey may have included a

disproportionately large number who also didn't respond to census interviewers. Marcelli said further study would be needed to test that possibility, but he noted the extent of the efforts to select a representative sample and to put respondents at ease in order to elicit honest answers.

"As far as I know, there has not been a new, serious attempt to estimate the undercount of illegal immigrants in the census," said Steven Camarota, director of research for the Center for Immigration Studies.

In 2005, Robert Justich, then a portfolio manager for Bear Stearns, co-authored a report suggesting the population of illegal immigrants "may be as high as 20 million people." Jeffrey Passel, senior demographer for the Pew Hispanic Center, disputed that finding. For one thing, other data sources, such as U.S. birth rates and Mexico's own census, don't corroborate such a large number. If there were really so many more immigrants, than there would be more women of child-bearing age, and more births. And if instead the missing millions are mostly Mexican men working in the U.S. and sending money home, the flip side of that influx would be reflected as a gap in the Mexican census numbers.

"Definitely the number is not as high as 20 million," said Manuel Orozco, senior associate of the Inter-American Dialogue, a Washington, D.C., policy-analysis group.

Justich, who now owns a music and film production firm, countered that immigrants from countries other than Mexico may make up the rest. However, he added that the number is no longer as high as 20 million.

Larger estimates also sometimes are based on border-patrol counts of apprehensions, which are far from reliable proxies. No one is sure of how many people are missed for each one who is caught trying to cross into the U.S. illegally. Many of those who do get through may return quickly, or cross back and forth. Also, some people are caught more than once, inflating the count. "It seems like we're not missing that many bodies in the United States," said Camarota, referring to the gap between the 20 million figure and his own.

The immigrant counters generally have seen a decline in the illegal-immigration population. "Economic drivers are very, very powerful" in lowering the illegal-immigrant population, said Hans Johnson, associate director of the Public Policy Institute of California. Others point to stepped-up enforcement efforts.

However, because of all the assumptions baked into these numbers, such drops come with so much statistical uncertainty that they may not be statistically significant. "The methodology for doing these estimates is not really designed to measure year-to-year change," Passel said.

One key difference between his count and the federal agency's: Homeland Security uses the Census Bureau's American Community Survey, which has a much larger sample size than the Current Population Survey, which Passel used. "I developed all of my methodology and all of the things that go with it when there wasn't an ACS," Passel said, "and I haven't gotten around to shifting to the new survey."

The ACS was introduced after the 2000 census, and may help overcome a problem with census numbers exposed in the last decennial census. Many more foreign-born residents were counted in 2000 than was expected based on annual estimates produced by the bureau. Census officials think these estimates have improved since 2000 thanks to the annual ACS surveys of three million households. "That's the source we're using to estimate the movement" of the foreign-born population, said Howard Hogan, the Census Bureau's associate director for demographic programs. "It's a huge improvement over anything we had available in the '90s."

Still, the Census Bureau doesn't ask people about their immigration status, in part because such questions may drive down overall response rates. Robert M. Groves, director of the Census Bureau, said he'd like to test that hypothesis. "We're sort of data geeks here," Groves said. "What we'd like to do to answer that question is an experiment."

That doesn't mean that census interviewers don't try to find and enumerate illegal immigrants. Groves compares counting that group to efforts to track another population that is hard to count, though not necessarily because of willful avoidance: people who are homeless. Census interviewers spend three days visiting soup kitchens, shelters and outdoor gathering spots such as under certain highway overpasses in Los Angeles. "You don't have to look at that operation very long to realize that though it's a heroic effort, there are all sorts of holes in it," Groves said. As a result, the Census Bureau includes anyone counted in that effort in the overall population, but doesn't break out a separate estimate of homeless people.

"We would like to do estimates that have the smallest number of assumptions we can't test," Groves said. When it comes to counting illegal immigrants, "there are a set of assumptions that we know we can't test. When we find ourselves in that situation, then we're uncomfortable giving a Census Bureau estimate that is subject to all of those debates."

Further reading: Passel outlined methods for counting the illegal-immigrant population, while this paper analyzed some difficulties with the estimates. Earlier the Christian Science Monitor and I have examined these numbers. Immigration statistics have become a subject of debate in the U.K., as well.

| | |
|---|---|
| **From**: | Comstock, Earl (Federal) |
| **Sent**: | 5/4/2017 12:27:32 AM |
| **To**: | Branstad, Eric (Federal) [EBranstad@doc.gov] |
| **Subject**: | Re: DOJ contact |

Thanks Eric!  Earl

Sent from my iPhone

On May 3, 2017, at 8:10 PM, Branstad, Eric (Federal) < > wrote:


Eric D Branstad
Senior White House Advisor
Department of Commerce

(202) 531-1620


Begin forwarded message:
**From:** "Flynn, Matthew J. EOP/WHO" <                            >
**Date:** May 3, 2017 at 7:15:56 PM EDT
**To:** "Branstad, Eric (Federal)" <            >
**Subject: RE: DOJ contact**
DOJ   Mary Blanche   Hankey
-----Original Message-----
From: Branstad, Eric (Federal)
Sent: Wednesday, May 3, 2017 3:41 PM
To: Flynn, Matthew J. EOP/WHO
Subject: DOJ contact

Who is best counterpart to reach out to at DOJ - Regarding Census and Legislative issue?

Thanks
Eric



Branstad, Eric (Federal)
Senior White House Advisor
Department of Commerce
(202) 531-1620


0003701