# EXHIBIT 3

**From**:     Christa Jones (CENSUS/ADEP FED) [Christa.D.Jones@census.gov]
**Sent**:     2/28/2018 8:57:28 PM
**To**:     Comstock, Earl (Federal)    PII
**CC**:     Kelley, Karen (Federal)    PII
**Subject**:     Re: Seeking comment - citizenship question.

Here's the revised response, in its entirety.

A separate suggestion, because there is confusion in the media and public with people assuming that we are asking about immigration status, here's another sentence potentially to add to the end of the first paragraph-- up to you if you think it is helpful or unnecessary.

Currently, the Census Bureau does ask citizenship on its American Community Survey (ACS) and the Current Population Survey. The ACS is a survey conducted nationwide every year among 3.5 million addresses. The Current Population Survey is a monthly survey that is the primary source of labor force statistics for the population of the United States. However, while it has asked about citizenship status, the Census Bureau has never asked about the legal status of respondents.

The Census Bureau first asked a citizenship question in 1820 when the census separately counted "foreigners not naturalized." The question was asked this way until 1850 when officials asked place of birth, a question that also appeared on the 1860 census.

The 1870 census asked the same questions on nativity, as well as questions on the nativity of each individual's parents. The 1870 census also had questions on citizenship for males over the age of 21. The 1880 census kept questions on individual and parental nativity, but removed questions on citizenship.

The 1890 census also asked individual and parental nativity, but included additional questions on naturalization and tenure in the United States for foreign-born men over the age of 21. The questions for 1900 and 1910, although slightly different, followed the same general outline as those of 1890. In 1920 and 1930, all foreign-born respondents, regardless of age and sex, received questions on naturalization status.

In 1940 ,while the questions about individual nativity and naturalization remained, questions about parental nativity moved to the supplemental questions, which were only asked of 5% of respondents   In 1950, that sampling size grew to 20%. In 1960, although questions about individual and parental nativity remained for all, there were no questions about citizenship or naturalization.

Starting with 1970, the census moved to a mailout/mailback format. Questions about nativity  appeared on the "long form" census form sent to 20% of households and only foreign-born were asked to answer questions about citizenship status and time period of arrival to the United States. From 1980-2000 the long form asked citizenship status of all sample respondents, not just foreign-born. Foreign born were asked for a time range or year that they arrived in the United States. In 2005, the ACS replaced the long-form decennial census questionnaire.

As we move through this formal evaluation process, we will keep the public updated as we look forward to delivering the planned questions for the 2020 Census and the ACS to Congress by March 31, 2018.

**Our goal is to conduct a complete and accurate 2020 Census. The Census Bureau remains committed to reflecting the information needs of our changing society as we continue to examine the effectiveness of decennial census questions to collect accurate data on America's people, places, and economy.**

---

**From:** Comstock, Earl (Federal) ⸤ PII ⸥
**Sent:** Wednesday, February 28, 2018 2:40:13 PM
**To:** Christa Jones (CENSUS/ADEP FED)
**Cc:** Kelley, Karen (Federal)
**Subject:** Re: Seeking comment - citizenship question.

Sorry to trouble you Christa, ⸤ **Deliberative** ⸥

⸤ **Deliberative** ⸥ Thanks. Earl

**From:** "Christa Jones (CENSUS/ADEP FED)" <Christa.D.Jones@census.gov>
**Date:** Wednesday, February 28, 2018 at 2:09 PM
**To:** "Comstock, Earl (Federal)" ⸤ PII ⸥
**Cc:** Karen Dunn Kelley ⸤ PII ⸥
**Subject:** Re: Seeking comment - citizenship question.

⸤ **Deliberative** ⸥ Do you need any more information for these responses?

On Feb 28, 2018, at 1:56 PM, Comstock, Earl (Federal) ⸤ PII ⸥ wrote:

Christa – please review asap.  Thanks.  Earl

**From:** "Manning, Kevin (Federal)" ⸤ PII ⸥
**Date:** Wednesday, February 28, 2018 at 1:54 PM
**To:** James Rockas ⸤ PII ⸥, "Comstock, Earl (Federal)" ⸤ PII ⸥, Wendy Teramoto ⸤ PII ⸥ Karen Dunn Kelley ⸤ PII ⸥
**Subject:** RE: Seeking comment - citizenship question.

To quickly interject, Census has received an inquiry from the same reporter. The draft responses and questions are below. These have not gone back to the reporter as he states as they are still correcting some elements in the fourth question that Earl brought up. The only thing they've given the reporter is pointing to the PMR.

**Census Bureau Interview Request Form**

*Name of Newspaper/Radio Show/TV Show:* Newsday

*Reporter Name and Contact:*  Victor Manuel-Ramos

*Deadline for Response:* 28, 2018 Feb / 4:00pm

*Interview Topic and Story Angle*:  About concerns raised by a coalition of immigrant advocates in our region about a request from the U.S. Department of Justice for your agency to include a question about citizenship in the 2020 census.



# Deliberative

# Deliberative

**From:** Rockas, James (Federal)
**Sent:** Wednesday, February 28, 2018 1:19 PM
**To:** Manning, Kevin (Federal) [ PII ]; Comstock, Earl (Federal) [ PII ]; Teramoto, Wendy (Federal) [ PII ]; Kelley, Karen (Federal) [ PII ]
**Subject:** Fwd: Seeking comment - citizenship question.

## Deliberative

James Rockas

Press Secretary & Deputy Director of Public Affairs

U.S. Department of Commerce

[ PII ]

Office: [(202)482-4883](tel:2024824883)

[ PII ]

*typed on an iPhone - please excuse the brevity

Begin forwarded message:

**From:** DOC Public Affairs <PublicAffairs@doc.gov>
**Date:** February 28, 2018 at 1:16:17 PM EST
**To:** "Rockas, James (Federal)" [ PII ]
**Subject: FW: Seeking comment - citizenship question.**

Fyi


**From:** Ramos, Victor [mailto:Victor.Ramos@newsday.com]
**Sent:** Wednesday, February 28, 2018 11:08 AM
**To:** DOC Public Affairs <PublicAffairs@doc.gov>
**Subject:** Seeking comment - citizenship question.


