UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NEW YORK IMMIGRATION
COALITION, *et. al*,

Plaintiff,

v.

UNITED STATES DEPARTMENT OF
COMMERCE, *et. al*,

Defendant.

Civil Action No. 1:18-cv-05025-JMF

Hon. Jesse M. Furman

---

### PLAINTIFFS' REQUESTS FOR ADMISSION TO DEFENDANT UNITED STATES DEPARTMENT OF COMMERCE

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, Plaintiffs request that defendant United States Department of Commerce, within thirty (30) days, admit or otherwise respond, in the manner permitted by that Rule, to the Requests for Admission set forth below.

### DEFINITIONS

1.     CENSUS BUREAU means the United States Census Bureau, including all regional offices and subdivisions of the Census Bureau, including any PERSON or PERSONS.

2.     COMMUNICATION or COMMUNICATIONS means any contact between two or more PERSONS (including any individual, corporation, proprietorship, partnership, association, government agency or any other entity) by which any information, knowledge or opinion is transmitted or conveyed, or attempted to be transmitted or conveyed, and shall include, without limitation, written contact by means such as letters, memoranda, e-mails, text messages, instant messages, tweets, social networking sites, or any other DOCUMENT, and oral contact, such as face-to-face meetings, video conferences, or telephonic conversations.

3.      COMMERCE means the United States Department of Commerce and all of its component agencies, including the Census Bureau.

4.      DECENNIAL CENSUS means the constitutionally mandated census that is administered every ten years by the Census Bureau to count the number of people residing in the United States.

5.      DOJ means the United States Department of Justice, including any PERSON OR PERSONS currently or formerly employed by such agency since January 20, 2017.

6.      DOCUMENT means any "document or electronically stored information— including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form." Fed. R. Civ. P. 34(a)(1)(A).

7.      PERSON OR PERSONS means any natural person, firm, partnership, association, joint venture, public or private corporation, individual, proprietorship, governmental entity, organization, other enterprise, group of natural persons or other entity that has a separate legal existence.

8.      OTHER GOVERNMENT AGENCIES means the DOJ, the United States Department of Homeland Security, the United States  Department of State, and any other agencies of the United States Government, including any PERSON OR PERSONS currently or formerly employed by such agencies since January 20, 2017.

9.      SECRETARY ROSS or DEFENDANT ROSS  means Wilbur J. Ross, Secretary of COMMERCE.

10.     TRUMP CAMPAIGN means any PERSON or PERSONS, organizations, or agents seeking the election or reelection of Donald J. Trump, including but not limited to employees of the presidential campaign committee, Donald J. Trump for President, Inc.

11.     TRUMP ADMINISTRATION means President Donald J. Trump, Vice President Michael R. Pence, and any PERSON or PERSONS currently or formerly employed at, for, or within the Executive Office of the President and all of its components at any time since January 20, 2017.

12.     The use of the singular form of any word shall include the plural and vice versa.

13.     The connectives "and," "or," and "and/or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses which might otherwise be construed outside the scope.

## <u>INSTRUCTIONS</u>

1.     Each Request is deemed admitted unless, within (30) days after service of the Requests, Defendant serves a written answer or objection addressed to the Request that is signed either by Defendant or its attorneys.

2.     If a complete answer to a Request is not known, state the answer as fully as possible to each part of such Request to which an answer is known. If you deny any Request, in whole or in part, describe in detail the basis for the denial and respond fully and fairly to the substance of the Request.

3.     The following Requests call not only for your knowledge, but for all knowledge that is available to you by reasonable inquiry, including but not limited to inquiry of your representatives, agents, employees, and, if not privileged, your attorneys.

4.     Unless otherwise specified, these Requests are deemed to be continuing to the full extent permitted under the applicable provisions of the Federal Rules of Civil Procedure, and you are required to promptly supplement your answers to these Requests as further information called for by these Requests becomes available to you or is within your knowledge.