Hello,

I'm a reporter with Newsday  on Long Island, New York, and I'm writing to seek the department's response to a coalition of advocacy organizations in our region raising concerns about a U.S. Department of Justice request for the U.S. Census Bureau to include a citizenship question in the next census.

These 19 organizations in our region, among them immigrant and labor advocates, have crafted a letter that they're sending to Secretary of Commerce calling the administration's proposal "a reckless request" that "would threaten the prospect of an accurate count" in our region and state.

I have already reached out to the U.S. Census Bureau and received a response, but thought of asking the department directly since the local advocates' letter is addressed to your Secretary.

Their main concern is that immigrants who are in the country illegally or who face expiration of deportation protections might be afraid of specifying their status in forms that will go to the federal government and could be used for enforcement purposes. They also worry that an undercount would translate going forward into fewer resources allocated to communities and regions where immigrants and minority communities are concentrated.

Among questions:

1.  How does your department balance these concerns with the administration's request?

2.  Does the department favor including the citizenship question in the census forms? Why or why not?

3.  Are there any issues with the current method of estimating citizenship numbers?

4.  Could such a policy change have other intended or unintended consequences beyond Voting Rights Act enforcement?

You may call me at the office number below or email me a statement here. **My deadline is 4 p.m. today**.

Much appreciated,


**Víctor Manuel Ramos**
Staff Writer, Newsday

**Office: 631-843-2286** * Fax: 631-843-2953
Snail mail: c/o Newsday, 235 Pinelawn Rd, Melville, N.Y. 11747

*For social media updates:*

<image001.jpg><image002.jpg><image003.jpg><image004.jpg>

---------------------------------------------------------------

The information transmitted in this email and any of its attachments is intended only for the person or entity to which it is addressed and may contain information concerning Newsday LLC and/or its affiliates that is proprietary, privileged, confidential and/or subject to copyright. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient(s) is prohibited and may be unlawful. If you received this in error, please contact the sender immediately and delete and destroy the communication and all of the attachments you have received and all copies thereof.

---------------------------------------------------------------

0012475

| | |
|---|---|
| **From**: | Comstock, Earl (Federal) [ PII ] |
| **Sent**: | 5/1/2017 10:31:41 AM |
| **To**: | Wilbur Ross [ PII ] |
| **CC**: | Teramoto, Wendy (Federal) [ PII ]; Branstad, Eric (Federal) [ PII ] |
| **Subject**: | FW: Census Testimony for Wed. May 3 House CJS Hearing |
| **Attachments**: | John Thompson 05 03 17 Written Testimony - Version 6sa - for Final Clearance.docx |
| | |
| **Importance**: | High |

Mr. Secretary –

I apologize for the rush.  This testimony wasn't provided until Friday mid-day.  Attached is the proposed testimony for John Thompson, the Director of the Census Bureau, to give the House Appropriation Subcommittee this Wednesday.  I have reviewed the testimony and there are a couple of points that I wanted to bring to your attention and be sure you approved of.  Those are:

# Not Responsive / Deliberative

**Not Responsive / Deliberative**

On page 10 the testimony reports on the Census questions.  Note that in March of 2018 the Census Bureau will report to Congress the specific questions that will be asked.

In March we fulfilled a major milestone, on time, when we delivered the planned subjects for the 2020 Census and the American Community Survey to Congress before the statutory deadline.  The Census Bureau followed a rigorous, multi-year process collaborating with the Office of Management and Budget (OMB) and other federal agencies to complete this process.  Federal agencies provided support to demonstrate a clear need for all data we plan to collect.  The submission to the Congress describes that the planned subjects remain unchanged from the 2010 Census and will cover gender, age, race/ethnicity, relationship and homeownership status.

**Deliberative**

**Not Responsive / Deliberative**

# Not Responsive / Deliberative

Please advise.  Thank you.  Earl

**From:** "Grossman, Beth (Federal)" [ **PII** ]
**Date:** Friday, April 28, 2017 at 12:09 PM
**To:** "Comstock, Earl (Federal)" [ **PII** ] David Langdon [ **PII** ]
**Cc:** "McClelland, Michelle (Federal)" [ **PII** ] "Holmes, Colin (Federal)" [ **PII** ] "Schufreider, Jim (Federal)" [ **PII** ], "Lenihan, Brian (Federal)" [ **PII** ], "VanHanswyk, Beth (Federal)" [ **PII** ]
**Subject:** Census Testimony for Wed. May 3 House CJS Hearing

Earl -

Attached is John Thompson's draft testimony on behalf of the Census Bureau for the Wednesday, May 3, 2017, oversight hearing before the House Committee on Appropriations, Subcommittee on Commerce, Justice, Science, and Related Agencies.   Census CIO Kevin Smith will be joining Director Thompson at the witness table.  The testimony has been circulated through the Department and reviewed by OGC, OLIA, Budget Office, as well as David Langdon in your office.  The subcommittee has asked Census to provide its testimony by Monday, so we would like to get the testimony over to OMB as soon as possible for their review and interagency circulation.

Please let me know if you have any questions or edits, and if it is OK to send the testimony to OMB.

-       Beth

# PREPARED STATEMENT OF

## JOHN H. THOMPSON
### DIRECTOR
### U.S. CENSUS BUREAU

**Before the Appropriations Committee's Subcommittee on**

**Commerce, Justice, Science and Related Agencies**

**U.S. House of Representatives**

**3 May 2017**

# Not Responsive / Deliberative

[ PAGE  \* MERGEFORMAT ]



**Not Responsive / Deliberative**

[ PAGE  \* MERGEFORMAT ]

0003698
0012530



**Not Responsive / Deliberative**

[ PAGE  \* MERGEFORMAT ]

0012531



**Not Responsive / Deliberative**

[ PAGE  \* MERGEFORMAT ]

0003698

0012532



**Not Responsive / Deliberative**

[ PAGE  \* MERGEFORMAT ]

0003698

0012533



**Not Responsive / Deliberative**

0003698                                                                    0012534



**Not Responsive / Deliberative**

[ PAGE  \* MERGEFORMAT ]

0003698                                                                                0012535

# Not Responsive / Deliberative

[ PAGE  \* MERGEFORMAT ]

# Not Responsive / Deliberative

0003698

0012537

# Not Responsive / Deliberative

**2020 Status Update**

*Topics and Questions for the 2020 Census*

In March we fulfilled a major milestone, on time, when we delivered the planned subjects for the 2020 Census and the American Community Survey to Congress before the statutory deadline. The Census Bureau followed a rigorous, multi-year process collaborating with the Office of Management and Budget (OMB) and other federal agencies to complete this process.  Federal agencies provided support to demonstrate a clear need for all data we plan to collect.  The submission to the Congress describes that the planned subjects remain unchanged from the 2010 Census and will cover gender, age, race/ethnicity, relationship and homeownership status.