5.     If you assert privilege as a grounds for failing to answer any Request, respond to that part of each such Request that, in your view, does not seek allegedly privileged information or communications. For each Request, or portion thereof, for which you claim a privilege, describe the full basis for the claim of privilege in sufficient detail to permit adjudication of the validity of that claim, including without limitation the following: (i) a brief description of the type of communication or information at issue *(e.g.,* document or conversation); (ii) the date of the information or communication; (iii) the name of the transmitter of the information or communication; (iv) the name of the persons to whom the information or communication was transmitted; (v) the name of each person to whom the information or communication has been provided, whether by you or any other person; (vi) a brief description of the subject matter of the information or communication; (vii) the nature of the privilege or protection asserted; and (viii) a brief explanation of why your response to the Request is believed to be privileged or protected from production.

6.     When a response to a Request contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible without thereby disclosing the privileged material.

7.     When a Request asks that a date, an amount, or any other specific information be provided, the precise information is requested. If the precise information is not available, provide

your best approximation of the information requested and the basis upon which this approximation is grounded.

      8.      The citations to deposition pages are included herein as a courtesy to provide Defendant with specific examples of where certain facts were admitted. The inclusion of such citations in no way narrows or limits the requests for admission or the obligation of Defendant to undertake the appropriate steps to confirm or specifically deny these requested admissions.

      9.      Plaintiffs' Requests for Admission are continuing and require Defendant to supplement any of their responses to any and all Requests if responsive information becomes known to Defendants after service of their responses.

## REQUESTS FOR ADMISSION

      1.      On June 16, 2015, when announcing his candidacy for president, Donald Trump stated: "When Mexico sends its people they're not sending their best . . . . They're bringing drugs.  They're bringing crime.  They're rapists . . . . It's coming from more than Mexico.  It's coming from all over South and Latin America."

      2.      On August 5, 2015, Donald Trump stated: "The Mexican government . . . send the bad ones over because they don't want to pay for them. They don't want to take care of them."

      3.      On August 21, 2015,  Donald Trump tweeted "How crazy - 7.5% of all births in U.S. are to illegal immigrants, over 300,000 babies per year. This must stop. Unaffordable and not right!"

      4.      In December 2015, during an interview with TIME magazine, Donald Trump stated "I happen to believe that various countries force their bad people into the United States, because they say why should we take care of these monsters, let the United States take care of them."

5.      In December 2015, Donald Trump called for "a total and complete shutdown of Muslims entering the United States."

6.      During his 2016 presidential campaign,  Donald Trump referred to children of immigrants as "anchor babies."

7.      During his 2016 presidential campaign,  Donald Trump stated that he would seek an end to "birthright citizenship."

8.      On March 22, 2016,  Donald Trump described Muslim immigrants by saying "there's no assimilation.  They're not assimilating . . . . They want to go by sharia law.  They want sharia law.  They don't want the laws that we have.  They want sharia law."

9.      On May 25, 2016,  Donald Trump Tweeted that "The protestors in New Mexico were thugs who were flying the Mexican Flag."

10.     On June 4, 2016,  Donald Trump Tweeted that "Many of the thugs that attacked peaceful Trump supporters in San Jose were illegals."

11.     In August 2016, Donald Trump stated: "most illegal immigrants are lower skilled workers with less education . . . these illegal workers draw much more out from the system than they can ever possibly pay back. And they're hurting a lot of our people that cannot get jobs under any circumstances."

12.     In August 2016, Donald Trump stated: "We will immediately terminate President Obama's two illegal executive amnesties in which he defied federal law and the Constitution to give amnesty to approximately five million illegal immigrants, five million. . . . [N]o one will be immune or exempt from enforcement.  . . . Anyone who has entered the United States illegally is subject to deportation."

13.     On September 1, 2016,  Donald Trump stated:  "According to federal data, there are at least two million—two million, think of it—criminal aliens now inside of our country—two million people criminal aliens. We will begin moving them out day one. As soon as I take office. Day one . . . Day one, my first hour in office, those people are gone."

14.     In October 2016, Donald Trump stated: We have some bad hombres here and we're going to get them out."

15.     In December 2016, during an interview with TIME magazine, Donald Trump stated, in reference to an article about a supposed recent crime wave on Long Island:  "They come from Central America. They're tougher than any people you've ever met. They're killing and raping everybody out there. They're illegal. And they are finished."