# Deliberative

# Not Responsive / Deliberative

---

[1] *2015 National Content Test: Race and Ethnicity Analysis Report* available at: https://www.census.gov/programs-surveys/decennial-census/2020-census/planning-management/final-analysis/2015nct-race-ethnicity-analysis.html



**Not Responsive / Deliberative**

[ PAGE \\* MERGEFORMAT ]

0003698
0012539

# Not Responsive / Deliberative

---

[2] Other T-Rex subcontractors include:  Z, Inc, General Dynamics Information Technology, SES, Whirlwind Technologies, LLC, Vidoori, and Octo.

0003698

0012540



UNITED STATES DEPARTMENT OF COMMERCE
Economics and Statistics Administration
U.S. Census Bureau
Washington, DC 20233-0001

January 19, 2018

MEMORANDUM FOR:      Wilbur L. Ross, Jr.
                                   Secretary of Commerce

Through:                    Karen Dunn Kelley
                                   Performing the Non-Exclusive Functions and Duties of the Deputy
                                   Secretary

                                   Ron S. Jarmin
                                   Performing the Non-Exclusive Functions and Duties of the Director

                                   Enrique Lamas
                                   Performing the Non-Exclusive Functions and Duties of the Deputy
                                   Director

From:                       John M. Abowd
                                   Chief Scientist and Associate Director for Research and Methodology

Subject:                   Technical Review of the Department of Justice Request to Add
                                   Citizenship Question to the 2020 Census

The Department of Justice has requested block-level citizen voting-age population estimates by OMB-approved race and ethnicity categories from the 2020 Census of Population and Housing. These estimates are currently provided in two related data products: the PL94-171 redistricting data, produced by April 1st of the year following a decennial census under the authority of 13 U.S.C. Section 141, and the Citizen Voting Age Population by Race and Ethnicity (CVAP) tables produced every February from the most recent five-year American Community Survey data. The PL94-171 data are released at the census block level. The CVAP data are released at the census block group level.

We consider three alternatives in response to the request: (A) no change in data collection, (B) adding a citizenship question to the 2020 Census, and (C) obtaining citizenship status from administrative records for the whole 2020 Census population.

We recommend either Alternative A or C. Alternative C best meets DoJ's stated uses, is comparatively far less costly than Alternative B, does not increase response burden, and does not harm the quality of the census count. Alternative A is not very costly and also does not harm the quality of the census count. Alternative B better addresses DoJ's stated uses than Alternative A. However, Alternative B is very costly, harms the quality of the census count, and would use substantially less accurate citizenship status data than are available from administrative sources.



United States™
Census
Bureau

0012480

| Summary of Alternatives | | | |
|---|---|---|---|
| | *Alternative A* | *Alternative B* | *Alternative C* |
| *Description* | No change in data collection | Add citizenship question to the 2020 Census (i.e., the DoJ request), all 2020 Census microdata remain within the Census Bureau | Leave 2020 Census questionnaire as designed and add citizenship from administrative records, all 2020 Census microdata and any linked citizenship data remain within the Census Bureau |
| *Impact on 2020 Census* | None | Major potential quality and cost disruptions | None |
| *Quality of Citizen Voting-Age Population Data* | Status quo | Block-level data improved, but with serious quality issues remaining | Best option for block-level citizenship data, quality much improved |
| *Other Advantages* | Lowest cost alternative | Direct measure of self-reported citizenship for the whole population | Administrative citizenship records more accurate than self-reports, incremental cost is very likely to be less than $2M, USCIS data would permit record linkage for many more legal resident noncitizens |
| *Shortcomings* | Citizen voting-age population data remain the same or are improved by using small-area modeling methods | Citizenship status is misreported at a very high rate for noncitizens, citizenship status is missing at a high rate for citizens and noncitizens due to reduced self-response and increased item nonresponse, nonresponse followup costs increase by at least $27.5M, erroneous enumerations increase, whole-person census imputations increase | Citizenship variable integrated into 2020 Census microdata outside the production system, Memorandum of Understanding with United States Citizen and Immigration Services required to acquire most up-to-date naturalization data |

Approved: _____   Date: _____

John M. Abowd, Chief Scientist
and Associate Director for Research and Methodology

0012481

# Detailed Analysis of Alternatives

The statistics in this memorandum have been released by the Census Bureau Disclosure Review Board with approval number CBDRB-2018-CDAR-014.

## Alternative A: Make no changes

Under this alternative, we would not change the current 2020 Census questionnaire nor the planned publications from the 2020 Census and the American Community Survey (ACS). Under this alternative, the PL94-171 redistricting data and the citizen voting-age population (CVAP) data would be released on the current schedule and with the current specifications. The redistricting and CVAP data are used by the Department of Justice to enforce the Voting Rights Act. They are also used by state redistricting offices to draw congressional and legislative districts that conform to constitutional equal-population and Voting Rights Act nondiscrimination requirements. Because the block-group-level CVAP tables have associated margins of error, their use in combination with the much more precise block-level census counts in the redistricting data requires sophisticated modeling. For these purposes, most analysts and the DoJ use statistical modeling methods to produce the block-level eligible voter data that become one of the inputs to their processes.

If the DoJ requests the assistance of Census Bureau statistical experts in developing model-based statistical methods to better facilitate the DoJ's uses of these data in performing its Voting Rights Act duties, a small team of Census Bureau experts similar in size and capabilities to the teams used to provide the Voting Rights Act Section 203 language determinations would be deployed.

We estimate that this alternative would have no impact on the quality of the 2020 Census because there would be no change to any of the parameters underling the Secretary's revised life-cycle cost estimates. The estimated cost is about $350,000 because that is approximately the cost of resources that would be used to do the modeling for the DoJ.