16.     On January 26, Donald Trump said, referring to immigrants: "We are going to get the bad ones out . . . The criminals and the drug deals, and gangs and gang members and cartel leaders. The day is over when they can stay in our country and wreak havoc."

17.     On January 27, 2017, Donald Trump signed an executive order blocking persons from Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen from entering the United States.

18.     On January 27, 2017, Donald Trump referred to Mexican immigrants as "tough hombres."

19.     In February 2017, Donald Trump said: "What has been allowed to come into our country, when you see gang violence that you've read about like never before, and all of the things — much of that is people that are here illegally .  . . They're rough and they're tough . . . So we're getting them out."

20.     On March 27, 2017, Jeff Sessions, referring to Latino immigrants, stated: "the American people are justifiably angry . . . assaults, burglaries, drug crimes, rapes, crimes against

children and murders.  Countless Americans would be alive today — and countless loved ones would not be grieving today  . . . The President has rightly said that this disregard for the law must end. . . ."

21.     On June 13, 2017, Acting ICE Director Thomas Homan testified "every immigrant in the country without papers . . . should be uncomfortable. You should look over your shoulder. And you need to be worried. . . . No population is off the table. . . ."

22.     On June 21, 2017, Donald Trump said, referring to Central American immigrants: "These are true animals.  We are moving them out of the country by the thousands."

23.     On June 28, 2017, Donald Trump said: "They are bad people. And we've gotten many of them out already. . .  We're actually liberating towns, if you can believe that we have to do that in the United States of America.  But we're doing it, and we're doing it fast."

24.     On July 28, 2017, Stephen Miller said: "a message of tolerance toward illegal immigration is the number-one boon to smugglers and traffickers.  And we've seen the results of that over the last eight years in terms of massive human rights violations associated with the Central American migrant surge. . . that permissive approach, we've seen the results, and the results have been deadly and horrific. . .  We also need to get expedited removal for illegal immigrants from Central America."

25.     On August 22, 2017,  Acting ICE Director Thomas Homan stated: "The message is clear: If you're in the United States illegally, if you happen to get by the Border Patrol, someone is looking for you. And that message is clear."

26.     On September 5, 2017, the Department of Homeland Security announced the rescission of the Deferred Action for Childhood Arrivals program.

27.     On September 5, 2017, Donald Trump tweeted:  "No longer will we incentivize illegal immigration.  LAW AND ORDER! #MAGA."

28.     On September 5, 2017, Donald Trump tweeted:  "Make no mistake, we are going to put the interest of AMERICAN CITIZENS FIRST!"

29.     On October 9, 2017, Wilbur Ross said: "President Trump's tighter border controls have already reduced greatly the influx of illegal aliens, but he needs legislation to finish the task. I support his request to secure our borders, swiftly return illegal entrants, stop visa fraud and overstays, sanctuary cities, asylum abuse and chain immigration, as well as exploitative employment of illegal aliens.  This will take money for more ICE officers, more federal prosecutors and more physical barriers.  That will be money well spent!"

30.     On November 6, 2017, the Department of Homeland Security announced that it would not be renewing the Temporary Protected Status designation for immigrants from Nicaragua.

31.     On November 20, 2017, the Department of Homeland Security announced that it would not be renewing the Temporary Protected Status designation for immigrants from Haiti.

32.     On January 8, 2018, the Department of Homeland Security announced that it would not be renewing the Temporary Protected Status designation for immigrants from El Salvador.

33.     On January 11, 2018, Donald Trump questioned why immigrants were being admitted from El Salvador, Haiti, and Africa, asking "why are we having all these people from shithole countries come here," and stating his preference for immigrants "from places like Norway."

34.     On February 22, 2018, Donald Trump stated that diversity visa lottery winners "turn out to be horrendous . . . . They're not giving us their best people."

35.     On April 5, 2018, Donald Trump stated: "we cannot let people enter our country… through chain migration….This is what the Democrats are doing to you. And they like it because they think they're going to vote Democratic…. A lot of them aren't going to be voting. A lot of times it doesn't matter, because in places, like California, the same person votes many times. You probably heard about that. They always like to say. 'Oh, that's a conspiracy theory.' Not a conspiracy theory, folks.  Millions and millions of people."