## Alternative B: Add the question on citizenship to the 2020 Census questionnaire

Under this alternative, we would add the ACS question on citizenship to the 2020 Census questionnaire and ISR instrument. We would then produce the block-level citizen voting-age population by race and ethnicity tables during the 2020 Census publication phase.

Since the question is already asked on the American Community Survey, we would accept the cognitive research and questionnaire testing from the ACS instead of independently retesting the citizenship question. This means that the cost of preparing the new question would be minimal. We did not prepare an estimate of the impact of adding the citizenship question on the cost of reprogramming the Internet Self-Response (ISR) instrument, revising the Census Questionnaire Assistance (CQA), or redesigning the printed questionnaire because those components will not be finalized until after the March 2018 submission of the final questions. Adding the citizenship question is similar in scope and cost to recasting the race and ethnicity questions again, should that become necessary, and would be done at the same time. After the 2020 Census ISR, CQA and printed questionnaire are in final form, adding the citizenship question would be much more expensive and would depend on exactly when the implementation decision was made during the production cycle.

0012482

For these reasons, we analyzed Alternative B in terms of its adverse impact on the rate of voluntary cooperation via self-response, the resulting increase in nonresponse followup (NRFU), and the consequent effects on the quality of the self-reported citizenship data. Three distinct analyses support the conclusion of an adverse impact on self-response and, as a result, on the accuracy and quality of the 2020 Census. We assess the costs of increased NRFU in light of the results of these analyses.

### B.1.    *Quality of citizenship responses*

We considered the quality of the citizenship responses on the ACS. In this analysis we estimated item nonresponse rates for the citizenship question on the ACS from 2013 through 2016. When item nonresponse occurs, the ACS edit and imputation modules are used to allocate an answer to replace the missing data item. This results in lower quality data because of the statistical errors in these allocation models. The analysis of the self-responses responses is done using ACS data from 2013-2016 because of operational changes in 2013, including the introduction of the ISR option and changes in the followup operations for mail-in questionnaires.

In the period from 2013 to 2016, item nonresponse rates for the citizenship question on the mail-in questionnaires for non-Hispanic whites (NHW) ranged from 6.0% to 6.3%, non-Hispanic blacks (NHB) ranged from 12.0% to 12.6%, and Hispanics ranged from 11.6 to 12.3%. In that same period, the ISR item nonresponse rates for citizenship were greater than those for mail-in questionnaires. In 2013, the item nonresponse rates for the citizenship variable on the ISR instrument were NHW: 6.2%, NHB: 12.3% and Hispanic: 13.0%. By 2016 the rates increased for NHB and especially Hispanics. They were NHW: 6.2%, NHB: 13.1%, and Hispanic: 15.5% (a 2.5 percentage point increase). Whether the response is by mail-in questionnaire or ISR instrument, item nonresponse rates for the citizenship question are much greater than the comparable rates for other demographic variables like sex, birthdate/age, and race/ethnicity (data not shown).

### B.2.    *Self-response rate analyses*

We directly compared the self-response rate in the 2000 Census for the short and long forms, separately for citizen and noncitizen households. In all cases, citizenship status of the individuals in the household was determined from administrative record sources, not from the response on the long form. A noncitizen household contains at least one noncitizen. Both citizen and noncitizen households have lower self-response rates on the long form compared to the short form; however, the decline in self-response for noncitizen households was 3.3 percentage points greater than the decline for citizen households. This analysis compared short and long form respondents, categories which were randomly assigned in the design of the 2000 Census.

We compared the self-response rates for the same household address on the 2010 Census and the 2010 American Community Survey, separately for citizen and noncitizen households. Again, all citizenship data were taken from administrative records, not the ACS, and noncitizen households contain at least one noncitizen resident. In this case, the randomization is over the selection of household addresses to receive the 2010 ACS. Because the ACS is an ongoing survey sampling fresh households each month, many of the residents of sampled households completed the 2010 ACS with the same reference address as they used for the 2010 Census. Once again, the self-response rates were lower in the ACS than in the 2010 Census for both citizen and noncitizen households. In this 2010 comparison, moreover, the decline in self-response was 5.1 percentage points greater for noncitizen households than for citizen households.

0012483

In both the 2000 and 2010 analyses, only the long-form or ACS questionnaire contained a citizenship question. Both the long form and the ACS questionnaires are more burdensome than the shortform. Survey methodologists consider burden to include both the direct time costs of responding and the indirect costs arising from nonresponse due to perceived sensitivity of the topic. There are, consequently, many explanations for the lower self-response rates among all household types on these longer questionnaires. However, the only difference between citizen and noncitizen households in our studies was the presence of at least one noncitizen in noncitizen households. It is therefore a reasonable inference that a question on citizenship would lead to some decline in overall self-response because it would make the 2020 Census modestly more burdensome in the direct sense, and potentially much more burdensome in the indirect sense that it would lead to a larger decline in self-response for noncitizen households.

# Deliberative

Hispanics and non-Hispanic non-whites (NHNW) have greater breakoff rates than non-Hispanic whites (NHW). In the 2016 ACS data, breakoffs were NHW: 9.5% of cases while NHNW: 14.1% and Hispanics: 17.6%. The paradata show the question on which the breakoff occurred. Only 0.04% of NHW broke off on the citizenship question, whereas NHNW broke off 0.27% and Hispanics broke off 0.36%. There are three related questions on immigrant status on the ACS: citizenship, place of birth, and year of entry to the United States. Considering all three questions Hispanics broke off on 1.6% of all ISR cases, NHNW: 1.2% and NHW: 0.5%. A breakoff on the ISR instrument can result in follow-up costs, imputation of missing data, or both. Because Hispanics and non-Hispanic non-whites breakoff much more often than non-Hispanic whites, especially on the citizenship-related questions, their survey response quality is differentially affected. **Deliberative**

## B.4.    Cost analysis

Lower self-response rates would raise the cost of conducting the 2020 Census. We discuss those increased costs below. They also reduce the quality of the resulting data. Lower self-response rates degrade data quality because data obtained from NRFU have greater erroneous enumeration and whole-person imputation rates. An erroneous enumeration means a census person enumeration that should not have been counted for any of several reasons, such as, that the person (1) is a duplicate of a correct enumeration; (2) is inappropriate (e.g., the person died before Census Day); or (3) is enumerated in the wrong location for the relevant tabulation (https://www.census.gov/coverage_measurement/definitions/). A whole-person census imputation is a census microdata record for a person for which all characteristics are imputed.