36.     On April 26, 2018, the Department of Homeland Security announced that it would not be renewing the Temporary Protected Status designation for immigrants from Nepal.

37.     On April 28, 2018, Donald Trump stated: "If a person puts their foot over the line, we have to take them into our country. We have to register them…. And you know, one of the reasons they do it is because the Democrats actually feel and they are probably right, that all of these people that are pouring across are going to vote for Democrats, they're not going to vote for Republicans, they're going to vote no matter what we do, they're going to vote."

38.     On May 4, 2018,  the Department of Homeland Security announced that it would not be renewing the Temporary Protected Status designation for immigrants from Honduras.

39.     On May 7, 2018, Jeff Sessions announced a "zero tolerance" policy for immigrants, including separating children from parents who cross the border unlawfully.

40.     On May 16, 2018, Donald Trump stated:  "We have people coming into the country, or trying to come in — we're stopping a lot of them. . . You wouldn't believe how bad these people are. These aren't people, these are animals, and we're taking them out of the country at a level and at a rate that's never happened before."

41.     On May 22, 2018, Besty DeVos testified that public schools can choose to call ICE to report potentially undocumented students.

42.     On or about January 31, 2017, the Trump Administration drafted an Executive Order which, among other things, directed the Census Bureau, to include "questions to determine U.S. citizenship and immigration status" on the 2020 Decennial Census.

43.     A background memo to the draft Executive Order stated that its purpose was to "fulfill several campaign promises by aligning immigration policies with the national interest."

44.     The background memo further stated that the provisions in the draft Executive Order were intended to address "the flow of illegal entries and visa overstays" and the "unlawful employment of aliens."

45.     Neither the draft Executive Order nor the background memo made any mention of any aspect of the Voting Rights Act.

46.      Neither the draft Executive order nor the background memo suggested in any other way that the Trump Administration's desire to add a citizenship question to the 2020 Census was motivated in any way by any aspect of the Voting Rights Act.

47.     Defendant Ross was aware of the draft Executive Order prior to the end of February 2017.

48.     Defendant Ross was aware, prior to the end of February 2017, of the desire of the Trump Administration to add a citizenship question to the 2020 Census.

49.     Defendant Ross understood by the spring of 2017 that "other senior Administration officials" referenced in his Supplemental Memorandum of June 21, 2018 wanted the 2020 Census to include a citizenship question.

50.     Defendant Ross knew by the spring of 2017 that President Trump wanted the 2020 Census to include a citizenship question.

51.     Defendant Ross knew by the spring of 2017 that Steven Bannon wanted the 2020 Census to include a citizenship question.

52.     Defendant Ross knew by the spring of 2017 that Stephen Miller wanted the 2020 Census to include a citizenship question.

53.     Defendant Ross knew by the spring of 2017 that Kris Kobach wanted the 2020 Census to include a citizenship question.

54.     In March 2017, Defendant Ross asked Earl Comstock a question about whether noncitizens were included in the census.

55.     On March 10, 2017, Mr. Comstock sent Defendant Ross an email in response to Defendant Ross' question.  The response included an article entitled "The Pitfalls of Counting Illegal Immigrants."

56.     On April 5, 2017 Defendant Ross discussed the addition of a citizenship question on the 2020 Census with Steven Bannon.

57.     During his conversation with Mr. Bannon on April 5, 2017, Mr. Bannon advised Defendant Ross that he wanted a citizenship question included on the 2020 Census.

58.     Before the end of February 2017, Defendant Ross concluded that the 2020 Census should include a citizenship question.

59.     Before the end of March 2017, Defendant Ross concluded that the 2020 Census should include a citizenship question.

60.     Before the end of April 2017, Defendant Ross concluded that the 2020 Census should include a citizenship question.

61.     Before the end of April 2017 Defendant Ross requested others in the Commerce Department to do what was necessary to include a citizenship question in the 2020 Census.

62.     On May 2, 2017 Defendant Ross emailed Earl Comstock, the Director of Policy at Commerce, stating that he was "mystified why nothing have [sic] been done in response to my months old request that we include the citizenship question [on the 2020 Census]."