Our analysis of the 2010 Census coverage errors (Census Coverage Measurement Estimation Report: Summary of Estimates of Coverage for Persons in the United States, Memo G-01) contains the relevant data. That study found that when the 2010 Census obtained a valid self-response (219 million persons),

the correct enumeration rate was 97.3%, erroneous enumerations were 2.5%, and whole-person census imputations were 0.3%. All erroneous enumeration and whole-person imputation rates are much greater for responses collected in NRFU. The vast majority of NRFU responses to the 2010 Census (59 million persons) were collected in May. During that month, the rate of correct enumerations was only 90.2%, the rate of incorrect enumeration was 4.8%, and the rate of whole-person census imputations was 5.0%. June NRFU accounted for 15 million persons, of whom only 84.6% were correctly enumerated, with erroneous enumerations of 5.7%, and whole-person census imputations of 9.6%. (See Table 19 of 2010 Census Memorandum G-01. That table does not provide statistics for all NRFU cases in aggregate.)

One reason that the erroneous enumeration and whole-person imputation rates are so much greater during NRFU is that the data are much more likely to be collected from a proxy rather than a household member, and, when they do come from a household member, that person has less accurate information than self-responders. The correct enumeration rate for NRFU household member interviews is 93.4% (see Table 21 of 2010 Census Memorandum G-01), compared to 97.3% for non-NRFU households (see Table 19). The information for 21.0% of the persons whose data were collected during NRFU is based on proxy responses. For these 16 million persons, the correct enumeration rate is only 70.1%. Among proxy responses, erroneous enumerations are 6.7% and whole-person census imputations are 23.1% (see Table 21).

Using these data, we can develop a cautious estimate of the data quality consequences of adding the citizenship question. We assume that citizens are unaffected by the change and that an additional 5.1% of households with at least one noncitizen go into NRFU because they do not self-respond. We expect about 126 million occupied households in the 2020 Census. From the 2016 ACS, we estimate that 9.8% of all households contain at least one noncitizen. Combining these assumptions implies an additional 630,000 households in NRFU. If the NRFU data for those households have the same quality as the average NRFU data in the 2010 Census, then the result would be 139,000 fewer correct enumerations, of which 46,000 are additional erroneous enumerations and 93,000 are additional whole-person census imputations. This analysis assumes that, during the NRFU operations, a cooperative member of the household supplies data 79.0% of the time and 21.0% receive proxy responses. If all of these new NRFU cases go to proxy responses instead, the result would be 432,000 fewer correct enumerations, of which 67,000 are erroneous enumerations and 365,000 are whole-person census imputations.

For Alternative B, our estimate of the incremental cost proceeds as follows. Using the analysis in the paragraph above, the estimated NRFU workload will increase by approximately 630,000 households, or approximately 0.5 percentage points. We currently estimate that for each percentage point increase in NRFU, the cost of the 2020 Census increases by approximately $55 million. Accordingly, the addition of a question on citizenship could increase the cost of the 2020 Census by at least $27.5 million. It is worth stressing that this cost estimate is a lower bound. Our estimate of $55 million for each percentage point increase in NRFU is based on an average of three visits per household. We expect that many more of these noncitizen households would receive six NRFU visits.

We believe that $27.5 million is a conservative estimate because the other evidence cited in this report suggests that the differences between citizen and noncitizen response rates and data quality will be amplified during the 2020 Census compared to historical levels. Hence, the decrease in self-response for citizen households in 2020 could be much greater than the 5.1 percentage points we observed during the 2010 Census.

0012485

*Alternative C: Use administrative data on citizenship instead of add the question to the 2020 Census*

Under this alternative, we would add the capability to link an accurate, edited citizenship variable from administrative records to the final 2020 Census microdata files. We would then produce block-level tables of citizen voting age population by race and ethnicity during the publication phase of the 2020 Census using the enhanced 2020 Census microdata.

The Census Bureau has conducted tests of its ability to link administrative data to supplement the decennial census and the ACS since the 1990s. Administrative record studies were performed for the 1990, 2000 and 2010 Censuses. We discuss some of the implications of the 2010 study below. We have used administrative data extensively in the production of the economic censuses for decades. Administrative business data from multiple sources are a key component of the production Business Register, which provides the frames for the economic censuses, annual, quarterly, and monthly business surveys. Administrative business data are also directly tabulated in many of our products.

In support of the 2020 Census, we moved the administrative data linking facility for households and individuals from research to production. This means that the ability to integrate administrative data at the record level is already part of the 2020 Census production environment. In addition, we began regularly ingesting and loading administrative data from the Social Security Administration, Internal Revenue Service and other federal and state sources into the 2020 Census data systems. In assessing the expected quality and cost of Alternative C, we assume the availability of these record linkage systems and the associated administrative data during the 2020 Census production cycle.

*C.1.    Quality of administrate record versus self-report citizenship status*

We performed a detailed study of the responses to the citizenship question compared to the administrative record citizenship variable for the 2000 Census, 2010 ACS and 2016 ACS. These analyses confirm that the vast majority of citizens, as determined by reliable federal administrative records that require proof of citizenship, correctly report their status when asked a survey question. These analyses also demonstrate that when the administrative record source indicates an individual is not a citizen, the self-report is "citizen" for no less than 23.8% of the cases, and often more than 30%.

For all of these analyses, we linked the Census Bureau's enhanced version of the SSA Numident data using the production individual record linkage system to append an administrative citizenship variable to the relevant census and ACS microdata. The Numident data contain information on every person who has ever been issued a Social Security Number or an Individual Taxpayer Identification Number. Since 1972, SSA has required proof of citizenship or legal resident alien status from applicants. We use this verified citizenship status as our administrative citizenship variable. Because noncitizens must interact with SSA if they become naturalized citizens, these data reflect current citizenship status albeit with a lag for some noncitizens.