63.     On May 2, 2017 Mr. Comstock responded to Defendant Ross promising "on the citizenship question we will get that in place."

64.     Mr. Comstock further advised Defendant Ross on May 2, 2017 that he had been advised it would be necessary to "work with Justice to get them to request that citizenship be added back to a census question…."

65.     Prior to May 2017 the Department of Justice had not been approached by anyone in Commerce to request the addition of the citizenship question to the 2020 Census.

66.     Prior to May 2017 the Department of Justice had not requested that the citizenship question be added to the 2020 Census.

67.     On May 4, 2017, Mr. Comstock contacted the Department of Justice.

68.     On May 4, 2017, Mr. Comstock contacted the Department of Justice for the purpose of adding a citizenship question to the 2020 Census.

69.     When Mr. Comstock contacted the Department of Justice on May 4, 2017 for the purpose of adding a citizenship question to the 2020 Census, Mr. Comstock was not seeking to promote more effective enforcement of the Voting Rights Act.

70.     After May 2, 2017, Mr. Comstock conversed with James McHenry at the Department of Justice for the purpose of adding a citizenship question to the 2020 Census.

71.     James McHenry has no responsibility for enforcement of the Voting Rights Act.

72.     At the time Mr. Comstock contacted James McHenry for the purpose of adding a citizenship question to the 2020 Census, Mr. Comstock was not seeking to promote more effective enforcement of the Voting Rights Act.

73.     After May 2, 2017, Mr. Comstock contacted the Department of Homeland Security for the purpose of adding a citizenship question to the 2020 Census.

74.     The Department of Homeland Security has no responsibility for enforcement of the Voting Rights Act.

75.     At the time Mr. Comstock contacted the Department of Homeland Security for the purpose of adding a citizenship question to the 2020 Census, Mr. Comstock was not seeking to promote more effective enforcement of the Voting Rights Act.

76.     After May 2, 2017, Mr. Comstock contacted Eugene (Gene) Hamilton for the purpose of adding a citizenship question to the 2020 Census.

77.     Eugene (Gene) Hamilton has no responsibility for enforcement of the Voting Rights Act.

78.     At the time Mr. Comstock contacted Eugene (Gene) Hamilton for the purpose of adding a citizenship question to the 2020 Census, Mr. Comstock was not seeking to promote more effective enforcement of the Voting Rights Act.

79.     Since Donald Trump's election, Eugene (Gene) Hamilton was in contact with Kris Kobach regarding immigration policy.

80.     During the spring of 2017, and prior to any request from the Department of Justice to add the citizenship question to the 2020 Census, Defendant Ross had a telephone conversation with Kris Kobach concerning his desire to have a citizenship question added to the 2020 Census.

81.    On July 14, 2017, Mr. Kobach emailed Defendant Ross.

82.    On July 14, 2017, Mr. Kobach wrote to Defendant Ross to remind Defendant Ross of their prior telephone discussion "a few months ago" and further stated that the absence of such a question, in his view, "leads to the problem that aliens who do not actually 'reside' in the United States are still counted for congressional apportionment."

83.    On July 21, 2017, Mr. Kobach emailed Wendy Teramoto, Defendant Ross' Chief of Staff, attaching his email to Mr. Ross stating that he had spoken to Defendant Ross about the addition of  citizenship question to the 2020 Census "at the direction of Steve Bannon . . . ."

84.    On July 25, 2017, Defendant Ross had a further telephone conversation with Mr. Kobach concerning the addition of the citizenship question to the 2020 Census.

85.    During the course of their discussion, Defendant Ross and Mr. Kobach discussed the potential effect of adding the citizenship question on apportionment based on residence of non-citizens.

86.    On August 7, 2017, Defendant Ross attended a dinner with Donald Trump.

87.    In August 2017, Defendant Ross discussed adding a citizenship question to the decennial census with Donald Trump.

88.    In August 2017, Defendant Ross discussed adding a citizenship question to the decennial census with Jeff Sessions.

89.    In August 2017, Defendant Ross inquired whether Jeff Sessions would support, and if so, request, inclusion of a citizenship question on the 2020 Census.