# Deliberative

noncitizen: 0.9% and missing: 0.3%. By contrast, when the administrative data indicated that the respondent was not a citizen, the self-report was citizen: 29.9%, noncitizen: 66.4%, and missing: 3.7%.

In the same analysis of 2000 Census data, we consider three categories of individuals: the reference person (the individual who completed the census form for the household), relatives of the reference person, and individuals unrelated to the reference person. When the administrative data show that the individual is a citizen, the reference person, relatives of the reference person, and nonrelatives of the reference person have self-reported citizenship status of 98.7%, 98.9% and 97.2%, respectively. On the other hand, when the administrative data report that the individual was a noncitizen, the long-form response was citizen for 32.9% of the reference persons; that is, reference persons who are not citizens according to the administrative data self-report that they are not citizens in only 63.3% of the long-form responses. When they are reporting for a relative who is not a citizen according to the administrative data, reference persons list that individual as a citizen in 28.6% of the long-form responses. When they are reporting for a nonrelative who is not a citizen according to the administrative data, reference persons list that individual as a citizen in 20.4% of the long-form responses.

We analyzed the 2010 and 2016 ACS citizenship responses using the same methodology. The 2010 ACS respondents were linked to the 2010 version of the Census Numident. The 2016 ACS respondents were linked to the 2016 Census Numident. In 2010, 8.5% of the respondents could not be linked, or had missing citizenship status on the administrative data. In 2016, 10.9% could not be linked or had missing administrative data. We reached the same conclusions using 2010 and 2016 ACS data with the following exceptions. When the administrative data report that the individual is a citizen, the self-response is citizen on 96.9% of the 2010 ACS questionnaires and 93.8% of the 2016 questionnaires. These lower self-reported citizenship rates are due to missing responses on the ACS, not misclassification. As we noted above, the item nonresponse rate for the citizenship question has been increasing. These item nonresponse data show that some citizens are not reporting their status on the ACS at all. In 2010 and 2016, individuals for whom the administrative data indicate noncitizen respond citizen in 32.7% and 34.7% of the ACS questionnaires, respectively. The rates of missing ACS citizenship response are also greater for individuals who are noncitizens in the administrative data (2010: 4.1%, 2016: 7.7%). The analysis of reference persons, relatives, and nonrelatives is qualitatively identical to the 2000 Census analysis.

In all three analyses, the results for racial and ethnic groups and for voting age individuals are similar to the results for the whole population with one important exception. If the administrative data indicate that the person is a citizen, the self-report is citizen at a very high rate with the remainder being predominately missing self-reports for all groups. If the administrative data indicate noncitizen, the self-report is citizen at a very high rate (never less than 23.8% for any racial, ethnic or voting age group in any year we studied). The exception is the missing data rate for Hispanics, who are missing administrative data about twice as often as non-Hispanic blacks and three times as often as non-Hispanic whites.

*C.2.   Analysis of coverage differences between administrative and survey citizenship data*

Our analysis suggests that the ACS and 2000 long form survey data have more complete coverage of citizenship than administrative record data, but the relative advantage of the survey data is diminishing. Citizenship status is missing for 10.9 percent of persons in the 2016 administrative records, and it is missing for 6.3 percent of persons in the 2016 ACS. This 4.6 percentage point gap between administrative and survey missing data rates is smaller than the gap in 2000 (6.9 percentage points) and 2010 (5.6

0012487

percentage points). Incomplete (through November) pre-production ACS data indicate that citizenship item nonresponse has again increased in 2017.

There is an important caveat to the conclusion that survey-based citizenship data are more complete than administrative records, albeit less so now than in 2000. The methods used to adjust the ACS weights for survey nonresponse and to allocate citizenship status for item nonresponse assume that the predicted answers of the sampled non-respondents are statistically the same as those of respondents. Our analysis casts serious doubt on this assumption, suggesting that those who do not respond to either the entire ACS or the citizenship question on the ACS are not statistically similar to those who do; in particular, their responses to the citizenship question would not be well-predicted by the answers of those who did respond.

The consequences of missing citizenship data in the administrative records are asymmetric. In the Census Numident, citizenship data may be missing for older citizens who obtained SSNs before the 1972 requirement to verify citizenship, naturalized citizens who have not confirmed their naturalization to SSA, and noncitizens who do not have an SSN or ITIN. All three of these shortcomings are addressed by adding data from the United States Citizen and Immigration Services (USCIS). Those data would complement the Census Numident data for older citizens and update those data for naturalized citizens. A less obvious, but equally important benefit, is that they would permit record linkage for legal resident aliens by allowing the construction of a supplementary record linkage master list for such people, who are only in scope for the Numident if they apply for and receive an SSN or ITIN. Consequently, the administrative records citizenship data would most likely have both more accurate citizen status and fewer missing individuals than would be the case for any survey-based collection method. Finally, having two sources of administrative citizenship data permits a detailed verification of the accuracy of those sources as well.

*C.3.  Cost of administrative record data production*

For Alternative C, we estimate that the incremental cost, except for new MOUs, is $450,000. This cost estimate includes the time to develop an MOU with USCIS, estimated ingestion and curation costs for USCIS data, incremental costs of other administrative data already in use in the 2020 Census but for which continued acquisition is now a requirement, and staff time to do the required statistical work for integration of the administrative-data citizenship status onto the 2020 Census microdata. This cost estimate is necessarily incomplete because we have not had adequate time to develop a draft MOU with USCIS, which is a requirement for getting a firm delivery cost estimate from the agency. Acquisition costs for other administrative data acquired or proposed for the 2020 Census varied from zero to $1.5M. Thus the realistic range of cost estimates, including the cost of USCIS data, is between $500,000 and $2.0M

0012488

Deliberative

**Summary Analysis of the Key Differences Between Alternative C and Alternative D**

This short note describes the Census Bureau's current assumptions about two alternatives to address the need for block level data on citizen voting age populations. The goal is to measure the citizenship status of all people enumerated in the 2020 Decennial Census. Both alternatives utilize administrative data on the citizenship status of individuals, however one option, Alternative D, proposes to also include the current American Community Survey (ACS) question on citizenship status on the 2020 Decennial Census short form.