90.    In August 2017, Defendant Ross discussed adding a citizenship question to the decennial census with members of the Trump Administration.

91.     On August 8, 2017, Defendant Ross emailed Mr. Comstock asking "where is DOJ in their analysis" of whether to request the addition of a citizenship question to the 2020 Census.

92.     Defendant Ross' email of August 8, 2017 further advised Mr. Comstock that '[i]f they [the Department of Justice] still have not come to a conclusion please let me know your contact person and I will call the AG."

93.     Mr. Comstock responded to Defendant Ross on August 8, 2017 stating that he would get back to him with the requested information.

94.     The Department of Justice had not agreed to request the addition of the citizenship question to the 2020 Census prior to August 8, 2017.

95.     From May through September 2017, Mr. Comstock attempted to identify someone outside the Census Bureau who would make a request for the addition of a citizenship question to the 2020 Census.

96.     On September 8, 2017, Mr. Comstock reported on his efforts to identify someone who would request the addition of the citizenship question to the 2020 Census.  He advised that, as of that date, he had not been successful.

97.     On or about September 13, 2017, Defendant Ross and Jeff Sessions spoke about addition of a citizenship question to the 2020 Census.

98.     On or about September 13, 2017, Defendant Ross inquired whether Jeff Sessions would support, and if so, request, inclusion of a citizenship question on the 2020 Census.

99.     On or about September 13, 2017, Defendant Ross inquired whether Jeff Sessions would support, and if so, request, inclusion of a citizenship question on the 2020 Census as consistent with and useful for enforcement of the Voting Rights Act.

100.    Prior to the discussion between Jeff Sessions and Defendant Ross on September 13, 2017, the Department of Justice had not agreed to request the addition of the citizenship question to the 2020 Census.

101.    Prior to the discussion between Jeff Sessions and Defendant Ross on September 13, 2017, the Department of Justice had not requested the addition of a citizenship question to promote enforcement of the Voting Rights Act.

102.    In November 26, 2017, Defendant Ross was present at Mar-a-Lago.

103.    On or about November 26, 2017, Defendant Ross conversed with President Trump.

104.    During the conversation on or about November 26 between Defendant Ross and President Trump, one of the topics discussed between Defendant Ross and Mr. Trump was the addition of a citizenship question to the 2020 Census.

105.    On November 27, 2017 Defendant Ross emailed Peter Davidson, General Counsel of the Department of Commerce, stating that "Census is about to begin translating the questions into multiple language and has let the printing contract.  We are out of time.  Please set up a call for me tomorrow with whoever is the responsible person at Justice.  We must get this resolved."

106.    Mr. Davidson responded to Defendant Ross on November 28, 2017 stating that he would brief him the following morning.

107.    In sworn testimony before the House of Representatives on March 20, 2018, in response to a question as to whether President Trump or other White House officials had directed Defendant Ross to add the citizenship question to the decennial census, Defendant Ross testified

that the Department of Commerce was responding "solely" to the Department of Justice's request.

108.    In sworn testimony before the House of Representatives on March 22, 2018, Defendant Ross testified that the Department of Justice initiated the request for the inclusion of the citizenship question on the decennial census.

109.    In sworn testimony before the Senate on May 10, 2018, Defendant Ross testified that the Department of Justice was the agency that made the request of the Department of Commerce to add the citizenship question to the decennial census.

110.    Prior to December 11, 2017, neither the Department of Justice nor any other government agency had requested that a citizenship question be added to the 2020 Census.

111.    On December 12, 2017 the Department of Justice sent a letter to Dr. Ron Jarmin, Acting Director of the Census Bureau, requesting the addition of the citizenship question.

112.    Prior to December 2017 neither Dr. Jarmin nor others in the Census Bureau had been advised of Defendant Ross' desire to include a citizenship question on the 2020 Census.

113.    Prior to December 2017, neither Dr. Jarmin nor others in the Census Bureau were requested to provide their views on the effect of adding a citizenship question to the 2020 Census.

114.    Commencing in mid-December,  Census Bureau experts analyzed the effect of adding a citizenship question to the 2020 Census in terms of both its utility to the goals stated in the Department of Justice request and other impact on the conduct of the 2020 Census and the reliability of the data obtained.