In both alternatives described here, the methodology requires linking 2020 census response data and administrative records. However, as illustrated both alternatives would also need to assign/impute citizenship for a portion of the population. The Census Bureau will have to assign citizenship in cases of questionnaire non-response and item non-response. Additionally, it is important to note, that even when a self-response is available it is not always possible to link response data with administrative records data. Poor data quality (e.g., name and age) and nonresponse or incomplete 2020 Census responses mean that we will not have a direct measure of citizenship status for all residents enumerated in 2020. The Census Bureau will to need employ an imputation model for these cases.

One of the key differences between to the two alternatives described below is the number of cases requiring imputation. The other key difference is the impact of errors in the citizenship status reported on the 2020 Census.

In the most recent version of the 2020 Decennial Life Cycle Cost Estimate, the Census Bureau projects counting 330 million residents in 2020. Figure 1 summarizes how citizenship status will be measured under Alternative C that does not employ a citizenship question on the 2020 Census. Figure 2 summarizes how this will be done using both administrative records and a 2020 citizenship question under Alternative D.

Alternative C is a simplified process for assigning citizenship through direct linkage and modelling, without including the question on the 2020 Census. The Census Bureau will link the responses for the 330 million census records to administrative records that contain information on the citizenship status of individuals. The Census Bureau expects to successfully link and observe this status for approximately 295 million people. The Census Bureau would need to impute this status for approximately 35 million people under Alternative C whose 2020 responses cannot be linked to administrative data. Although the Census Bureau has fully developed and tested the imputation model, it has high confidence that an accurate model can be developed and deployed for this purpose. Further, we will most likely never possess a fully adequate truth deck to benchmark it to.

Measuring citizenship status is slightly more complex under Alternative D where all U.S. households will be given the opportunity to provide the citizenship status of each household member. Based on response data for the ACS citizenship and other response data research, we know that not all households that respond to the 2020 Census will answer this question, leaving the question blank or with otherwise invalid responses. Additionally, Alternative D, must also account for those households that do not respond at all or will have proxy responses. Due to these reasons, we estimate that we will get 2020 citizenship status responses for approximately 294.6 million people, a slightly higher estimate

than Alternative C.  For the 35.4 million people without a 2020 citizenship response, the Census Bureau will employ the same methodology as in Alternative C, linking the 2020 Census responses to the administrative records.  The Census Bureau estimates that it will be able to link these cases to administrative records where we observe citizenship status for approximately 21.5 million people.  For the remaining 13.8 million will be imputed through a model as described above.  Thus, there will be a need for imputing many cases across either alternative.

The Census Bureau will link the 294.6 million records from the 2020 Census with the administrative records.  This will be done both for potential quality assurance purposes and to improve the quality of future modeling uses.  Based on the current research from the ACS, the Census Bureau expects to successfully link approximately 272.5 million of these cases. Of these, 263 million will have citizenship statuses that agree across the 2020 response and administrative record.  The Census Bureau estimates there will be 9.5 million cases where there is disagreement across the two sources.  Historic Census Bureau practice is to use self-reported data in these situations.  However, the Census Bureau now knows from linking ACS responses on citizenship to administrative data that nearly one third of noncitizens in the administrative data respond to the questionnaire indicating they are citizens, indicating that this practice should be revisited in the case of measuring citizenship.  Finally, for those 22.2 million cases that do not link to administrative records (non-linkage occurs for the same data quality reasons discussed above), the Census Bureau will use the observed 2020 responses.  Again, Census Bureau expect some quality issues with these responses.  Namely, the Census Bureau estimates that just under 500 thousand noncitizens will respond as citizens.

The relative quality of Alternative C versus Alternative D will depend on the relative importance of the errors in administrative data, response data, and imputations.  To be slightly more but not fully precise consider the following description of errors under both alternatives.  First note that all possible measurement methods will have errors.  Under Alternative C, there will be error in the administrative records, but we believe these to be relatively limited dues to the procedure following by SSA, USCIS and State.  In both Alternative, the modeled cases will be subject to prediction error.  Prediction error occur when the model returns the incorrect status of a case.  As there are more models cases in Alternative C, prediction error will be a bigger issue there.  Alternative D has an additional source or error, response error.  This is where 2020 respondent give the incorrect status.  Statisticians often hope these error are random and cancel out.  However, we know from prior research that citizenship status responses are systematically biased for a subset of noncitizens.  Response error is only an issue in alternative D.  Unfortunately, the Census Bureau cannot quantify the relative magnitude of the errors across the alternatives  at this time.

0012503

Figure 1





0012504

Figure 2



0012505

| | |
|---|---|
| **From**: | Walsh, Michael (Federal) [ PII ] |
| **Sent**: | 3/16/2018 1:23:10 PM |
| **To**: | Teramoto, Wendy (Federal) [ PII ]; Rockas, James (Federal)[ PII ] |
| **CC**: | Kelley, Karen (Federal) [ PII ]; Comstock, Earl (Federal) [ PII ] |
| **Subject**: | RE: Updated with his further edits below - For your approval |

If not, I [                    **Deliberative**                    ] I spoke to Karen and she is OK with it.

**From:** Teramoto, Wendy (Federal)
**Sent:** Friday, March 16, 2018 9:20 AM
**To:** Rockas, James (Federal) [ PII ]
**Cc:** Kelley, Karen (Federal) [ PII ]; Walsh, Michael (Federal) [ PII ]; Comstock, Earl (Federal)
[ PII ]
**Subject:** Re: Updated with his further edits below - For your approval

Did you already send this to Reporter?

Sent from my iPhone

On Mar 16, 2018, at 9:18 AM, Rockas, James (Federal) [ PII ] wrote:

**QUOTES FOR GILLIAN:**

We will present the decision to Congress by March 31 but we are still working on the decision.

We have had letters from both sides - from elected officials and think tanks and others - we have been spending a lot of time reaching out telephonically to stakeholders on both sides. Whichever way we go it will be a controversial decision.

The decision will be made ate the Commerce Secretary level.

A question on citizenship is already asked on the American Community Survey, which is a limited sample taken each year - not the full decennial census.

We are doing tons of analysis of this whole thing; we don't yet have a decision; we are still in the research phase; making sure that we have considered every aspect.