115.    At no time did officials from the Census Bureau meet with officials from the Department of Justice to discuss the Department of Justice's request to add a citizenship question to the decennial census.

116.    In sworn testimony before the Senate on May 10, 2018, Defendant Ross testified that the Department of Commerce had "spent a lot of time talking with Justice about the request" and that the Department of Commerce "truly believed" that the Department of Justice thought that they needed to add the citizenship question on the decennial census.

117.    At no time in all of their analysis of the effect of the proposed addition of a citizenship question to the 2020 Census have any of the Census Bureau officials recommended the addition of the question, either to achieve the goals stated in the Department of Justice request or to pursue other objectives of the decennial census.

118.    On January 19, 2018, following a month of detailed analysis, Karen Dunn Kelley, the Deputy Secretary of the Commerce Department, Ron S. Jarmin, the Acting Director of the Census Bureau, and Enrique Lama, the Acting Deputy Director of the Census Bureau sent Defendant Ross the analysis of the Census Bureau staff which recommended that the request of the Justice Department be satisfied either by maintaining the status quo where no citizenship question would be added ("Alternative A") or by using administrative data from other agencies to augment the data provided by the Census, again with no citizenship question added to the decennial census ("Alternative C").

119.    The January 19, 2018 memorandum of the Census Bureau developed a cautious estimate that an additional 5.1% of households with at least one noncitizen would not self-respond to the citizenship question, and that households with all citizens would be unaffected by the change.

120.     The January 19, 2018 memorandum of the Census Bureau stated that the addition of a citizenship question on the 2020 Census would increase the cost of the 2020 Census by at least $27.5 million.

121.     The January 19, 2018 memorandum of the Census Bureau stated that adding a citizenship question to the 2020 Census would lead to major potential quality and cost disruptions.

122.     The January 19, 2018 memorandum of the Census Bureau stated that there is a higher item non-response rate for the citizenship question among Hispanics and non-Hispanic blacks, as compared to other populations.

123.     The January 19, 2018 memorandum of the Census Bureau to Defendant Ross stated that of the three alternatives, "Alternative C best meets DoJ's stated goals, is comparatively far less costly than Alternative B [which would add the citizenship question], does not increase response burden [on the 2020 Census], and does not harm the quality of the census count."

124.     The January 19, 2018 memorandum of the Census Bureau further advised Defendant Ross that "Alternative B [adding the citizenship question] is very costly, harms the quality of the census count, and would use substantially less accurate citizenship status data than are available from administrative sources."

125.     The January 19, 2018 memorandum of the Census Bureau provided Defendant Ross with nine single-spaced pages of analysis supporting each of these conclusions and their recommendation against adding a citizenship question to the 2020 Census.

126.     No official of the Census Bureau has ever advised Defendant Ross that any of the analyses in the January 18, 2018 memorandum were incorrect or invalid.

127.    Following his review of the Census Bureau memorandum of January 19, 2018, Defendant Ross caused his subordinates to pose a series of questions to the Census Bureau staff concerning their analysis.

128.    The Census Bureau provided answers to Defendant Ross' question in various drafts in February and early March 2018.

129.    In none of those answers did the Census Bureau withdraw their conclusion that the stated goals of the Department of Justice could best be met by using administrative data in conjunction with the standard census questions which would not include a citizenship question.

130.    In none of those answers did the Census Bureau withdraw their conclusion that adding a citizenship question would result in data that would be less beneficial to the stated goals of the Department of Justice, increase the cost of the 2020 Census, lead to a greater non-response rate, and jeopardize a complete census count.

131.    On or about January 26, 2018, Defendant Ross received a letter from the six prior Directors of the Census Bureau urging him not to add a citizenship question to the 2020 Census because it had not been sufficiently and properly tested and might well harm the Census as a whole.

132.    In mid-February Defendant Ross met with the Census Bureau staff and discussed their analyses and recommendations on the issue of the citizenship question.

133.    At the meeting in mid-February, the Census Bureau did not withdraw their recommendation in favor of using administrative data and against adding a citizenship question.