The cost of the 2010 Census in today's money is $12.1bn and the estimate that the Census Bureau prepared in October 2015 for the 2020 Census was $12.3bn.

The former administration did not use certified cost estimators.

We brought in outside consultants, and after careful work by them and certified cost estimators, we have now raised the estimate to $15.6bn, which includes risk-based contingency but not a contingency for unknown risks to the 2020 Census.

There are unknowable risks.

We have a very, very complicated situation now with the Census because of technology changes and in hiring process - we have to hire 500,000 enumerators for part time work for a limited time period!

That wasn't too hard in 2010 because you didn't have very full employment.

But given the way that the economy is now, the physical act of hiring people is going to be quite a problem -this is a unique management challenge."

 We will spend $480m on marketing and advertising, up from $376m in 2010, and outreach will be done in many different languages.

The online response forms will come in 13 languages, the enumerators will have 59 different non-English language guides, and further outreach through call centers and other means will be in dozens of different languages, as suitable to the population.

We certainly won't have any advanced notice of cyber-attacks, but if one does occur, we will deal with it with help from other government agencies.

We understand the importance of ensuring the highest levels of cybersecurity and the need to continuously monitor and enhance our ability, in real time, to identify, detect, protect, respond, and recover from potential cyber and fraud threats.

Working independently, and with industry and federal partners like NIST and DHS, the Census is implementing a multilayered approach that ensures the safety and security of our systems and data throughout our processes of survey data collection, data analysis, and dissemination of information.

Census incorporates fraud analytics and detection to ensure that the data collected has the highest authenticity and validity so as to maintain the Public Trust and Confidence.

Part of the partnerships are with business groups. We think we will have very good cooperation from the business community because it is a very major consumer of census data.

Another issue will be cost.

We will be spending 107 dollars per housing unit in the whole country on this Census - up from 91 inflation adjusted dollars for the 2010 Census. In 2010 dollars, we spent 77 dollars per household in the 2010 Census.

 Census management assumes 60.5 of households will respond voluntarily, down from 63.5 in 2010.

Gillian, please add:  Violation of the secrecy of Census responses is a criminal offense punishable by multiple years in prison and a fine of $250,000.  This is why there never has been a violation and I believe there never will be.  Every Census employee takes a life-time oath not to disclose any data.

----------

James Rockas

Press Secretary & Deputy Director of Public Affairs

U.S. Department of Commerce





**To:** Teramoto, Wendy (Federal) ███████@doc.gov]
**From:** Comstock, Earl (Federal)
**Sent:** Sat 9/16/2017 11:33:38 AM
**Importance:** Normal
**Subject:** Calls with DoJ
**Received:** Sat 9/16/2017 11:33:38 AM

Morning Wendy –

Here is the memo I gave SWLR regarding my discussions with DoJ.

Earl

\*\*\*

September 8, 2017

To:   Secretary Wilbur Ross

Fr:   Earl Comstock

Re:   <u>Census Discussions with DoJ</u>

 In early May Eric Branstad put me in touch with Mary Blanche Hankey as the White House liaison in the Department of Justice.  Mary Blanche worked for AG Sessions in his Senate office, and came with him to the Department of Justice.  We met in person to discuss the citizenship question.  She said ███████████████████████████████████████ ████████████ A few days later she directed me to James McHenry in the Department of Justice.

 I spoke several times with James McHenry by phone, and after considering the matter further James said t███████████ ████████████ James directed me to Gene Hamilton at the Department of Homeland Security.

 Gene and I had several phone calls to discuss the matter, and then Gene relayed that after discussion DHS really felt that it was best handled by the Department of Justice.

 At that point the conversation ceased and I asked James Uthmeier, who had by then joined the Department of Commerce Office of General Counsel, to ████████████████████████████████████████████ ████████████

**From:**   Wilbur Ross  [ PII ]
**Sent:**   8/10/2017 7:38:25 PM
**To:**     Comstock, Earl (Federal)  [ PII ]
**Subject:** Re: Census Matter


I would like to be briefed on Friday by phone. I probably will need an hour or so to study the memo
first.we should be very careful,about everything,whether or not it is likely to end up in the SC. WLR

Sent from my iPad

> On Aug 9, 2017, at 10:24 AM, Comstock, Earl (Federal) [ PII ] wrote:
>
> PREDECISIONAL AND ATTORNEY-CLIENT PRIVILEGED
>
> Mr. Secretary – we are preparing a memo and full briefing for you on the citizenship question.  The
memo will be ready by Friday, and we can do the briefing whenever you are back in the office.  Since this
issue will go to the Supreme Court we need to be diligent in preparing the administrative record.
>
> Earl
>
> On 8/8/17, 1:20 PM, "Wilbur Ross" [ PII ] wrote:
>
> **Not Responsive / Deliberative**
**Not Responsive / Deliberative** Were you on the call this morning about Census? **Deliberative**
**Deliberative**                                                where is the DoJ in their analysis ? If
they still have not come to a conclusion please let me know your contact person and I will call the AG.
Wilbur Ross
>
>     Sent from my iPhone
>
>> On Aug 8, 2017, at 10:52 AM, Comstock, Earl (Federal) [ PII ] wrote:
>>
>> Not Responsive / Deliberative
>
>

September 8, 2017

To:     Secretary Wilbur Ross

Fr:     Earl Comstock

Re:     <u>Census Discussions with DoJ</u>

In early May Eric Branstad put me in touch with Mary Blanche Hankey as the White House liaison in the Department of Justice.  Mary Blanche worked for AG Sessions in his Senate office, and came with him to the Department of Justice.  We met in person to discuss the citizenship question.  She said she ███████████████████████████████████
A few days later she directed me to James McHenry in the Department of Justice.

I spoke several times with James McHenry by phone, and after considering the matter further James said that ██████████████████████████████████████████
██████████████████████████████████████ James directed me to Gene Hamilton at the Department of Homeland Security.

Gene and I had several phone calls to discuss the matter, and then Gene relayed that after discussion DHS really felt that it was best handled by the Department of Justice.

At that point the conversation ceased and I asked James Uthmeier, who had by then joined the Department of Commerce Office of General Counsel, to ████████████████████████
████████████████████████████████████