134.    On March 1, 2018 Deputy Secretary Kelley, Director Jarmin, and Assistant Director Lamas sent Defendant Ross an analysis comparing the relative merit of adding a citizenship question and using those results in combination with administrative data

("Alternative D") as opposed to using just administrative data without the addition of a citizenship question ("Alternative C").

135.    The March 1, 2018 memorandum of the Census Bureau concluded that "inclusion of a citizenship question on the 2020 Census questionnaire is very likely to reduce the self-response rate, pushing more households into Nonresponse Followup (NRFU).  Not only will this likely lead to more incorrect enumerations, but it is also expected to increase the number of persons who cannot be linked to the administrative data because NRFU PII is lower quality than the self-response data."

136.    The March 1, 2018 memorandum of the Census Bureau concluded that "Alternative D [including the addition of the citizenship question] would result in poorer quality citizenship data than Alternative C [which would not add the citizenship question].  It [Alternative D] would still have all the negative cost and quality implications of Alternative B outlined in the draft January 19, 2018 memo to the Department of Commerce."

137.    Defendant Ross reviewed the analyses and recommendations of the Census Bureau, which were supported by 18 pages of analysis and answers to Defendant Ross' prior questions.

138.    Defendant Ross directed members of the Commerce Department staff to draft a memorandum justifying the addition of the citizenship question.

139.    In March 2018 the Commerce Department staff drafted a 4 page memorandum without consulting the Census Bureau officials, concluding that the Secretary would order the addition of a citizenship question to the 2020 Census.

140.    Defendant Ross stated in his March 26, 2018 Decisional Memorandum, that "neither the Census Bureau nor the concerned stakeholders could document that the response

rate would in fact decline materially," despite the Census Bureau's finding that adding a citizenship question to the 2020 Census would lead to a 5.1% decrease in self-response rates.

141.    Defendant Ross stated in his March 26, 2018 Decisional Memorandum that it was "difficult to assess" "non-response follow-up increases resulting from inclusion of the citizenship question would lead to increased costs," despite the Census Bureau's estimate that the decrease in self-response rates caused by adding a citizenship question to the 2020 Census would lead an increase in costs of at least $27.5 million.

Dated:  September 7, 2018

ARNOLD & PORTER KAYE SCHOLER LLP
AMERICAN CIVIL LIBERTIES UNION

By: /s/ John A. Freedman

Dale Ho
David Hausman+
American Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
(212) 549-2693
dho@aclu.org
dhausman@aclu.org

Sarah Brannon+ **
Davin Rosborough**
Ceridwen Cherry+
American Civil Liberties Union Foundation
915 15th Street, NW
Washington, DC 20005-2313
202-675-2337
sbrannon@aclu.org
drosborough@aclu.org
ccherry@aclu.org

Arthur N. Eisenberg
Christopher T. Dunn
Perry M. Grossman

Andrew Bauer
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-7669
Andrew.Bauer@arnoldporter.com

John A. Freedman
David P. Gersch+
Peter T. Grossi, Jr*
R. Stanton Jones*
Eric A. Rubel*
David J. Weiner*
Robert N. Weiner*
Barbara H. Wootton*
Elisabeth S. Theodore*
Daniel F. Jacobson+
Caroline D. Kelly+
Christine G. Lao-Scott*
Jay Z. Leff+
Chase R. Raines+
Dylan S. Young+
Arnold & Porter Kaye Scholer LLP

New York Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
(212) 607-3300 601
aeisenberg@nyclu.org
cdunn@nyclu.org
pgrossman@nyclu.org

Samer E. Khalaf*
American-Arab Anti-Discrimination Committee
1705 DeSales Street, N.W., Suite 500
Washington, DC 20036
202-244-2990
skhalaf@adc.org

Nicholas Katz*
CASA de Maryland
8151 15th Avenue
Hyattsville, MD 20783
(240) 491-5743
nkatz@wearecasa.org

Massachusetts Avenue, N.W.
Washington, DC 20001-3743
(202) 942-5000
John.Freedman@arnoldporter.com

+ designates admitted pro hac vice
* designates pro hac vice application forthcoming.
** Not admitted in the District of Columbia; practice limited pursuant to D.C. App. R. 49(c)(3).

*Attorneys for Plaintiffs*